1

1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                     Judge Robert A. Mark
3

4     IN RE:
                              )
5     LUCKY CHASE II, LLC      ) CASE NO: 09-18087-BKC-RAM
            Debtor.           )
6     _____ )

7

            MOTION FOR ABSTENTION(30), RESPONSE TO MOTION
8     FOR ABSTENTION(72), MOTION TO APPOINT A TRUSTEE(31),
      RESPONSE TO MOTION TO APPOINT TRUSTEE(78), MOTION FOR
9     RELIEF FROM STAY(32), RESPONSE TO MOTION FOR RELIEF
      FROM STAY(79), MOTION TO PROHIBIT USE OF CASH
10    COLLATERAL(33), RESPONSE TO MOTION FOR USE OF CASH
      COLLATERAL(73), MOTION TO TERMINATE EXCLUSIVITY(34),
11    RESPONSE TO MOTION TO TERMINATE EXCLUSIVITY(76),
      MOTION TO ESTABLISH PROCEDURES FOR MONTHLY INTERIM
12    COMPENSATION AND REIMBURSEMENT(11), RESPONSE AND
      OBJECTION TO APPLICATION TO EMPLOY KEITH COOPER(26),
13    SETTING FINAL HEARING ON RE: EMERGENCY MOTION TO USE
      CASH COLLATERAL(9), RESPONSE AND OBJECTION TO
14    EMERGENCY MOTION TO USE CASH COLLATERAL(29), MOTION
      FOR RELIEF FROM STAY(42), PRELIMINARY HEARING ON
15    MOTION TO DISMISS CASE(49), FINAL HEARING ON RE:
      APPLICATION TO EMPLOY KEITH COOPER AND FTI
16    CONSULTING(7), AMENDED MOTION (52), MOTION TO STRIKE
      AMENDED MOTION FOR RELIEF(77)
17                        MAY 19TH, 2009

18        The above-entitled cause came on for hearing

19    before the HONORABLE ROBERT A. MARK, one of the judges

20    in the UNITED STATES BANKRUPTCY COURT, in and for the

21    SOUTHERN DISTRICT OF FLORIDA AT LARGE, at 51 SW 1st

22    Avenue, Miami, Dade County, Florida, commencing at or

23    about 2:30 p.m., on May 19th, 2009, and the following

24    proceedings were had:

25                    Reported by: Carmen E. De La Cruz

2

```
 1   APPEARANCES:

 2   BERGER SINGERMAN
     BY:   ARTHUR SPECTOR, ESQ, and
 3         DEBORAH TALENFELD, ESQ.
     On behalf of the Debtor.

 4

 5   RUDEN MCCLOSKY
     BY:   LAWRENCE GORDICH, ESQ, and
 6         MELISSA ALAGNA, ESQ.
     On behalf of AmTrust Bank.

 7

 8   ALSO PRESENT:
     KEITH COOPER
 9   SCOTT DEAKTOR

10

11                      I N D E X
     WITNESS        DIRECT     CROSS      REDIRECT      RECROSS
12   KEITH COOPER
     (Mr. Spector)  26                    62
13   (Mr. Gordich)             41                       65
     (Mr. Schneiderman)        57
14

15

16

17

18

19

20

21

22

23

24

25
```

3

1          THE COURT:  Have a seat, please thanks.

2     Can I get appearances?

3          MR. SPECTOR:  Good afternoon, Your Honor.

4     Arthur Spector and Deborah Talenfeld of Berger

5     Singerman here for the debtor, with Keith Cooper and

6     Scott Deaktor.

7          MR. GORDICH:  Good afternoon, Judge.

8     Lawrence Gordich and Melissa Alagna, who's outside for

9     just a moment checking some dates, here on behalf of

10    AmTrust Bank.

11         MR. SCHNEIDERMAN:  Steven Schneiderman for

12    the U.S. Trustee.

13         MR. SPECTOR:  Your Honor, thank you for

14    your patience.

15         THE COURT:  Is there anybody here for the

16    movant, Ortiz on the stay relief?

17         MR. ALTOMARE:  Frank Altomare for Gabriela

18    Ortiz.

19         THE COURT:  Okay.  Are you an attorney

20    or you're here --

21         MR. ALTOMARE:  No, sir.

22         THE COURT:  -- but you have her power of

23    attorney?

24         MR. ALTOMARE:  Yes, I do.  Which you have

25    a copy.

4

```
1              THE COURT:  Okay.

2              MR. ALTOMARE:  Thank you.

3              MR. SPECTOR:  Your Honor, we're here on a

4    boatload of matters.  Before we get to them one by

5    one, some of them are from the debtors' side, and some

6    of them from the bank's side and we have one -- and

7    Ms. Ortiz, as well.  Before we get to all of those, I

8    just wanted to tell you that we, at least the debtor,

9    appreciated your reaching out and suggesting

10   mediation.  We've accepted that.  We have advanced

11   things since that time, and it did break an ice #10

12   just by asking the question.

13             We, that is the debtor proposed a formal

14   proposal for settlement, and just as  recently as this

15   afternoon, we discussed the counter proposal by

16   AmTrust Bank.  We suggested the name of the mediator.

17   The bank has agreed that if this goes to mediation,

18   that would be an acceptable mediator.  We've now

19   checked with the mediator's calendar, he was okay on

20   the date, and I had forgotten when I gave it to him,

21   that Mr. Gordich had already said he had to  fish that

22   week.  Had to maintain his title, I guess.  So, we're

23   checking with Mr. Markowitz now for an earlier date,

24   which would be next week, actually.

25   Mr. Gordich has asked for a mediation on the 28th,
```

1    which is a week from Thursday.  I'm available on that

2    day.  We're  checking with Mr. Markowitz whether he's

3    available.

4             Mr. Gordich made plain to me when we had

5    this conversation just a little while, that the bank

6    doesn't agree consensually to mediate, but, of course,

7    if the Court were to order mediation, Mr. Gordich and

8    the bank would certainly participate in good faith.

9    And I have no question about that.

10            So, that's where we are.  There's counter

11   proposals back and forth, the mediator in the wings

12   and with that, we are prepared to move along with our

13   hearings today, to the extent that they're required.

14            THE COURT:  Just to put a little bit more

15   on the record.  Following the initial hearing in the

16   case on May 4th, the Court had a conference call with

17   Mr. Spector, Ms. Talenfeld and Mr. Gordich, for the

18   purpose of asking counsel whether they thought

19   mediation might be productive.  And, I believe, a fair

20   summary of the call, which wasn't all that long, was

21   that both sides or the attorney's for both sides

22   believed it could be productive, but the bank was very

23   specific in saying that while it would participate in

24   mediation, it did not want to consent to postponing

25   today's hearings.

1            MR. SPECTOR:  That's correct.  My

2    recollection is identical, Your Honor.

3            THE COURT:  Okay.  All right.  So that, I

4    probably, should have said before your update, but in

5    any event, now we have the description of the call and

6    then the description of events since.

7            So, Mr. Gordich, do you want to comment

8    either on what transpired during the call, or

9    Mr. Spector's description of upcoming hopeful

10   mediation?

11           MR. GORDICH:  Surely, I do.

12           THE COURT: Okay.

13           MR. GORDICH:  The only thing that I would

14   like to supplement with regard to constructing the

15   transcript as it were of that very brief telephonic

16   hearing, is that also I distinctly remember at least

17   one gentleman saying that he wanted parallel paths to

18   continue, including those depositions that would be

19   quite useful, and with regard to the transcript

20   of Your Honor's last hearing, where Your Honor

21   specifically asked both sides whether they would go

22   forward on those three depositions, and Your Honor set

23   a schedule for when they would be done.  So, that was

24   my recollection of the telephonic hearing.

25           And, as far as Mr. Spector's recitation of

1    where we are right now, I don't take issue with

2    everything he says, but I would like to just highlight

3    one particular issue, which is, we did everything in

4    our power to make abundantly clear that we wanted

5    those depositions.  Everything that we could do.

6    Because Your Honor was very clear on the record, and I

7    can go to specific transcript portions, but I doubt it

8    will be necessary, because I think Your Honor will

9    well remember as well, that you through colloquy

10   through counsel established that these depositions of

11   Mr. Deaktor of the 30(b)(6) under 7030 gave, set out

12   the procedures because I was unclear how it would be

13   done, and of Mr. Cooper, would be going forward and

14   they would be done by the 14th, and in a worse case

15   scenario by the 16th so that Your Honor could flush

16   out some of these issues.

17            Let's assume for the sake of argument that

18   Your Honor was inclined today to say, okay, I want to

19   get some things resolved today.  So let's just look at

20   the final orders of retention, let's just look at a

21   furthering of the order on the use of cash collateral,

22   and let's hold over for another day whether there is

23   conduct egregious enough that as a metter of law and a

24   matter of depositions and discovery that may have

25   occurred, I'm going to hold over the appointment of a

1    trustee and these other things.

2              Judge, you can't even do that today

3    because of their, what I respectfully call,

4    contumacious conduct by twarting our efforts, to have

5    those depositions.  Because now I've had a chance to

6    go back and look through the transcript, there is

7    inconsistencies in answers, not to questions that I

8    asked, but to questions the Court asked.  For example,

9    you asked of Mr. Cooper a line of questions as to who

10   does he represent and who has paid him.  It's kind of

11   interesting, because at one point we heard, and the

12   transcript will reflect, that Mr. Deaktor, Marcia

13   Deaktor and Marsha Deaktor, wife and mother of Mr.

14   Deaktor are principals of the debtor.  And that,

15   what's the name -- iStar has a lien on the equity

16   interest of the debtor.  And yet, when I looked at the

17   schedules and statements, it appears as if Mr. Deaktor

18   is not an owner anymore.  That it's actually iStar or

19   one of its subsidiaries that's an owner.

20             So, now Your Honor asked, well,

21   Mr. Cooper, who you represent and what conversations

22   did you have?  Now that I've spoken with my client, my

23   client was very desirous of me taking the deposition

24   of Mr. Cooper, unless there be any confusion, again,

25   at the risk of being redundant, everything I hear is

9

1   that Mr. Cooper is sterling.  But along with that

2   sterling comes a sterling price tag.  And we say, that

3   shouldn't be paid.  Your Honor, cut through that and

4   said, well, Mr. Gordich, if, in fact, he's being paid

5   by sources outside of the estate, how would that do

6   for you?  And I said, well, Judge, I guess I wouldn't

7   have anything to say.  I just want to find out who's

8   on first base, who's on second, what's going on.

9            THE COURT:  The schedules that you're

10  referring to, those were recently filed?

11           MR. GORDICH:  Yes, sir.

12           MR. SPECTOR:  I've got them here.

13           MR. GORDICH:  Or I have a copy.

14           MR. SPECTOR:  Yes.  They were filed on

15  time whatever the date was, May 14th.

16           MS. TALENFELD:  14th.

17           THE COURT:  Okay.  I see them now.

18           MR. GORDICH:  So, I don't know if

19  Mr. Cooper -- my client has told me they know

20  Mr. Cooper quite well, and have had, I'm not going to

21  say what the conversations were exactly, because as

22  counsel brought up in a footnote, Federal Rule 408,

23  and Mr. Spector at the last hearing suggested that he

24  ought to do a Law Review article on Section 328.

25  Perhaps he should do one on 408 and Bankruptcy Code

1    Sections 363 and 361, because obviously, this is a

2    federal court, you're a federal judge and as such, 408

3    would imply that we not talk about settlement.

4            But there's a strange counter play here

5    because 363 and 361 say, that to the extent that the

6    creditor, secured creditor, does not agree in writing

7    to the use of cash collateral, it's their duty to then

8    propose to us, quote, unquote, adequate protection so

9    that it can be used beyond our objection, and then

10    Your Honor has to look at the sufficiency of that

11    offer.  So, there's a weird interplay there that at

12    some point Your Honor does have to hear what's being

13    offered, and decide whether it's sufficient or not.

14            Be that as it may, we come back to the

15    point that, if Mr. Cooper was representing iStar or

16    representing another entity that has a claim against

17    iStar or another entity that has a claim against this

18    debtor or against the Deaktors, and if the Deaktors

19    still owe money to iStar, it's very confusing and even

20    though Your Honor could conceivably say, yes, this

21    case, although small compared to K-mart and others,

22    I'm going to let Mr. Cooper go in there and do his

23    thing as a CRO or any other thing, because I'm going

24    to make sure he's paid by someone else.  There is

25    still that initial threshold that must be met that he

1    is disinterested.

2           Now, I appreciate that they have brought

3    up the Pharmed case and some other cases for some

4    theories and that's what he was going to write the Law

5    Review article on, about under 328 that you don't have

6    to be a disinterested person under 101, and so forth.

7    But, Your Honor, to use a term that Judge Cristol uses

8    often, I just don't know if that would pass the smell

9    test.  And until I get that deposition and find out

10   what this interplay is, I'm not suggesting that

11   Mr. Cooper is doing anything nefarious or

12   inappropriate or otherwise, but maybe mistakenly he

13   hasn't thought through this whole thing.  And at the

14   very minimum, one would think that my client would get

15   the benefit of what Your Honor ordered should be done.

16          THE COURT:  Well, you enter a lot of

17   issues there, but I -- and I was listening, but I was

18   also trying to go through the schedules and statement

19   of affairs.  And in the statement of affairs current

20   officers, directors and shareholders, Scott Deaktor is

21   listed as the manager and Briarwood Holdings, LLC is a

22   hundred percent of the membership interest.

23          And I think, that's what was said at the

24   last hearing.  It's not iStar.

25          MR. SPECTOR:  Yes, sir.

1                MR. GORDICH:  I understood --

2                THE COURT:  It's not iStar.  I thought

3    that you said earlier that the mezz lender had

4    actually taken over.

5                MR. GORDICH:  I understood that

6    Mr. Deaktor owned the debtor at some point.

7                MR. DEAKTOR:  Still do.

8                MR. GORDICH:  Okay.  He just said, still

9    do.

10                THE COURT:  Well, Briarwood Holdings --

11                MR. GORDICH:  But it's not on the

12    schedules.

13                MR. SPECTOR:  He does not own the debtor.

14                MR. GORDICH:  Well --

15                MR. SPECTOR:  Briarwood owns this.

16                THE COURT:  I have my notes from the 4th,

17    and I have Lucky Chase, and then Briarwood, and I

18    don't know what LCW stands for.

19                MR. SPECTOR:  LCW is the name.  That's the

20    parent company of them all.  I'm not sure whether --

21    it could be Lucky Chase Windsor.

22                THE COURT:  And I --

23                MR. SPECTOR:  I don't know what it means,

24    but it's LCW.

25                THE COURT:  And iStar is the mezz lender

1    to Briarwood, and still has a pledge of Briarwood --

2                MR. SPECTOR:  IStar is the one that holds

3    the pledge of the interest of all of the entities.

4                THE COURT:  So they have a --

5                MR. SPECTOR:  There's a whole lot of

6    entities besides Lucky Chase.  Lucky Chase is just one

7    of many entities.

8                THE COURT:  I'm not sure it's directly

9    relevant, but just for my own little chart here, iStar

10   is a mezz lender to which entity?

11               MS. TALENFELD:  LCW, Your Honor.

12               THE COURT:  Okay.

13               MR. SPECTOR:  IStar is a mezz lender, it's

14   not any participant, it's a third party.

15               THE COURT:  No, I understand that.  But

16   the discussion at the last hearing was that it was

17   because of iStar's leverage as a mezz lender to the

18   ultimate parent company and various other affiliates,

19   that the debtor was required to bring in an ace turn

20   around manager, and perhaps required to bring in

21   Mr. Cooper specifically.

22               MR. SPECTOR:  Mr. Cooper is prepared to

23   testify in support of the debtors application for

24   employment of FTI Consulting as the CRO.  All of these

25   things can be done on the record, under oath, in a

1    matter of ten minutes.

2              THE COURT:  Okay.  Well, why don't we go

3    back to the -- before Mr. Gordich started --

4              MR. SPECTOR:  Well, I don't know --

5              THE COURT:  -- which was the depositions

6    and why the principals --

7              MR. SPECTOR:  Fine.  Let's go back to the

8    chronology.  We had contested matters galore on the

9    day we were in court last.  The following day Your

10   Honor -- and, at that hearing, the contested matters

11   galore, the first day hearings, the Court set an

12   ambitious schedule of depositions.  Let's say, let's

13   make sure we get them in by May 14th.  The very next

14   day we got a request for dates from, I think, it was

15   Mr. Gordich's office.  I'm not sure who from the

16   office.  That very day I forwarded to Mr. Cooper and

17   Mr. Deaktor and asked them to give me available dates.

18              The next day Your Honor set up the call,

19   and it seems plain to me, the thinking would have been

20   necessarily before we head down all of this litigation

21   on even first day matters such as employment, let's

22   take a break, primarily because we've already said our

23   proposal is to pay them in full, and not cram them

24   down.  My thinking and perhaps the Court's thinking,

25   let's see if we can cut to the chase, no pun intended,

1   and get this thing resolved with a mediation.

2            So, we had the call on the mediation.

3   Both sides, at least we're agreeing to it, green

4   lighted it right away.  Fine, let's talk.  And

5   Mr. Gordich was amber, at the worse, but green -- you

6   know, light green towards it.  So, after the Court

7   hung up the phone call, we got together again on a

8   separate line, and my statement, my verified response,

9   lays out what the essence of that conversation was,

10  which included let's not go through the depositions

11  which we amen.  That came from Mr. Gordich, we amen,

12  yes, of course, that makes sense.  And then it was

13  coupled with Mr. Gordich's suggestion that I come up

14  with names of mediators, which I did off the top of my

15  head.  Three names that came to my mind, because I've

16  used them in the past or others I knew had used them

17  in the past.

18           Then came the idea that, you should

19  prepare a formal, you, meaning the debtor, should

20  prepare a formal proposal for settlement to get things

21  moving.  That's when I hesitated and said, well, let's

22  get the mediator in because some mediators don't like

23  you to do it on your own, they want to go through

24  them.  Let's see what the mediators protocols are.

25  That's where we left it.  The next day I went off to

1    the -- the next day?  Yeah, the next day, the 7th --

2    Thursday, whatever Thursday was, which, I think, was

3    the 7th.  I went off to Bonita Springs for the

4    Bankruptcy Bar Retreat.

5              On Friday the 8th, I get an e-mail from --

6    I'm trying to do this from my head, I shouldn't.  I

7    had it all written down here.

8              THE COURT:  Well, on the 8th Mr. Gordich

9    according to the e-mail attached to the notice of

10   non-compliance made it clear that he never agreed and

11   still didn't agree to --

12             MR. SPECTOR:  Oh, I know what it is.

13             THE COURT:  -- cancelling the deposition

14   or to not take the deposition.

15             MR. SPECTOR:  I'm in Bonita Springs,

16   Ms. Talenfeld sent form of the mediation order, that

17   we thought had been agreed to on the phone.  In it, it

18   included a stay of discovery, the last paragraph.

19   Somewhere when I was in Bonita Springs I see an e-mail

20   back from Mr. Gordich, actually from Ms. Talenfeld

21   attaching Mr. Gordich's e-mail, saying, wait a minute,

22   I didn't agree to that, blah, blah, blah, et cetera.

23   Maybe you've seen the e-mail.

24             That's when I decided, all right, what he

25   wanted, if you look carefully at the e-mail he talks

1    about, you didn't give me a formal proposal.  I said,

2    all right.  Let's capitulate on that.  When I got

3    back, we got together with Mr. Cooper, Mr. Deaktor, we

4    formulated the formal proposal.  We got it to him,

5    that Monday, the 11th, and said, here it is.  Okay.

6    That's what you wanted.

7             At that point we thought we'd complied

8    with everything he needed, and we were okay with that.

9    I then contact -- I then contact, I think it was the

10   11th, I think it was -- the 11th, Mr. Cooper, that was

11   Monday, asked me whether his deposition was on for

12   Thursday, because he had told me, I could do Thursday

13   morning.  That's when all this blew up.  I said, okay,

14   let's get this in.  So, I got in the formal proposal

15   for settlement.  And then I told him, okay, we -- your

16   deposition won't be going.  I never talked, never gave

17   a date to Mr. Gordich.  I gave him the settlement

18   proposal and never heard another thing.

19            Now it's the 13th, at four something p.m.,

20   that's Wednesday the 13th, and I get this voicemail on

21   my -- I think it was my cell phone or it was bled

22   over.  It was carried over to my cell phone, saying,

23   I'm very mad -- you know, at first he said the

24   settlement proposal went miles towards getting us

25   together, but I want to let you know we are

1    disappointed, we didn't get any dates for the

2    depositions.  And that's when I immediately -- I think

3    I heard it the next morning, I immediately called him

4    at 9:20 in the morning, and again at 11:20ish, saying,

5    wait a minute and he had a series of questions.  In

6    his e-mail -- in his voice mail to me he said, and

7    assuming Mr. Markowitz is picked, can you find out if

8    he's available?  Can we do it the next couple of

9    weeks?  Can we do it in my office in Brickell?  Can we

10    -- et cetera, all this, questions like that.  So I

11    called him that morning and said, okay, let's go

12    through it.  He wasn't in.  I called him again in the

13    morning, okay, let's go through those questions.  He

14    wasn't in.  I sent him an e-mail that morning.  You

15    asked me to get ahold of you.  I've called you twice,

16    and sent an e-mail.  Get ahold of me.

17              I think I've been sandbagged.  I think

18    I've been set up.  I would have been happy.  In fact,

19    it might of been possible to get Mr. Cooper down by

20    the Thursday date, if he had been responsive.  I think

21    I've been sandbagged to set this up as a false

22    dispute.  In addition, Your Honor, if we are

23    mediating, which is what I thought we were doing from

24    the day we spoke on the phone, why are we also

25    litigating?  What's the benefit of the mediation, if

1    you're going to be spending the money on litigation?

2              So, it was my belief, Ms. Talenfeld had

3    the same belief having the conversation, that as long

4    as we -- his only condition to being okay with the

5    mediation, was giving us a proposal.  We didn't think

6    it was a good idea, but we finally gave it to him on

7    Monday.  We didn't hear anything for two more days,

8    other than that went a long ways towards getting us to

9    mediation.  Oh, by the way, what about the

10   depositions?

11             THE COURT:  All right.  Now, Mr. Gordich,

12   I'm really not going to have a long hearing on who

13   said what.  I'm satisfied that there was a

14   misunderstanding as to whether the depositions would

15   be postponed based on their communicating a proposal,

16   even though your offer says you wouldn't consider

17   canceling or postponing the depositions unless there

18   was a proposal that was close enough for your client

19   to give you the authority to postpone.  And

20   apparently, it didn't, but at this point, I note you

21   noticed non-compliance.  I'm not going to make a

22   ruling on that right now.  You can argue as we get

23   into whatever matters are going to be contested today,

24   why I shouldn't grant relief based on the witnesses

25   not appearing for deposition.  But I don't want to

```
 1    hear anymore about who said what to whom and who

 2    thought things were going forward or not going

 3    forward.

 4              So, one of the things you said earlier,

 5    Mr. Gordich, so I think this is probably pretty

 6    accurate is that we are in a position where we need to

 7    take some further action on the retention issues and

 8    the use of cash collateral.  The trustee motion and

 9    the stay relief motion, and dismissal motion, I think,

10    are all set for non-evidentiary preliminary hearing

11    today any way.

12              MR. SPECTOR:  Correct.

13              THE COURT:  Abstention and termination of

14    exclusivity, I'm inclined to just deny, because they

15    don't really add much to the mix, but if we're going

16    to continue the other things, it doesn't -- apparently

17    we need to continue those as well, if -- setting

18    hearings after mediation.  If we're setting hearings

19    after mediation and carrying everything is requested

20    by the bank, I would probably do that.

21              MR. SPECTOR:  We would have no objection.

22              THE COURT:  So, where are we on cash

23    collateral?

24              MR. SPECTOR:  We left it this way, Your

25    Honor:  Your Honor recognized the last time we got
```

1    together that really what we're asking for in the

2    budget is just to maintain the property, which the

3    bank would have to do if it were running itself, with

4    the exception of professional fees.

5            THE COURT:  Right.

6            MR. SPECTOR:  And Your Honor said, okay,

7    and if the bank objects to that we'll have a hearing

8    on that.  And that's really what we're here about

9    today.  With respect to that, we have prepared

10   Mr. Cooper to testify, and if Your Honor takes the

11   position that the bank is somehow prejudiced by this,

12   you know, we'll deal with that.  If you think it's

13   necessary to come back again.  But to clear the air,

14   there was so much, the word is chaff, C-H-A-F-F,

15   thrown up in the air.  I like to be able to be focused

16   on one issue at a time.  What I heard was just a, I

17   don't know, a mind meld or something.  That's a poor

18   expression.  That's not what I meant.  We just heard

19   everything that the bank might have a grievance about

20   in every manner all at one time.  There is no -- not

21   even a way to keep track of all the statements.  And

22   Your Honor --

23           THE COURT:  Well, I'm not asking you to

24   respond to Mr. Gordich's --

25           MR. SPECTOR:  Well, that's good, because I

1    wouldn't know where to begin.

2              THE COURT:  But let's keep it on track

3    where I believe the lawyers here are all professionals

4    and are basically working well together with the

5    exception of a misunderstanding about the depositions,

6    which is not necessarily a small matter, as we go

7    forward, but I just don't want to spend time getting

8    into areas that dispute over e-mails and who called

9    who, and who returned a call when, and what exactly

10   was said when.  It does appear that there's agreement

11   to mediate and we've got to address certain other

12   issues today.

13             Let me ask Mr. Gordich on cash collateral

14   whether extending the use of cash collateral under the

15   conditions of the interim order is acceptable?  I'm

16   not saying the debtor is going to withdraw its request

17   to include payment of professional fees, but the

18   interim order, I mean, basically has operating

19   expenses and no use of cash to pay professional fees.

20             MR. GORDICH:  We take the same position as

21   last time that if the cash collateral is going to be

22   used, it ought to be used by a trustee.  And with

23   regard to the retention, we have no objection to the

24   retention of Mr. Spector's firm.

25             MR. SPECTOR:  With regard to the latter, I

1    have to give a full disclosure.  There's more --

2    there's an amended disclosure that's going to be

3    coming in.

4             In the process of -- so, I'm not asking

5    for the Court to enter the order approving our

6    employment until you have all the information, Your

7    Honor.  So, I'd like to take that off the table for

8    today.  That's why I said, we'll do FTI's today, but

9    not ours.  In the process of preparing the schedules

10   for filing, one of the questions, question Number 3,

11   of -- pardon me, Schedule B(3) I think it is payments

12   to insiders.  There was a list that was attached, some

13   of the names on that list, money that was paid by the

14   debtor to affiliates, some of those affiliates were at

15   one time represented by Berger Singerman.  I would

16   like to disclose that in a supplemental application --

17   supplemental declaration in support of the application

18   for employment.  We're going through the time records.

19   We're going through when -- some of them were

20   discontinued and finished years ago.  Nevertheless, as

21   you all know, it's much better to fully disclose than

22   partially disclose.

23             So, before we get any further, I wanted to

24   say that right now.  And we'll give you a more

25   detailed thing in writing when we get it.  And, I do

1    appreciate Mr. Gordich's consent to the employment,

2    but we don't think Your Honor should enter an order

3    until we fully disclose, not that we have any concern

4    about it.

5            THE COURT:  But for present purposes other

6    than the issue of whether there be any interim payment

7    from the estate through the use of cash collateral or

8    compensation procedures, you're still operating under

9    an interim order?

10           MR. SPECTOR:  Yes, sir.

11           THE COURT:  Okay.  But that didn't expire

12    today?

13           MR. SPECTOR:  I think it does.

14           THE COURT:  Or, did it?  Cash collateral

15    order does, but I'm talking about the retention order.

16           MR. SPECTOR:  Oh, no.  I don't believe

17    that expires, no.  And if Your Honor would simply say

18    it's continued without date, that should do it for the

19    record any way.

20           THE COURT:  For some reason, I don't even

21    know if we had it on our calendar.

22           MR. SPECTOR:  Well, then there's no harm

23    then.

24           THE COURT:  Well, the order -- the interim

25    order set it for today, I think it just may have maybe

1    not -- it doesn't --

2              MR. SPECTOR:  Then I'll just ask for a

3    continuance for a week or so, so that we can, you

4    know, get you the updated information.

5              THE COURT:  All right.

6              MR. SPECTOR:  Now, the Deaktor -- strike

7    that.  The application for employment of the CRO is

8    something we would like to get nailed down, separate

9    and apart from the cash collateral part of it, use of

10   the cash collateral part of it.

11             Your Honor, there were all sorts of

12   strange allegations from AmTrust Bank about the

13   relationship between FTI and Mr. Cooper.

14             THE COURT:  Okay.  Why don't you just put

15   Mr. Cooper on?

16             MR. SPECTOR:  And I'd like to clarify that

17   today, if I can.

18             MR. GORDICH:  Your Honor, it was our

19   anticipation that we would get a deposition as per

20   your order, so that we could inquire into many things.

21   To put him up now and give, you know, whatever period

22   of time now, I've been accused of sandbagging today,

23   and I understand you don't want to go into that and I

24   won't go into that, but --

25             MR. SPECTOR:  He can reserve his

1    cross-examination if he feels it's necessary, Your

2    Honor.  We still can put our direct.

3              THE COURT:  Let's put him on and let's see

4    where we're going.  There's already an interim order

5    retaining him so.

6              MR. SPECTOR:  Keith Cooper, please.

7    THEREUPON:

8                   KEITH COOPER,

9    after having been first duly sworn, was examined and

10   testified as follows:

11                 DIRECT EXAMINATION

12   BY MR. SPECTOR:

13   Q.   Please state your name and occupation for the

14   record, and your business address?

15   A.   My name is Keith Fred Cooper.  I'm a Senior

16   managing director with the company called FTI

17   Consulting, Incorporated.  My business address is 1201

18   West Peachtree Street, Suite 500, Atlanta, Georgia,

19   30309.

20   Q.   Thank you.  Would you please explain to the

21   Court how you first came into association in any form

22   with Mr. Deaktor and his affiliated -- and his

23   companies?

24   A.   Yes, I came into -- my initial association

25   with Mr. Deaktor and his mother and his wife back in

1    October of 2006, in connection with the restructuring

2    of the Windsor at Pembroke Cay property, restructuring

3    that debt.

4        Q.    And what is Windsor at Pembroke Cay?

5        A.    Windsor at Pembroke Cay is another apartment

6    to condo conversion project owned by the Deaktors.  It

7    was owned by the Deaktors at the time, and ot had debt

8    outstanding to HSBC.  Actually, a group of banks led

9    up by HSBC, as well as iStar financial had a mezzanine

10   lien of $15 million.

11       Q.    So you came in first to work solely with the

12   Pembroke Pines location?

13       A.    Yes, I worked as a financial advisor in

14   connection with that property.

15       Q.    Did your relationship as financial advisor

16   ever change to some other relationship?

17       A.    Yes, as the engagement progressed, HSBC

18   requested of Scott, of the Deaktors, to elevate my  --

19   and change the nature of my engagement from simple

20   financial advisory role to a chief restructuring

21   officer of Windsor.

22       Q.    Did you at that time have any work associated

23   with the Windsor at Pembroke Cay for other entities of

24   the Deaktor chain of companies?

25       A.    Yes.  As the restructuring progressed we

1    ended up having to do a global restructuring of the

2    Deaktor entities, in addition to Windsor -- Windsor at

3    Pembroke Cay.  At that time the Deaktors had another

4    one -- actually, three other main properties that they

5    were converting from apartments to condos.  One was

6    Biscayne Beach Club, one was the St. Michelle, and

7    then the other one was Briarwood or The Falls at

8    Briarwood.

9        Q.    Which is the property involved in this case;

10   right?

11       A.    Yes, it's the property that's owned by Lucky

12   Chase II.

13       Q.    Now, fast forward to the end of 2008 or I

14   guess it would be the early part of 2009.  Did there

15   come a time that you have became formerly engaged by

16   Lucky Chase II, LLC, the debtor?

17       A.    Yes, I was formerly engaged in very near the

18   end of April, I think, April 28th or something like

19   that, 27th, of 2009.

20       Q.    In the role of what?

21       A.    In the role of chief restructuring officer.

22       Q.    And was this -- before I ask that question,

23   before you took on that role, had you consulted iStar

24   with respect to taking on that role?

25       A.    Yes.  Since the restructuring of Windsor --

1    at the time, Windsor was a fairly uncomplicated

2    capital structure.  It had HSBC as its first lien

3    lender.  It had iStar as a mezzanine lender who had

4    certain rights with respect to the debt owned or

5    represented by HSBC.

6              So, as a result of that restructuring,

7    iStar ended up providing a loan to a new entity that

8    was created called LCW Company.  And as a result of

9    that restructuring, that was effectuated in February

10   of 2007.  There were cross defaults put in place with

11   respect to the iStar loan, with respect to all the

12   other properties.

13             So, to the extent that St. Michelle went

14   into default that would impact the LCW company loan,

15   and the iStar financial loan and same way with all the

16   other entities.

17   Q.   Mr. Gordich on behalf of AmTrust Bank filed

18   an objection to the employment of your firm in this

19   role.  I'm going to walk you through a couple of the

20   paragraphs of that objection to see if you can answer

21   some of his concerns.

22   A.   Okay.

23   Q.   In Paragraph 27, AmTrust Bank states it is

24   unclear as to the hourly rate that you personally are

25   being billed at for this engagement.  Can you tell the

1   Court what that hourly rate is?

2       A.   Yes, my standard hourly rate is $825 an hour.

3       Q.   And, are there any other people at FTI

4   consulting who are primarily responsible for this

5   engagement besides yourself?

6       A.   Yes, there were two other individuals.

7       Q.   They are whom?

8       A.   Shawn Harding and Richard Baxter.

9       Q.   Do you know the hourly rate that they're

10  billed at?

11      A.   Yes, I do.

12      Q.   What is that?

13      A.   Shawn Harding there's a standard hourly rate

14  of $675 an hour, and Richard Baxter's standard hourly

15  rate, excuse me, $420.

16      Q.   Before you took on the role formerly in April

17  of 2009 as CRO of Lucky Chase II, LLC, had you done

18  any negotiating with people at AmTrust Bank with

19  regard to the loan that's at issue in this case?

20      A.   Yes, I had.

21      Q.   When did you do that?

22      A.   Actually throughout -- well, actually dating

23  back to 2007 and in the restructuring that I referred

24  to earlier with LCW Company and Windsor Pembroke

25  Pines, as well as then later on in 2008 with respect

1    to a subsequent sale and restructuring transaction

2    that occurred, again, with respect to Windsor during

3    the summer of 2008.

4         Q.   So, your engagement at that point was for

5    Windsor, but it had the side ramifications, you had to

6    get into it, involved with Lucky Chase; is what

7    you're saying?

8         A.   That's correct.  I was acting at that point

9    in time as a financial advisor to Windsor in

10   connection with iStar financial loans.  At that point

11   in time as part of the 2007 restructuring, iStar took

12   out the first mortgage from HSBC, and so, it was the

13   single lender who totally held both the first lien

14   mortgage level, as well as mezzanine level.  And then

15   in addition, the LCW Company which is -- became the

16   new owner of all the properties prior to February

17   2007, and this is when, of course, some of the

18   confusion came in.  The Deaktors both Scott and

19   Marcia, as well as his mother Marsha owned directly

20   each of those apartment complexes.  So Windsor was

21   owned directly by the individuals.  The St. Mitchel

22   was owned directly by the individuals.

23              As part of this 2007 restructuring, the

24   new company, LCW Company, was incorporated as a

25   limited liability company and the ownership interest

1    of each of those apartment complexes were transferred

2    from the individuals; Scott, Marcia and Marsha to LCW

3    Company.  The LCW Company then is owned by Scott and

4    Marcia Deaktor, his wife and well as Marsha Deaktor

5    his mother.  So that's where the confusion comes in.

6        Q.    For the record, when you do the Marcia,

7    Marcia.  One's C-I-A, and one's S-H-A.

8        A.    Yes, the C-I-A is his wife, and S-H-A is his

9    mother.

10       Q.    It's not Darrel and the other brother Darrel.

11   It's different.

12             In Paragraph 28, of the AmTrust response the

13   bank says that --

14             THE COURT:  So, LCW -- I'm sorry to

15   interrupt.  So LCW is part of the restructuring then

16   pledged its ownership interest of all three entities

17   to iStar to secure the mezzanine lender?

18             THE WITNESS:  That's precisely correct,

19   Your Honor.

20   BY MR. SPECTOR:

21       Q.    The -- Paragraph 28 of the response says that

22   FTI served in the capacity which you're serving in now

23   for an extended period of time and hasn't been able to

24   help the debtor restructure its debt.  Appropriately

25   manage the assets, et cetera.  I'm going to ask you a

1    question about that allegation.

2         Did FTI Consulting assist the Deaktors or the

3    Deaktor entities in the engagement since 2006, and if

4    so, how?

5    A.    Yes, we have.  When we first -- when we

6    actually were first retained there was a total debt

7    of, I think, in excess of $300,000,000 between all the

8    four entities.  As a result of the restructuring

9    transaction in 2007, in addition to convincing iStar

10   to take out the first mortgage lender in the Windsor

11   property, we also convinced them to advance in the new

12   loan $6 million to LCW.

13        So, there was a new capital injection into

14   the entities via iStar Financial.

15             THE COURT:  Did any of that make its way

16   down to this debtor?

17             THE WITNESS:  Not that I know of, no.  It

18   was put in LCW to assist with, primarily with Windsor,

19   and actually, Biscayne Beach Club actually at the

20   time.

21   BY MR. SPECTOR:

22   Q.    And in 2008, when you had negotiations one on

23   one, perhaps in a role for a different entity, but

24   extensively to help Lucky Chase with either Ohio

25   Savings Bank or AmTrust Bank, one or the another since

1    it's the same loan, what was your experience there?

2    Were you able to help Lucky Chase in that loan

3    negotiation in 2008 with AmTrust or its predecessor?

4         A.    Well, yes.  I mean, again, throughout post-

5    February 2007, we ceased serving as the CRO, and

6    really turned into and changed the nature of our

7    engagement to the financial advisor.  Initially, we

8    had -- there was troubles with the lender on Biscayne

9    Beach Club.  We worked through those.

10         We successfully obtained a restructuring with

11    that lender, and eventually, again, convinced iStar to

12    take that lender out, to pay them out, and then

13    subsequently, again, in the summer of 2008, there was

14    a sale of Phase II and III.  Windsor had three phases.

15    It's a very, very large apartment complex and it was

16    split up into three separate phases for condominium

17    purposes.  He had -- Windsor had only started the

18    apartment to condo conversion on Phase I.

19         That is one that's still in existence, but

20    over, almost 300 units were in Phases II and III.  And

21    those were sold off to a buyer, and then that -- those

22    proceeds were used to pay down the Windsor loans, as

23    well as actually a portion of those proceeds were used

24    to fund certain operations of Deaktor North, which is

25    -- actually, I'm sorry, there was a third, excuse me,

35

1    a fifth operation.  It's rental units up in Pittsburg

2    owned by the debtor.

3            Again, that's owned by the LCW Company, which

4    are owned by Scott and Marcia, and Marsha Deaktor.

5        Q.   Is it fair to say that looking at 28,

6    Paragraph 28, in a narrow sense that AmTrust is right,

7    you were unable to help Lucky Chase in its

8    negotiations with AmTrust in 2008?

9        A.   That is true.  As Mr. Gordich mentioned

10   earlier, we did -- I did have discussions, and clearly

11   they were for settlement purposes.  So, I don't think

12   I'm supposed to describe it --

13       Q.   Yes.

14       A.   -- the content of those discussions, but we

15   had those discussions and they did not move forward.

16       Q.   So you re-negotiated and worked out all the

17   other obligations that were out there for all the

18   other Deaktor entities, but this is the one that you

19   couldn't bring home?

20       A.   Yes, and as part of that --

21           MR. GORDICH:  Objection, Your Honor.  I

22   just want to make sure that the Court notes that he's

23   now opened up Pandora's box, on a whole new line of

24   questioning that I'm going to ask the Court to let me

25   cross-examine on.

1          MR. SPECTOR:  Well --

2          THE COURT:  I won't rule because that

3    didn't state an objection, but --

4    BY MR. SPECTOR:

5    Q.    Let's move then to Paragraph 29 --

6          MR. GORDICH:  It's irrelevant to what the

7    one issue that's supposed to be before the Court now,

8    and therefore, it was answered and I need to --

9          THE COURT:  Well, we'll get to that when

10   you get to the scope of your cross.  I'm not going to

11   -- if your objection is to relevance, I'm overruling

12   it.

13   BY MR. SPECTOR:

14   Q.    Paragraph 29 says, FTI is currently owed a

15   substantial amount of money by the debtor or an

16   unnamed affiliate.  Can you answer that clearly so

17   AmTrust Bank can understand what your financial

18   relationship is at the present time with Lucky Chase

19   and with any affiliates?

20   A.    Yes, all my billings prior to my engagement

21   with Lucky Chase II, LLC on April 27th, whenever it

22   was.  I don't have the engagement letter in front of

23   me.  Were billed to the Windsor entity.  Windsor

24   Pembroke Cay, LLC, I believe, is the name.  And all

25   our fees have been paid.  We had incurred substantial

1    fees over the two years and we have been paid all but

2    the 200,000.

3         Again, those services were rendered in

4    connection with Windsor and all the cross default

5    issues that arose with respect to the Windsor

6    currently there is $39 million outstanding on Windsor

7    to iStar Financial.  So, there's a substantial amount

8    of debt outstanding.  The total of that outstanding on

9    all the four, excuse me, now it's down to three, the

10   projects here in Florida for the LCW Company are

11   approximately 85, $86 million.

12        Q.   That's not owed to FTI, that's --

13        A.   No, no.  I'm sorry.  I'm describing the

14   substantial amount of debt that iStar Financial has

15   significant interest in, and all the cross default

16   issues that arise there from.

17             MR. GORDICH:  Move to strike as

18   unresponsive.  He asked him how much was owed to his

19   company, and then he went into a diatribe about the

20   complexities of the different phase.

21             MR. SPECTOR:  Your Honor, may I respond?

22             THE COURT:  Yeah, I'm -- overruled.  I'm

23   not concerned about things that may get a little bit

24   beyond the specific scope of what the Court may need

25   to determine for the Cooper retention if it's not --

1    not prejudicial to anything that's going on in this

2    case, if we get a little bit more background.

3              MR. SPECTOR:  Thank you, Your Honor.

4    BY MR. SPECTOR:

5        Q.   Skipping down to 32, it talks about the

6    retainer debtor paid.  It says here retainer from the

7    debtor in the amount of $25,000 on April 29th, 2009.

8    It says you don't disclose the source of the funds.

9              Can you disclose the source of the funds for

10   us, please?

11       A.   Yes, I can.

12       Q.   Okay.  Who would that be?

13       A.   That would be from a company called Deaktor

14   -- Deaktor Processing, LLC, or something like that.

15   An unrelated entity or related, it's an affiliate of

16   LCW, excuse me, Lucky Chase II, but it is not Lucky

17   Chase II.  It came from a related Deaktor entity.

18   Excuse me, I think it's Deaktor Documents, LLC.

19       Q.   Whatever it is.

20       A.   But it's --

21             THE COURT:  And that was disclosed at the

22   last hearing.

23   BY MR. SPECTOR:

24       Q.   In Number 33, it says presumably the source

25   of the funds was AmTrust cash collateral rent issues

1    and profits; is that true or false?

2        A.    I'm sorry?

3        Q.    Would the source of the funds be from AmTrust

4    rents, issues, profits of cash collateral?

5        A.    No.

6            THE COURT:  We covered this already last

7    time.

8            MR. SPECTOR:  Okay.

9    BY MR. SPECTOR:

10        Q.    34 is the last one I'm going to cover.  It

11    says here that FTI, according to AmTrust, it's their

12    position that FTI is apparently the recipient of

13    substantial payments from the AmTrust cash collateral.

14    I guess you already answered that.  I suppose you

15    already answered the same thing, that's obviously

16    before.  So, that's been answered.

17            MR. SPECTOR:  I don't have any other

18    questions for this witness, and I would turn the

19    witness over to Mr. Gordich.

20            THE COURT:  Let me ask a couple things.

21            MR. SPECTOR:  Sure.

22            THE COURT:  Is the iStar loan to LCW in

23    default?

24            THE WITNESS:  Currently it is in default,

25    yes.

1              THE COURT:  Okay.  And is -- did iStar

2    insist that you be brought in as CRO of Lucky Chase,

3    and -- in order for them to not exercise their --

4              THE WITNESS:  Correct.

5              THE COURT:  -- interest?

6              THE WITNESS:  That's correct.

7              THE COURT:  Okay.  And how much are you

8    owed, based on your -- you and your firms hourly

9    services since the petition date; do you know?

10             THE WITNESS:  Since the petition date,

11   actually per the U.S. Trustee, the fees that I had

12   disclosed on the first day hearings, included fees

13   incurred on the 29th, but prior to the time of filing.

14   And, I think, Mr. Schneiderman would like us to

15   consider all fees incurred on the 29th, to be

16   considered post-petition.

17             So, in that case we've incurred about

18   approximately, $30,500.  About 9,000 of that was on

19   the 29th.  So that was -- we have incurred about 7,500

20   prior to the 29th, in April, before the filing.

21             THE COURT:  So --

22             THE WITNESS:  So total fees are $38,500.

23             THE COURT:  That's --

24             THE WITNESS:  And that was through Sunday,

25   Your Honor.

1                THE COURT:  Okay.  But that -- that's

2    after application of the 25,000 or no?

3                THE WITNESS:  The 25,000 has not been

4    applied to any of that.

5                THE COURT:  Okay.

6                THE WITNESS:  So, you take the 25,000 off

7    of that.

8                THE COURT:  So, over and above the

9    retainer, you're owed --

10               THE WITNESS:  Approximately, 13,000 and

11   change.

12               THE COURT:  And has any third party

13   guaranteed your fees as CRO of Lucky Chase?

14               THE WITNESS:  No.

15               THE COURT:  All right.  Mr. Gordich.

16                   CROSS-EXAMINATION

17   BY MR. GORDICH:

18       Q.   Sir, did you -- did I hear correctly that

19   you're owed above and beyond the $25,000 retainer,

20   you're owed another $13,000, approximately, give or

21   take from this last Sunday?

22       A.   No, I'm sorry, through last Sunday.

23       Q.   Through last Sunday?

24       A.   Yes, this past Sunday.

25       Q.   Right.  So, whatever -- up till last Sunday,

1    another 13,000, so $38,000 would bring you current,

2    and then from this past Sunday to today whatever it

3    is?

4         A.    That's correct.  We have not had hardly any

5    hours since May 17th.

6         Q.    Understood.  And perhaps you answered and I

7    just didn't understand it or hear it.  Somewhere in

8    the disclosure it says that you're owed from one of

9    the entities somewhere around $225,000?

10        A.    That's correct.  From Windsor Pembroke Cay.

11        Q.    Okay.  And, are there ever any other inter

12   company transfers of all these different companies

13   from one to another?

14        A.    Yes, I believe there is.

15        Q.    Okay.  So there might, in fact, be debts

16   between these inter companies -- I'm sorry, between

17   these companies; correct?

18        A.    Yes, there is.

19        Q.    And, as a matter of fact, there probably is

20   if there's inter company transfers; right?

21        A.    That's correct.

22        Q.    Okay.

23        A.    I believe they are disclosed on the sofa's

24   and schedules.

25        Q.    Okay.  Now, Judge Mark asked you a question

1    about iStar.  I don't know, I don't remember the words

2    he said commanding or compelling or I don't remember

3    the word, asking.  I'll just say, for you to be

4    appointed as the CRO in this case; correct?

5         A.   That's correct.

6         Q.   Why?

7         A.   Because of the cross collateral -- cross

8    default issues, and quite frankly, this is one of the

9    properties that has potential upside equity in it, and

10   that because of the amount of debt outstanding,

11   primarily, on Windsor, if you look at Windsor's by the

12   -- by itself, they're probably underwater.  The value

13   of the underlying property does not exceed the amount

14   of debt.  And so, therefore, they are -- iStar is

15   looking to these other developments which is St.

16   Mitchel and Briarwood, Lucky Chase II has potential

17   recoveries.  So, that's why.

18        Q.   Okay.  So, they're hopeful that you can do

19   good things in this case, and the other case to get

20   them paid in another case where they're undersecured?

21        A.   Yes.

22        Q.   Okay.  Do you recall at the last hearing that

23   you said that --

24             THE COURT:  Let me just -- I'm sorry,

25   Mr. Gordich.  Is it just one loan or are there several

1    loans?

2              THE WITNESS:  Well, there's actually --

3              THE COURT:  I'm talking about from iStar.

4              THE WITNESS:  From iStar there are

5    multiple loans.  There is -- I think there's still an

6    amount outstanding on the first lien mortgage on

7    Windsor.  That's owed to iStar, then there's the --

8              THE COURT:  But that -- they have an

9    actual first lien on from taking out HSBC?

10              THE WITNESS:  That's correct.

11              THE COURT:  But on the mezz loans, whether

12    it's in one loan or a series of loans, it's all cross

13    collateralized by the ownerships interest in the three

14    projects?

15              THE WITNESS:  That's right.

16              THE COURT:  Or is it more than three

17    projects?

18              THE WITNESS:  Well, there's actually more

19    than -- there's the three projects here in Florida's

20    that's left; Lucky Chase II, Windsor and St. Mitchel.

21    And then there's the Deaktor North properties which

22    consist of rental properties up in Pittsburgh.

23              THE COURT:  There's also the ownership of

24    those properties or the entities that own those

25    properties has also been pledged?

1              THE WITNESS:  That's correct.  And then,

2    that all roles up into the LCW Company, parent.  All

3    the ownership interest in all those projects have been

4    transferred to and are now owned by LCW Company.  And

5    then the Deaktors have the equity interest in that,

6    but LCW Company, as you indicated earlier, have

7    pledged the equity interest in each of the operating

8    projects to iStar.

9              THE COURT:  Okay.  So iStar's hope is that

10   there will be equity from this project upstreamed to

11   LCW to help pay down the mezz loan?

12             THE WITNESS:  That's correct.

13             THE COURT:  Okay.  All right.

14   BY MR. GORDICH:

15      Q.   Do you recall at the last hearing that, when

16   you were answering one of Judge Mark's questions about

17   why you were brought in this case, you said to take

18   control of the checkbook?

19      A.   Yes, that was one of them.  Yes.

20      Q.   Okay.  And when did you -- are you the CR --

21   subject to Judge Mark's approval, are you the CRO now?

22      A.   Subject to the Court's approval, yes.

23      Q.   And when did you first take over the helm?

24      A.   I guess when I -- when I was assigned the

25   engagement letter.  So, April, April 27th or whatever.

1    Q.    And were you at the helm when any of these

2    closings out of trust occurred?

3    A.    No, I was not.

4    Q.    Okay.  And, you were consulted --

5    A.    I'm sorry, but by out of trust you mean the

6    closings that occurred and were closed with the new

7    mortgage company, that were not approved by Ohio

8    Savings; is that what you mean?

9    Q.    What I mean by precisely, but thank you for

10   asking, is where the debtor asked for AmTrust to agree

11   to a fourth reduction of the release prices, AmTrust

12   said, no, and they went ahead and closed anyhow, and

13   they sold properties to the public and somehow got

14   title insurance policies issued --

15            THE COURT:  All right.  We know that

16   there's loans at issue with AmTrust asserting and I

17   don't know if it's --

18            MR. GORDICH:  My apologies.  I just did it

19   to clarify.

20            THE COURT:   I don't know if it's imputed

21   that AmTrust did not agree to the release prices, and

22   didn't, in fact, execute the releases.  Right, that's

23   your proffer?

24            MR. GORDICH:  My proffer is is that they

25   were asked for releases, they said, no.  And if you

1    look in the declaration they think that the best

2    defense is a good offense, and they say that it's our

3    fault that they were compelled to do this --

4              THE COURT:  All right.

5              MR. GORDICH:  -- because we wouldn't drop

6    the case.

7              THE COURT:  Okay.  So, for shorthand,

8    we're talking about closings without AmTrust releases?

9              MR. GORDICH:  Correct, and --

10             THE COURT:  All right.  Well, put that

11   aside, that doesn't relate to Mr. Cooper.  You -- the

12   question was, was Mr. Cooper at the helm when any of

13   those closings occurred and he said, no.

14             THE WITNESS:  That' correct, Your Honor.

15   I was not at the helm.

16             THE COURT:  Let's move on from there.

17   BY MR. GORDICH:

18        Q.   Do I understand that Mr. Deaktor -- what was

19   the title that Mr. Deaktor held before you took the

20   reins?

21        A.   I'm not really positive, managing member.  I

22   guess, president.

23        Q.   Okay.

24        A.   I'd have to go back a check the record.

25        Q.   Let's just call it manager and we'll figure

1    it out at some point, but let's just call it manager.

2    Did he do a good job?

3         A.   I think based on the results, the answer

4    would be somewhat subject to suspect.  And, you know,

5    I would not close loans that had not received approval

6    from the existing mortgage lender.

7         Q.   Did you do the schedule and statements?

8         A.   Yes -- well, not me personally, but my staff

9    assisted, significantly assisted, the controller and

10   employees at The Lucky Chase II.

11        Q.   Is that done now?

12        A.   Yes.  We filed them, yes.

13        Q.   All right.  And if, in fact, the Court was

14   inclined to enter an order approving you as the CRO,

15   what would you do?

16        A.   I would direct the employees of Lucky Chase

17   II.

18        Q.   Strike that.  Let me try one more time,

19   because I'm going to try to narrow it down even

20   better.

21             What can you do that Mr. Deaktor cannot do?

22        A.   I can direct and manage and focus the actions

23   of the company in a manner in which, I believe, will

24   further the estates' interest, both the secured

25   creditors interest, as well as all creditors,

1    unsecured, and then the equity owners to maximize that

2    recovery.  And I can bring my expertise and

3    restructuring to assist in addressing the situation,

4    and driving actions to maximize recovery.

5        And, I believe, because of my experience in

6    connection with and understanding of the real estate

7    market, broadly financial institutions, specifically,

8    and restructuring industry, I have a unique expertise

9    that Mr. Deaktor does not.  And also, I can help drive

10   the actions of the company to achieve a successful

11   restructuring.

12   Q.   Okay.  And I don't mean to be flip as to you,

13   I'm trying to highlight a point, so please pardon me

14   before I even ask.  You're not going to be able to

15   change the economy or any of the real estate prices or

16   anything like that; right?

17   A.   No.  I wish I could, but I can't.

18   Q.   And, you don't have several or a million and

19   a half or a million and one --

20       THE COURT:  There's no jury, Mr. Gordich.

21   You don't need to go through these kinds of things.

22       MR. GORDICH:  Did I move my hand?  I'm

23   sorry.  I was trying to make a point, but I apologize,

24   Judge.

25       THE COURT:  No, I understand the point.

1    I'm just saying you don't need to continue --

2                    MR. GORDICH:  I apologize.  I'll move on.

3                    THE COURT:  -- with this line.

4                    MR. GORDICH:  I'll move on.

5                    THE COURT:  Go ahead.

6    BY MR. GORDICH:

7        Q.   Do you have some other -- I understand you

8    have other experience in the Southern District of

9    Florida?

10       A.   Yes, I do.

11       Q.   Do you have some experience with the

12   trustee's in the Southern District of Florida?

13       A.   Trustee's in?

14       Q.   Panel trustees?

15       A.   I've had occasion where I've had some

16   interaction with some of them, yes.

17       Q.   Okay.  And can you tell me what you can bring

18   to this case, and, again, forgive me at 825 an hour,

19   675 an hour, and 420 an hour that the standard

20   trustee's cannot?

21       A.   Well, I can bring a cost effective solution

22   because I've seen how, with all due respect to my

23   colleagues in the industry and panel trustee's, I've

24   seen how they run cases where the total fees far away

25   exceed cases where I've been filed in liquidations and

1    have achieved much better result than they have.

2        Q.    So, by liquidation, you're already thinking

3    this should be a liquidation?

4        A.    Well, liquidation as to -- liquidation of

5    this matter and moving it out to a successful

6    conclusion.

7        Q.    Uh-huh.

8        A.    I don't believe -- I didn't mean to imply

9    that I believe this estate needs to quote, unquote,

10   liquidate, with no ongoing operations coming out.

11       Q.    Okay.

12       A.    I apologize.

13       Q.    And you talked before in connection with an

14   answer to Judge Mark's question about you had brought

15   offers to AmTrust in the past; correct?

16       A.    I have made some -- yes, I had made

17   suggestions, yes.

18       Q.    Those are all -- I'm sorry, I cut you off?

19       A.    I'm sorry.  I had made restructuring

20   suggestions, yes.

21       Q.    Uh-huh.  And, in fact, were they not

22   suggestions or offers of iStar, that you brought?

23       A.    They weren't of iStar.  I had discussed them

24   with iStar and had gotten their approval before I made

25   them to AmTrust.  But they weren't necessarily -- they

1    didn't originate from iStar, they came from me.

2        Q.    Okay.  I wasn't involved at that point.  I'm

3    just going by what I have heard and I'm just asking

4    you to refresh your recollection for just a moment,

5    and think back and see if, in fact, and, you know,

6    time has passed, that -- did you not convey an offer

7    from iStar?

8        A.    I understood iStar did make a buy-out offer

9    to --

10        Q.    I didn't ask you the substance, sir.  I just

11    asked did you make --

12        A.    I didn't convey that.  That I was made by --

13    directly between iStar's counsel and Ohio Savings.

14    That was separate and apart from me.  I didn't -- I

15    didn't make that.  I understood the conversation

16    happened.

17        Q.    If, in fact, you are not, we have no idea

18    what the judge is going to rule, but if, in fact, it

19    comes to pass that you are not paid out of the assets

20    of this estate, will you continue representation?

21        A.    I would have to evaluate the ability to have

22    my fees paid from alternative sources other than Lucky

23    Chase II.  And so, I can't answer that question until

24    I know that answer.

25        Q.    Okay.  And if I can borrow this from someone

1   else, what's your endgame?  What do you ultimately

2   expect to be able to do in this case if you are

3   appointed?

4        A.   I would expect to sit down and negotiate a

5   plan of reorganization and appropriate settlement

6   between the parties, whether that's between the

7   debtor, secured creditor and first interest, as well

8   as the unsecured, and develop a consensual plan of

9   reorganization.

10       Q.   Okay.

11       A.   At this point, though, I can't tell you what

12  that's going to look like.

13       Q.   Understood.  And my colleague has already

14  asked you a question, for what purpose, I don't know,

15  but asked you were you able to do that when you had

16  sat down before and you said, no; correct?

17       A.   Well, I -- I think the question that

18  Mr. Spector asked was, was I successful in achieving a

19  restructuring with Ohio Savings, AmTrust.  And

20  clearly, the answer is no, since we're sitting in

21  bankruptcy.

22       Q.   And just a hypothetical question, in your

23  experience if a lender is asking for a trustee and

24  saying that they will cooperate with a trustee, is

25  that maybe a good idea to have them negotiate with the

1    trustee as opposed to a CRO picked by a debtor?

2              MR. SPECTOR:  I'll object to that, Your

3    Honor.  I'm not sure this witness is being asked his

4    opinion as to what the course the case should follow,

5    whether -- or is he asking the opinion of the witness

6    to guide the Court?

7              THE COURT:  I'll overrule it.  If he has

8    an opinion, he's testified about his experience in

9    restructuring and dealing with banks, so.

10             THE WITNESS:  Generally -- I'm sorry, Your

11   Honor.

12             THE COURT:  Go ahead.

13             THE WITNESS:  Generally, my experience has

14   been trustees have not been beneficial to the overall

15   outcomes in bankruptcy.  That's just been my general

16   experience.

17             MR. GORDICH:  Judge, again, I thought I

18   was going to take a deposition.  I quickly jotted down

19   the best notes I can, and I don't want to tread on

20   thin ice and go into any other theatrics.

21             THE COURT:  Well, what do you think we

22   should do today?

23             MR. GORDICH:  I think that if Your Honor

24   does not feel that you have enough to appoint a

25   trustee, then you have to resolve some issues that are

1    clearly before you, and you have resolve.  You have to

2    do something about cash collateral.  There is no doubt

3    about that, otherwise the debtor dies.

4            THE COURT:  Well, I'm not going to appoint

5    a trustee, terminate exclusivity or grant abstention

6    or dismissal today.  So, the end game, so to speak,

7    from this hearing is going to be to have use of cash

8    certainly to operate the project, and set further

9    hearings, and I take it despite the frustration over

10   depositions, there still is agreement to mediate;

11   correct?

12           MR. GORDICH:  There is not agreement to

13   mediate.  There is agreement that if Your Honor sends

14   us to mediate, that we agree to Jerry Markowitz and I

15   believe that counsel has sent a BlackBerry to find out

16   if he's available on the 28th.

17           If you send us, you can bet we're going to

18   go and we're going to do it in good faith.

19           THE COURT:  All right.  So, that would be

20   my intent, and just a comment that I would share now

21   is that, it would seem to me and I have no idea and

22   certainly would not ask for any information about what

23   proposals were made, but it would seem to me that the

24   mediation would include if -- let me try again.

25           It would seem to me that if the mediation

1    was seeking a result in which the bank was going to

2    work with the debtor and continuing to sell units and

3    pay down the debt, perhaps pending other efforts to

4    refinance the loan or possibly sell the project, but

5    various alternatives.  But assuming the bank is going

6    to work with the debtor under some mediated proposal,

7    that the mediation could also include whether Mr.

8    Cooper or simply the Deaktors or some other party

9    acceptable to the bank, would be in there in operating

10   the project.  So, in short, it would seem that the

11   future of Mr. Cooper in the mix, would also be part of

12   the mediation.

13          MR. GORDICH:  No doubt.

14          THE COURT:  So, we have to get from now to

15   the next hearing, in terms of Mr. Cooper's continued

16   retention, as well.  Maybe what's worth exploring is

17   what kind of time commitments you see from you and

18   your staff and in the next two, three weeks?

19          MR. SPECTOR:  I would like to ask him a

20   question that would help with that, Your Honor.

21          THE COURT:  Okay.  We'll go ahead with

22   redirect, and then I'm going get some comments from

23   Mr. Schneiderman, as well.

24          MR. SCHNEIDERMAN:  Before we redirect,

25   should I do my cross?

1           THE COURT:  Okay.  Go ahead.

2           MR. SCHNEIDERMAN:  Okay.  Thank you, Your

3    Honor.

4                      CROSS-EXAMINATION

5    BY MR. SCHNEIDERMAN:

6       Q.   Mr. Cooper, has the ownership of Deaktor

7    Documents been pledged or transferred; to your

8    knowledge?

9       A.   I don't know.

10      Q.   Are you providing services to Deaktor

11   Documents?

12      A.   No, not directly, no.

13      Q.   Are you -- do you know what assets Deaktor

14   Document has?

15      A.   I don't know.  I don't know.  I understand

16   it's a very -- it's a services type company.  So, it

17   would be very limited, if at all.

18      Q.   Are you CRO of any other Deaktor related

19   entity?

20      A.   Not at this time, no.

21      Q.   Were you at any time?

22      A.   Yes.

23      Q.   Which one?

24      A.   Windsor at Pembroke Cay, as I had mentioned

25   earlier.

1    Q.    And has that engagement been terminated?

2    A.    Yes.

3    Q.    Are you still providing services to LCW or

4    the -- however we're phrasing the parent corporation?

5    A.    It would be -- it's really in connection with

6    Windsor at Pembroke Cay, because it involves iStar.

7              THE COURT:  So, you're still -- FTI is

8    still a financial consultant to LCW and the other

9    entities?

10             THE WITNESS:  Yes, to Windsor.  Although

11   at this point there hasn't been any activity on those

12   at all.  It's all been related to the issue so

13   arisiing out of --

14             THE COURT:  Well, what's going on Windsor

15   since this has come up?  Is there ongoing sales on

16   Phase I.

17             THE WITNESS:  Yes, there are some ongoing

18   -- as I understand it, there's ongoing sales on phase

19   1, but very limited.  You know, we haven't been

20   involved since the sale of Phases II and III to bulk

21   buyer back in the summer of 2008.

22             THE COURT:  So, how many units are left in

23   that project?

24             THE WITNESS:  I want to say about 100.

25             THE COURT:  And Mr. Deaktor's proffering,

1    what, how many?

2                    MR. DEAKTOR:  Sixty-eight.

3                    MR. SPECTOR:  Sixty-eight, Judge.

4                    THE COURT:  And what's the average

5    marketing price, what they sell for at --

6                    THE WITNESS:  Average marketing -- the

7    gross sales price is 300,000.  The average net

8    typically is between, if it's a one bedroom, 125,

9    three bedrooms gets up to maybe 200, so it ranges

10   between that

11                   When I say net, it's the net pay-off to

12   the lender, after all the discounts and brokerage

13   commissions and things of that nature.  There is

14   significant haircuts taken off of the asking price in

15   this market.

16                   THE COURT:  All right.

17   BY MR. SCHNEIDERMAN:

18       Q.   Are there any loans from iStar directly to

19   Lucky Chase, the debtor?

20       A.   Not that I know of, no.

21       Q.   Are there any transfers of asset money or

22   funds from Lucky Chase to iStar?

23       A.   No, not that I know of.

24       Q.   Are you in possession of or do you have

25   access to the books and records of the various LCW

60

1    companies?

2        A.    Access meaning, do I possess -- am I keeping

3    the books or -- I mean, I have access through reaching

4    out to the company, but --

5        Q.    Are you aware of any accounts receivable or

6    corresponding accounts payable from one LCW entity to

7    another, including the debtor?

8        A.    Yes.

9        Q.    And were those debts incurred under your

10    watch, as you were CRO of Windsor at the time or

11    financial consultant for LCW?

12        A.    Back in '06, '07 there were some transfers

13    between the various entities.

14        Q.    And --

15        A.    And then, since then I have not been the CRO,

16    I've been the financial advisor.  So, I mean, they

17    would occur from time to time.

18        Q.    Are you -- do you consider yourself still to

19    be the financial advisor for LCW?

20        A.    Well, I mentioned that earlier.  Again, we

21    haven't rendered any services to Windsor, again, since

22    the summer of 2008.

23        Q.    But if something happens with Lucky Chase II,

24    will you be providing services for LCW, as just the

25    natural progression of benefits received or realized

1  in this bankruptcy?

2      A.   Well, no.  I don't think I could, since I'd

3  be the CRO of Lucky Chase II, since I'll be the CRO of

4  that -- this entity of this debtor.  I couldn't serve

5  as a financial advisor to the other entities from this

6  point forward.

7      Q.   And the other entities understand that?

8      A.   Yes.

9      Q.   Okay.  Who makes the ultimate decisions here,

10  is Mr. Deaktor still, let's called him, the board?

11      A.   No, it would be the Deaktors; it would be

12  Marcia, his wife Marcia with a C, and his mother

13  Marsha with an S-H.

14      Q.   And they have the ability to terminate your

15  services?

16      A.   Yes.

17      Q.   Do you know the amounts of the accounts --

18  strike that.

19           You said there were existing accounts

20  receivable and accounts payable on the books.  Were

21  any of those monies owed to or -- strike that.

22           Were any of those monies that are owed to LCW

23  by the debtor incurred while you were the financial

24  advisor, at your suggestion?

25      A.   No, not at my suggestion.  Not at all.

1     Q.   Well, did you give approval or disapproval of

2     any loans made by or --

3     A.   I advised against inter-company or whatever

4     you want to call them, inter-company transfers.

5     Q.   And the transfers were made regardless of

6     your advice?

7     A.   Yes, irrespective of my advice, yes.

8     Q.   And have the Deaktors made any other

9     decisions with respect to Lucky Chase irrespective of

10    your advice?

11    A.   I could -- in one instance, yes.

12    Q.   Where would that be?

13    A.   Well, the instance is in closing units

14    without the approval from Ohio Savings.

15    Q.   And those happened before the April 27th date

16    of your --

17    A.   Yes.

18    Q.   -- engagement?

19    A.   Yes.

20          MR. SCHNEIDERMAN:  Okay.  I have no

21    further questions at this time, Your Honor.

22          THE COURT:  Okay.  Mr. Spector.

23          MR. SPECTOR:  Yes.

24                    REDIRECT EXAMINATION

25    BY MR. SPECTOR:

1      Q.   I want you to tell us exactly what their

2   counter proposal we received from AmTrust Bank is?

3   All I want to know from you is, would it require, if

4   we worked on that premise, on the proposal that we

5   received, would it require the skills of FTI

6   consulting to come 391 and come to settlement

7   arrangement?

8               MR. GORDICH:  Objection.  If, again

9   because I think that in 363 and 361, at some point

10   Your Honor has to look at the offers of adequate

11   protection, and this might come under it.

12               As long as Your Honor is not disqualified

13   from hearing the rest of this case to its conclusion,

14   whatever it is, I have no objection to both sides

15   throwing in front of Your Honor or asking questions of

16   this witness as to what the offers were.

17               MR. SPECTOR:  I don't think --

18               MR. GORDICH:  Excuse me.

19               MR. SPECTOR:  Oh, sure.

20               MR. GORDICH:  Let me just finish.

21               MR. SPECTOR:  Sorry.

22               MR. GORDICH:  I just don't want to get

23   into a situation where somebody then says, oh, no.

24   Judge Mark can't finish this case.  It has to go to

25   someone else.

1          THE COURT:  All right.  I'll respond by

2    striking or rephrasing Mr. Spector's question in a way

3    that's not going to require disclosure of the proposal

4    or counter proposal, and just ask whether you believe

5    you will play a useful role in attempts to mediate the

6    issues between the debtor and AmTrust?

7          THE WITNESS:  Yes, I do Your Honor.

8    BY MR. SPECTOR:

9    Q.   Now, that doesn't mean you'd be the mediator,

10   but when we go into mediation will your skill set be

11   extremely helpful in trying to achieve a successful

12   mediation?

13   A.   I believe it would, yes.

14   Q.   Would it be more or less successful if you

15   were absent from the mediation and Mr. Deaktor

16   represented the interest of Lucky Chase in your view?

17   A.   I believe it would be less successful.

18          MR. SPECTOR:  Okay.  That's my only

19   redirect, Your Honor.  If we're done with the

20   questioning, Your Honor, I would like to simply.

21          MR. GORDICH:  Well --

22          MR. SPECTOR:  Maybe not.  Okay.

23          THE COURT:  Well --

24          MR. GORDICH:  One question.

25          THE COURT:  Go ahead.

```
 1                     RECROSS EXAMINATION
 2   BY MR. GORDICH:
 3       Q.   How much do you think it's going to cost to
 4   get to the goal line?
 5               THE COURT:  What goal line?
 6               MR. GORDICH:  The goal line being the
 7   proffer from Mr. Cooper of what he hopes he will be
 8   able to accomplish.  If you can fix my question, fix
 9   my question, too.
10               THE COURT:  I'm just not sure whether
11   you're talking about one game or the whole season?  I
12   mean, you know, I didn't know whether you were asking
13   about what it was going to take to get to, what he
14   hopes would be a mediated settlement or what he hopes
15   would be a sellout or refinancing the project?
16               MR. GORDICH:  I'll take the first one and
17   then I'll ask the second one.
18               THE COURT:  All right.
19   BY MR. GORDICH:
20       Q.   How much do you think it would cost in your
21   fees, and (408) fees, to get to the end of the
22   mediation?
23       A.   I don't know.  I don't know if it's one
24   session, multiple sessions.  I don't know if we'll end
25   up having side-bar conversations.  Multiple side-bar
```

1  conversations.  I just don't know how much time it's

2  going to require.

3          If it's a short session, it will be very

4  liberal.  If it's multiple sessions, more exercise.  I

5  just -- it's negotiations and I can't predict what.

6      Q.   Understood.

7      A.   -- how long or what the outcome is.

8      Q.   And therefore, may I assume that you'll give

9  me an equal answer or similar answer that you're

10 unable to predict the future, if, in fact, I asked you

11 how long or how much it would cost in fees to get to

12 the ultimate resolution of this case?

13     A.   That's correct.  I don't have a firm

14 estimate.

15     Q.   Thank you.

16          THE COURT:  All right.  So what do you --

17          MR. SPECTOR:  Your Honor, I propose the

18 following; I propose that we -- you may step down.

19          THE WITNESS:  Thank you.

20          MR. SPECTOR:  I would propose, Your Honor,

21 that the Court grant the motion for the debtor's --

22 grant the debtor's application for the approval of the

23 employment of FTI Consulting in the role of CRO.

24          I think the record is clear that their

25 skill set, Mr. Cooper's and his teams skill set is

1    benefit -- I would say, essential, but I don't want to

2    over play, it doesn't have to be essential.  But we

3    think it's important that they be in place.

4            You've heard Mr. Cooper candidly admit

5    that in his opinion there were certain things that

6    were done by prior management that ought not have been

7    done.  We didn't go into the details.  And  I know

8    there'll be a day for that, and we have explanations

9    on behalf of the debtors estate as to how that came

10    about.  And it's not of the egregious nature that

11    would warrant unusual results.  And in light of the

12    fact that the brain trust got together and said, you

13    know what, there's enough of this out there, we ought

14    to make sure that there is a CRO in place, so that

15    going forward, we can ensure to the Court, creditors,

16    trustee -- U.S. Trustee, that everything will be

17    beyond question.

18            I think this case is an appropriate case for

19    a CRO.  Mr. Cooper and his team have been living with

20    this and other similar problems for since 2006.  Have

21    restructured hundreds of millions of dollars of

22    Deaktor debt.  This is the one that they couldn't get

23    done yet, but we're not giving up.  We think that we

24    can restructure it here.  And we hesitate to go

25    forward without the expertise and guiding hand of

1    someone as steady as Keith Cooper and his team.

2            So, it's our request, Your Honor, that you

3    grant the application for approval of employment of

4    FTI, and then we'll discuss the other issues that have

5    to come up.

6            THE COURT:  Well, what are you proposing

7    as far as payment, then?

8            MR. SPECTOR:  Well, they are divorced, I

9    believe.  The application for employment is one thing.

10   How they get paid, we wouldn't want to move on to the

11   cash collateral, if you're bringing that up to the

12   issue right now, we would say that Your Honor -- we

13   would ask that the cash collateral budget, which

14   includes professional fees, and by the way, now that

15   we're reading it, there is a utility deposit to FP&L

16   that we have to make by the end of the month, to avoid

17   having a utilities motion.  It's like what, $2,000,

18   24?

19           MS. TALENFELD:  Yeah, 26.

20           MR. SPECTOR:  $2,600 that we have to amend

21   the budget.  We have an amended budget with us to

22   bring into Court, because that wasn't in the

23   original generation.  What?

24           MS. TALENFELD:  2360.

25           MR. SPECTOR:  2360.  So, with that minor

1    change, we would like the Court to grant the

2    application for the use of cash collateral as amended

3    with the 2360, and also to include the professional

4    fees.

5              This is -- this case can't stay very long,

6    because there is a 90 day deadline.  And given the

7    phrenitisism and the way it would enhance the

8    litigation, spending more money.  It looks like in

9    this case, we're going to have to file a plan earlier

10   than 90 days.

11             THE COURT:  Well, on your budget

12   Mr. Cooper would have 65,000 in fees, as I read the

13   budget.  Seventeen-five a week for each of the four

14   weeks starting the week ending the 8th, the 15th and

15   then by the end of this week.  So, he's not --

16             MR. SPECTOR:  Well, he hasn't --

17             THE COURT:  He's not going to reach that

18   amount.

19             MR. SPECTOR:  No, he's not.  However, we

20   are going to mediation probably, in a week or so, and

21   we're going to need his expertise big time in the

22   coming week to get us ready for that, and during the

23   mediation.

24             So, you know, in a budgeting thing, you

25   don't know where you're going to spend the money.  You

1   just estimate where it will be.  He may be low one

2   week and higher another week.

3            THE COURT:  Mr. Schneiderman, did you have

4   a view on the retention itself or --

5            MR. SCHNEIDERMAN:  Your Honor --

6            THE COURT:  -- use of cash?

7            MR. SCHNEIDERMAN:  Your Honor, it's a

8   strange issue because the motion is not under 327

9   retention, its under 363 type of retention.  And

10  arguably, the debtor is seeking the approval of the

11  CRO and not addressing the adverse interest and

12  disinterest in this requirement, that would normally

13  be a requisite under 327.

14            I think under the scenario here, though,

15  we have to ask, is there really a conflict and from

16  just the appearance of impropriety with the

17  relationships between iStar, LCW, the other entities

18  that have pledged their interest, and Lucky Chase II,

19  the inter company transactions.

20            My suggestion would have been, Your Honor,

21  if it's going to help the end game, which is what

22  everyone is talking about here, maybe the immediate

23  end game is the mediation.  And, if it helps all the

24  parties to get to the mediation, then perhaps what we

25  should do is have a second interim order authorizing

1    that retention.

2              The first interim order allows retention,

3    but we limited what Mr. Cooper would be doing in the

4    case.  And, I think, Your Honor limited the amount of

5    fees that could be used, and Mr. Spector made the

6    argument at the last hearing, these are matters that

7    would have to be done anyway.  These are things the

8    schedules and sofa's and the things that the debtor

9    would have to be doing, and Mr. Cooper was in the best

10   position to do those.  I think Your Honor maybe said,

11   I don't know, I think Mr. Spector said 8 or $9,000 at

12   that hearing to do those jobs.

13             Maybe the same thing has to happen here,

14   because the choice between granting the motion without

15   Mr. Gordich having the opportunity to depose

16   Mr. Cooper fully, is not the fault of AmTrust, but to

17   cut this off today, may put this case behind three

18   steps  rather than moving forward one step.

19             So, my suggestion would be under the 363

20   that we go forward with a second interim application,

21   limit the fees that would be involved for Mr. Cooper,

22   and understanding that it may have to -- it may end up

23   coming out of cash collateral, Your Honor, but it may

24   be for the better of the entire case, and

25   Mr. Gordich's client, as well.

1          It's my long answer of saying, the motion
2    should be rolled, Your Honor, with some provisos.
3          THE COURT:  All right.  Well, Mr. Gordich,
4    what I would propose or argument is adopting, in large
5    part what Mr. Schneiderman is suggesting and just
6    putting a number to it, and entering a further interim
7    order acknowledging that the debtor should be
8    authorized to employ Mr. Cooper, for the additional
9    interim period until we address this further, but that
10    there's still an open issue as to whether there is
11    adequate protection under the cash collateral
12    principal for the use of the bank's cash collateral to
13    pay his hourly fees and the amounts that they may be
14    accruing.  But, I would want sufficient assurance of
15    payment to keep Mr. Cooper on through the mediation,
16    and through the next hearing to see where we are at
17    that point.
18          So, what I would propose is the second
19    interim order, and previewing the cash collateral
20    issues authorizing the draw down of his retainer, if
21    that's even a requires a further order, and
22    authorizing up to $25,000 in additional cash
23    collateral to be used to pay Mr. Cooper's firm pending
24    a further hearing.
25          And perhaps, what we can do, unless you

1    want to comment now, is we can take a break and then

2    talk about whether there's other cash collateral

3    issues, and then plan on just talking about

4    scheduling.  I don't know if through the miracle of

5    modern BlackBerry's you've heard back from

6    Mr. Markowitz or not, or --

7                MR. SPECTOR:  That's wha I'm checked on

8    now, and no, I have not.  I will give him a call on

9    the break.

10                THE COURT:  We may be able -- we may have

11    to defer to discussion of the next hearing date, until

12    we know the mediation date, but that would be the

13    proposal.

14                But, before I break, you could comment

15    briefly, if you want to now, before we go off the

16    record, but I also think we should deal with the other

17    stay relief motion.  I probably should have had --

18                MR. SPECTOR:  Mr. Altomare.

19                THE COURT:  -- Mr. Altomare come up

20    earlier.  But why don't you get ready.  Well, let me

21    take Mr. Altomare, since I have him walking up.  And

22    then, I will hear from you before we break, if you'd

23    like.

24                Before you even start, let me suggest to

25    Mr. Spector, I don't think the motion to strike is

1    well founded.  A debtor can appear, I mean, a party

2    can appear pro se.  This individual is an individual

3    person and she appears to be appearing through

4    Mr. Altomare who, at least has submitted a power of

5    attorney.  So what's the problem?

6              MR. SPECTOR:  I don't believe an

7    individual can appear with a power of attorney.  I

8    believe you need an attorney to appear, if you're an

9    individual and you're represented by anybody, it's got

10   to be an actual attorney licensed to practice.  That

11   was my understanding of Florida Law, and actually just

12   about every state that I know of.  But, if Your Honor,

13   wants to, technically -- that, I believe, is the law,

14   but it's Your Honor's courtroom, and I would like to

15   --

16             THE COURT:  It's a distinguishing power of

17   attorney, for example from like a guardian.

18             MR. SPECTOR:  Yes.

19             THE COURT:  A guardian for an

20   incapacitated person could appear --

21             MR. SPECTOR:  Yes.

22             THE COURT:  -- but you're saying there's

23   no ability for an individual to delegate through a

24   power of attorney the right to appear?

25             MR. SPECTOR:  That's my understanding of

1      the law, Your Honor.

2                MS. TALENFELD:  Judge, can I just say, we

3      had a deposition yesterday.  Mr. Gordich deposed

4      Ms. Ortiz, and she was perfectly capable of being

5      deposed and answering questions.  So I, again, there's

6      no reason why she could not have filed if she was pro

7      se, there was no reason to have someone else do it.

8                THE COURT:  Yeah, well, I don't want to

9      belabor this because I can't imagine I'm going to

10     grant the motion anyway, so it's probably moot.  But

11     who are you actually in terms of your relationship?

12               MR. ALTOMARE:  I'm her fiance.

13               THE COURT:  Okay.

14               MR. ALTOMARE:  I have lived this nightmare

15     for the last six months, and seeing what's going on

16     even today, you know, I can only imagine if we had a

17     courtroom of the condo owners here, you'd have a riot

18     going on.  But, that's besides the point.

19               THE COURT:  Where -- her underlying claim

20     is --

21               MR. ALTOMARE:  It's a small claim case

22     that we filed.

23               THE COURT:  She owns a unit and as part of

24     the closing the debtor was obligated to make 13 --

25               MR. ALTOMARE:  18 consecutive monthly

1   payments for maintenance.

2           THE COURT:  Okay.  So, the debt that

3   you're seeking in terms of compensatory damages is the

4   breach of the contractual obligations to pay the first

5   18 months of maintenance.

6           MR. ALTOMARE:  That's correct.  We tried

7   every way humanly possible since January to resolve

8   this issue, even to the point of me getting a phone

9   call today at around 11:30 from a gentleman named Gus,

10  who  identified himself as the VP of the company,

11  talking with Scott, trying to settle this.  Turning

12  down the offer, and then I said, okay, then I'll see

13  you at 2:30.

14          THE COURT:  Okay.

15          MR. ALTOMARE:  As of today.

16          THE COURT:  All right.  Well, I don't see

17  any basis to grant stay relief.  I'm going to reserve

18  ruling on the motion to strike.  It may be technically

19  correct that Ms. Ortiz should be signing her

20  pleadings, and should be arguing herself unless she

21  hires an actual attorney.

22          MR. ALTOMARE:  We have very limited funds

23  for that.

24          THE COURT:  But, be that as it may, it

25  seems to me you just have a claim against the estate.

1            MR. ALTOMARE:  In small claims, yes.

2            THE COURT:  But now it's in bankruptcy.

3    So, you have a claim against the bankruptcy estate.

4            MR. SPECTOR:  It's better than that.  It's

5    an allowed claim.  We haven't disputed it.

6            MS. TALENFELD:  We listed it, and didn't

7    dispute it.

8            MR. SPECTOR:  We did not dispute it.

9    We're not disputing the claim.

10           THE COURT:  For 3,000?

11           MR. SPECTOR:  5,000.

12           MS. TALENFELD:  Yeah.

13           MR. SPECTOR:  As allowed.

14           THE COURT:  Okay.  So their -- that's the

15   good news.  The bad news is, who knows if they're

16   going to have money to pay the unsecured creditor.

17   But, there's no way you will get stay relief to

18   execute on a judgment.  The most relief that's almost

19   ever granted in a Chapter 11, in terms of creditors

20   who have litigation is to proceed, if it's efficient

21   and not unduly expensive to the debtor, to liquidate

22   the claim in another court and then await treatment of

23   the claim in the bankruptcy.

24           So, they've already essentially, they

25   haven't stipulated to judgment in the County Court.

1            MR. SPECTOR:  We conceded to --

2            MR. ALTOMARE:  I went down there Monday

3    morning and I couldn't do anything because of the

4    stay.

5            THE COURT:  I know, but -- well, that's a

6    problem of trying to explain this to you, if you're

7    not a lawyer.

8            MR. ALTOMARE:  But I do understand what

9    the position is.

10           THE COURT:  You have a claim in the

11   bankruptcy case, which right now would be equivalent

12   to what you would have if you had a judgment against

13   the debtor in County Court for $5,000.

14           MR. ALTOMARE:  I understand.

15           THE COURT:  However you want to proceed in

16   County Court against Mr. Deaktor, individually, there

17   is no --

18           MR. ALTOMARE:  Well, I named both Lucky

19   Chase and Scott as a co-defendant --

20           THE COURT:  Okay.

21           MR. ALTOMARE:  -- in the County Court.

22           THE COURT:  All right.  Well, then I'm

23   going to ask Ms. Talenfeld or Mr. Spector to do an

24   order reserving ruling on the motion to strike or --

25   actually, just deny the motion to strike as moot,

1    since the Court is denying the motion for stay relief,

2    but put in the order that the motion for stay relief

3    is denied provided, however, that the automatic stay

4    does not preclude Ms. Ortiz from proceeding in the

5    County Court action against Mr. Deaktor.

6              MR. SPECTOR:  Or anybody else who is not

7    the debtor.

8              THE COURT:  Right.  So, I mean, if you

9    want to try to pursue Mr. Deaktor, individually --

10             MR. ALTOMARE:  Thank you, Your Honor.  I

11   would need to go back to the County Court and continue

12   it with Scott?

13             THE COURT:  Yes.  You never were stayed by

14   the bankruptcy from doing that.

15             MR. ALTOMARE:  Okay.

16             THE COURT:  So, that just clarifies your

17   rights.

18             MR. ALTOMARE:  Thank you, very much.

19             THE COURT:  All right.  So, Mr. Gordich,

20   comments on Mr. Cooper and FTI and cash collateral now

21   or do you want to take a break?

22             MR. GORDICH:  Whatever the Court's

23   pleasure is.

24             THE COURT:  Well, if you want to.

25             MR. SPECTOR:  I've talked to Mr. Cooper

1    about the proposal on behalf of the debtor and FTI, we

2    are perfectly happy with going with Mr. Schneiderman's

3    solution.

4              THE COURT:  Okay.  Well, we wouldn't

5    necessarily have to break if you --

6              MR. SCHNEIDERMAN:  Let's clarify one

7    thing, Your Honor.

8              THE COURT:  He meant Judge Schneiderman.

9              MR. SCHNEIDERMAN:  Let me call my parents,

10   they would be very happy, very proud.  The $25,000

11   retainer draw down and then there's a second 25,000,

12   Mr. Cooper testified that the outstanding fees at this

13   time is over 38-5.

14              I'd like clarification that if the second

15   -- you're saying the second 25,000 would include the

16   balance, remaining which would be 13-5?

17              THE COURT:  Right.

18              MR. SCHNEIDERMAN:  Or is it a new 25,000

19   deal with the matters from today forward, to deal with

20   the mediation and the cost and, as Mr. Spector said

21   his --

22              THE COURT:  Total of 50.  The $25,000

23   retainer and another 25 which can be used to pay down

24   bills that have accrued.  And additional bills up to

25   the balance of the 25 until we have any further

1    authorization.

2              MR. SCHNEIDERMAN:  Thank you, Your Honor.

3              THE COURT:  Okay.

4              MR. GORDICH:  Here are my thoughts, Judge.

5    First of all, I hope that I intrigued the Court  with

6    enough of the question that were done by rather basis

7    that Your Honor is inclined to hear also the U.S.

8    Trustee, but there's a possible conflict of interest

9    and we simply don't know yet.

10             THE COURT:  Yeah, but my comment on that

11   not to short circuit further exploration of if, if you

12   get the deposition, mediation fails, but on the issue

13   of inter company transfers would be no different, if

14   Mr. Deaktor was in place then Mr. Cooper, and perhaps

15   would be worse.  And that just dealt with generally in

16   bankruptcies with inter company transfers, if somebody

17   else needs to conflict counsel, we don't have a

18   creditors committee, but somebody needs to look into

19   it, you would say, trustee.  But, I don't know that

20   that inter company transfer issue is enough to support

21   the appointment of a trustee.  But that's between

22   Mr. Deaktor and Mr. Cooper.  I don't think the issue

23   is major.

24             As far as whether Mr. Cooper has a true

25   conflict in terms of pursuing the best interest of

1    this debtor, because of the relationship not directly,

2    but the influence, let's say, of iStar through its

3    leverage over the Deaktors, I guess that's an issue to

4    explore.  But that's not that clear at this point.  I

5    mean, I think what's clear is that the debtors, if

6    iStar went away, Mr. Deaktor would be -- probably

7    still in place, but also trying to make a deal.  So

8    there would be equity here.  IStar is owed a lot of

9    money by the Deaktors, its overall enterprise, so,

10    they're the ones that are pushing to get some equity

11    up.  But it's still an effort to preserve equity.

12    There's no, I guess what I'm saying is, I don't see

13    where the conflict would exist in terms of some

14    motivation by Mr. Cooper to do something that's not in

15    the interest of protecting the potential equity of the

16    company.

17                MR. GORDICH:  Looking back at the

18    questions asked by the U.S. Trustee's attorney who I

19    did not talk to before this hearing.  I had no idea

20    what he was going to ask.  He asked some questions

21    relative to who had the stewardship of these other

22    entities when the inter company debt was created.

23    And, I think, they're relevant, but let's put aside

24    because Your Honor doesn't want, you know, to address

25    right now the conflict issue.  I understand and I

1    suspect that Your Honor would like to get us to a

2    mediation to see what happens, but I just want Your

3    Honor to understand that I really think that's a

4    genuine issue.

5              THE COURT:  There may be issues.  I'll

6    leave it at that.

7              MR. GORDICH:  I'm not trying to be

8    theatrical, but I'm just trying to put it on the table

9    and I really do think that it is awkward, at best, to

10   try the appoint this gentleman under some basis other

11   than the tried and true ordinary basis that you're

12   professionally are disinterested and so forth.  But I

13   won't say anymore about that today.  I'll talk about

14   the second issue you raised which is, I think, I heard

15   you say, well, what about an additional $25,000.  Is

16   that what Your Honor suggested to get to and through

17   the mediation?

18             THE COURT:  Yeah, I don't want to say

19   through the mediation, because it may be that

20   mediation will start, not be declared an impasse, but

21   not be finalized and we'll be coming back for further

22   hearing on some of these other matters.  But

23   essentially or more accurately until we have a further

24   hearing on the application, which in all likelihood

25   will be after the mediation is either successful or

1    reaches an impasse.

2            MR. GORDICH:  Okay.  Then, if that is Your

3    Honor's inclination, we would take the Schneiderman

4    proposal with a twist.  And the twist is, if Your

5    Honor will hold true to what Your Honor's inclination

6    was at the last hearing which is, you heard testimony

7    today by my colleagues -- in answer to my colleagues

8    question of Mr. Cooper, and in answer to Your Honor's

9    question that basically the benefit here is to

10   Windsor, iStar and these other entities to try to

11   protect and preserve the equity.  And if so, they

12   should pay the $25,000 and not my client.  Which in

13   the last transcript Your Honor said, Mr. Spector, that

14   might be where the Court's going on this.  And if the

15   Court is still going there, we'd love to go with you.

16           THE COURT:  I haven't changed my view that

17   the expense of Mr. Cooper and FTI may not be

18   appropriate over the -- in terms of the use of cash

19   collateral over the objection of the bank, to the

20   extent that they are baby-sitting the checkbook and

21   otherwise monitoring at the insistence of the mezz

22   lender to the parent company.  Having said that,

23   though, that the 25,000, in addition to the retainer,

24   so, I guess, a total of 50, I'm satisfied is going to

25   be a reasonable amount for services actually necessary

1    for the estate and useful in attempting to negotiate a

2    resolution on behalf of the estate.  As distinct

3    functions that maybe should be paid for by a third

4    party.  It's hard to be precise, but I'm satisfied

5    that they've undertaken activities for which

6    compensation is justified, and that the additional 25

7    is a reasonable amount.

8              MR. GORDICH:  I understand Your Honor's

9    ruling.  Now, with regard to the mediation, of course,

10   hopefully, that date will be good and we'll go to that

11   mediation and do the best we can.  I will tell Your

12   Honor as I said before, if at any time anybody wants

13   to say, Judge Mark will not be disqualified, then we

14   have no problem with him coming out because from our

15   point of view, we have hit them with our best shot and

16   tried to be as detailed as possible, so that if it

17   comes to fruition, it will do so rapidly.  If it

18   doesn't, it doesn't.

19             But I wanted to again say that we

20   respectfully submit that we appreciate Mr. Coopers'

21   candor, because what he said in response to my

22   questions, my colleague, Mr. Spector and Your Honor's

23   questions, we respectfully submit, has conclusively

24   proven that a Trustee would be appropriate.  So, in

25   the event that the mediation does not come to

1    fruition, that's our position and we are telegraphing.

2              MR. SPECTOR:  Your Honor, I don't

3    appreciate playing up things such as, we want you to

4    know our offer.  There's a reason why we have rules

5    like this just for that kind of purpose.  We, you

6    know, it -- to be productive, negotiations have to be,

7    it's public policy, public policy says negotiations

8    are best conducted in private.  And the trier of facts

9    should be shielded from it.

10             Your Honor is human and we don't want to

11   do anything that would, you know, it's just

12   inappropriate that's all I'm saying.  And it's not

13   because we don't want you to know, it's just not the

14   appropriate way to go, and I don't appreciate

15   grandstanding of that nature.  And, I've held my

16   tongue on a lot of things and I just want to draw the

17   line there.

18             The other thing I just have to point out

19   and I appreciate Your Honor's ruling.  We will go for

20   it.  I don't want to be making speeches all the time,

21   but before equity gets anything, everybody has got to

22   be dealt with.  The fact that Mr. Cooper may be

23   trying, as Your Honor pointed out, if it weren't

24   Mr. Cooper, iStar in the driver's seat as equity, it

25   would have been Mr. Deaktor as equity and his mother

1    and his wife.

2            There's always equity in every case.

3    Somebody hires a lawyer to file a Chapter 11, a lot of

4    times it's because they want to keep the company when

5    they come out.  Unfortunately, not always successful,

6    but that's the goal of Chapter 11, you reorganize and

7    you still own something when you're done.

8            The fact that equity says, you know, I

9    need some help to reorganize this case.  I can't do it

10   by myself.  I need some expertise that I don't have.

11   The estate always bears that, and there's always a

12   bank or some lender that winds up having to pay that

13   one way or the other, and it gets caught up and paid

14   at the end if equity is going to be keeping anything.

15   It has to get paid back or they have to agree to take

16   a haircut on the way out.  Otherwise, it doesn't

17   happen.  So, you know, that's my pitch now, and I'll

18   save it for when we really get to it, but I just don't

19   think it's a fair assumption to say just because

20   equity, once it's done, that equity has to pay.  That

21   isn't the way most cases are run.

22            THE COURT:  I don't disagree with that,

23   and we're talking about the expense, though, and

24   whether the expense of somebody Mr. Cooper's caliber

25   has been demanded by the equity owner or potential

1   equity owners, at an expense which would be probably

2   greater than if you just had the president of the

3   company still in there on salary, and whether or not

4   there's adequate protection for the use of cash

5   collateral.

6           If there's equity, and it's coming out of

7   a potential equity, then that's fine.  If it's

8   essentially being carved out of the banks collateral

9   on a case that may or may not be successful, then

10  that's another issue.

11          All right.  Here's where I think we are,

12  We -- I'm going to go with that ruling in terms of

13  Mr. Cooper.  We'll need a further hearing on his

14  continued retention and request for further hearing on

15  cash collateral.  And those may have to come sooner

16  rather than the date which we might pick for further

17  hearings, if they are going to be evidentiary hearings

18  on the banks major motions for stay relief or to

19  dismiss.

20          Let's take a break and try to talk about

21  dates.  I would expect, though, that we would stay

22  discovery pending mediation, if you're going to do

23  mediations fairly quickly.  And then, if there's an

24  impasse, take discovery.  But that's not what

25  you're --

1          MR. GORDICH:  Well, just two quick things;

2    Number 1, what my colleague was referring to before

3    and which I announced at the last hearing is from the

4    6th of June to the 15th of June, I am trying to defend

5    a fishing tournament title for the last two years, and

6    trying to three-peat.  It's the one time a year that I

7    would go away on vacation, and really hope to get

8    everyone's indulgence to continue to do that.  And

9    with regard to discovery, if that's Your Honor's wish

10   that's Your Honor's wish.  I mean, quite candidly, I

11   think -- I know you don't want to go into it, so I'm

12   not going to go into it.

13          THE COURT:  But the question is, whether

14   the discovery and the expense of that discovery is

15   going to meaningfully --

16          MR. GORDICH:  Understood.

17          THE COURT:  -- move the ball forward for

18   mediation.

19          MR. GORDICH:  Understood.  We don't, and

20   again, I say this with respect, we don't think that

21   the debtor fully appreciates the misdeeds that have

22   occurred and does not appreciate where they are at.

23          THE COURT:  But if there's a CRO in place,

24   putting aside the expense and payment of Mr. Cooper

25   for the moment.  Those misdeeds don't necessarily

1    compel the appointment of a trustee.  We went through

2    this in Puig, and Mr. Schneiderman can perhaps

3    painfully share his losing experience in making the

4    argument in Puig for appointment of a trustee.

5              MR. GORDICH:  Right.

6              THE COURT:  There's a requirement that the

7    trustee be sought, based on prior misconduct.  But

8    when you look at whether there's a requirement that a

9    trustee be appointed, you look at the present

10   management.

11             MR. GORDICH:  Exactly.

12             THE COURT:  And, the fact that the

13   Deaktors who, you are proffering for this purpose,

14   would be the wrongdoers in terms of the closing,

15   ultimately could fire Mr. Cooper.  My response to that

16   same argument in Puig was, they do that, I'll appoint

17   a trustee the next day.  So, that's kind of my

18   thinking on the effect of the prior closings.

19             Now, obviously, that's a big sore spot to

20   the bank, but I'm just wondering how broad discovery

21   on the additional relationships of the other entities

22   and Mr. Cooper's prior roles in activities, and

23   further details that get into these prior closings for

24   which may be relevant on some of your motions, but how

25   does that move the ball forward for mediation when

1    we're talking about as Frank said in Godfather I, it's

2    just business, Sal.  I mean, you're just trying to

3    make a deal.

4              MR. GORDICH:  Uh-huh.

5              THE COURT:  You know, why do you need

6    discovery to get to mediation?

7              MR. GORDICH:  Okay.  First of all, Your

8    Honor listened to the motion by Mr. Altomare, and I

9    don't know if Your Honor had the opportunity to look

10   at the transcript of the deposition that we filed.

11   Although you have dispensed with Mr. Altomare's motion

12   for relief from stay, there were issues that came up

13   and showed further harm to the public that's been done

14   by Mr. Deaktor and his management.  We --

15             MS. TALENFELD:  I just want Your Honor to

16   know --

17             MR. GORDICH:  Goodness.

18             MS. TALENFELD:  I'm sorry.  But, on the

19   record the deposition, I was there and I objected to

20   every question.  Every question was leading.  So, the

21   testimony, I don't think he should even be bringing it

22   up.  I objected to every single question.  He led the

23   witness, without a translator, and wouldn't allow me

24   to determine that she needed a translator.  We finally

25   got to ask -- I was allowed to ask a question, she

1    didn't understand English, needed a translator.  We

2    had to start from the beginning.  And I objected to

3    every question as leading, so I object to him bringing

4    up that testimony.

5            THE COURT:  Okay.  Well, let -- I'll

6    sustain that for the moment, because we're a little

7    bit off course anyway.  I'm just asking you why you

8    need discovery for purposes of the mediation?  Or does

9    it depend on when the mediation's going to occur?

10           MR. GORDICH:  Your Honor, I think they

11    thwarted our attempts to get discovery because we

12    think that it focuses what has gone on in this case,

13    and why a trustee should be appointed.  So, we think

14    that this will focus their attention on what their

15    real prospects are for the future, and will help

16    mediation occur.

17            And may I also say, at the deposition I

18    was interrupted like I was just now.  And I took her

19    suggestion and the entire thing was done over, again,

20    with a translator and the lady gave the exact same

21    answers to the exact same questions.  So, I hope that

22    Your Honor does find it relevant.  We will be bringing

23    it up at an appropriate time, and there were others

24    that were defrauded in the same manner.  But, I just

25    think that it will help the mediation if he

1    understands, but you know what, I withdraw it.  I'd

2    rather just go to the mediation and not do violence to

3    Your Honors thought process as to how to go forward.

4              Let's go to the mediation and hopefully

5    afterwards, if we are unable to solve it, I will then

6    attempt to get the depositions, again.

7              THE COURT:  Okay.

8              MR. GORDICH:  Now, that leaves the cash

9    collateral.  And I think I understood my colleague to

10   say that he has a new budget.  If so, I've not seen

11   that new budget, so it would be hard for me to comment

12   on it.

13             MR. SPECTOR:  It's exactly the same budget

14   except 4,000 --

15             MS. TALENFELD:  2360.

16             MR. SPECTOR:  2,360, was added as an

17   expense at the end of this month, to put up the

18   deposit for FP&L.

19             MS. TALENFELD:  Excuse me, Your Honor,

20   it's 2,360.  That covers five accounts.

21             MR. SPECTOR:  Five FP&L accounts.

22             MS. TALENFELD:  Yes, three model units, I

23   believe it's the sales office and the leasing office.

24             MR. SPECTOR:  As you know, we're required

25   under out local rules to check with --

1               THE COURT:  What about all the rental

2    units?

3               MS. TALENFELD:  Those are not covered by

4    the debtor.

5               THE COURT:  The tenant all have their own

6    deposits?

7               MS. TALENFELD:  Yes.

8               THE COURT:  Okay.

9               MS. TALENFELD:  Purely for what the debtor

10   is required.

11              MR. SPECTOR:  So, that wasn't in the

12   budget, but we did what we're supposed to do and FP&L

13   said, okay.

14              THE COURT:  All right.  Well, I'm want to

15   try to move this forward, but for scheduling you still

16   have not reached Mr. Markowitz?

17              MR. SPECTOR:  I just tried him again.  I

18   didn't call because we haven't broke.

19              THE COURT:  Take a break and talk about

20   cash collateral, and then assuming you reach

21   Mr. Markowitz, let's try to talk about timing.

22   But Mr. Schneiderman --

23              MR. SCHNEIDERMAN:  Your Honor, I would ask

24   that the Berger Singerman application be continued to

25   the same date.

```
 1            THE COURT:  Yeah, I'm going to do that.

 2            MR. SPECTOR:  Did we get a date yet?

 3            MR. SCHNEIDERMAN:  No.

 4            MR. SPECTOR:  Oh, okay.

 5            MS. TALENFELD:  No, we don't have a date.

 6            THE COURT:  We'll be back.

 7        (Thereupon, a brief recess was taken:)

 8            THE COURT:  Have a seat, thanks.

 9            MR. SPECTOR:  Your Honor, we contacted

10  Mr. Markowitz during the break and we've agreed upon a

11  date of June 18th for the mediation.  Thursday, June

12  18th.

13            THE COURT:  Okay.  So, we have a month to

14  deal with it?

15            MR. SPECTOR:  Yes.

16            THE COURT:  So, what's a month,

17  Mr. Gordich, is going to be gone part of that time.

18  So, are there issues on use of cash collateral besides

19  the payment of professionals in the next month or you

20  think those are pretty well agreed to?

21            MR. GORDICH:  I'm going to renew my

22  position and I expect Your Honor to renew your ruling.

23  Which is that it should only be used because it's on

24  my client's dime, with regard to a trustee.  And I

25  expect you're going to make the same ruling, Judge.
```

1             THE COURT:  Well, you are correct.

2             MR. GORDICH:  It happened once today,

3    Judge.

4             THE COURT:  I'm not prepared to appoint a

5    Trustee at this point.  And I don't believe that

6    there's any question that the debtor should be

7    authorized to use cash collateral to continue to

8    operate the property.  If within the next month,

9    Mr. Spector, what's happening with respect to teeing

10   up the release price issue, is that -- are there any

11   sales you're ready to close where that issue is going

12   to come before the Court?

13            MR. SPECTOR:  I used the break to ask

14   Mr. Deaktor and Mr. Cooper those questions about, if

15   there's any -- we had a bunch of sales that were in

16   the drawer.  That after we realized the bank was no

17   longer dropping the release prices, there were some

18   that got through, but now we stopped.  Mr. Cooper put

19   an end to anybody going through with those sales.

20            So, the question now is do we have to go

21   back and call these people and see if they're still in

22   the market and want to buy.  So, the answer is, we're

23   finding out about that.  The other possibility is, and

24   they are actively marketing the remaining empty units

25   as rentals to increase the rent roles in the meantime.

1    They're not going to do nothing with them.

2              The way it works is, you know, we have

3    people come and look at the model homes, model

4    apartments and say, you know, we can get a rental like

5    this for you if you sign a lease.  We'll have it ready

6    for you in 30 days, and then we spend the money to fix

7    it up.  Not fixing up everything and let it sit there,

8    but basically rentals.  So, those are the two avenues

9    of business revenue generation that the debtor is

10   looking at right now.

11             THE COURT:  But are they advertising, is

12   there any -- I didn't really --

13             MR. SPECTOR:  Yes.

14             THE COURT:  -- look at the budget whether

15   there's advertising to try to sell?

16             MR. SPECTOR:  Yes.  Mr. Cooper says, yes.

17   Yes.

18             THE COURT:  Okay.

19             MR. SPECTOR:  Okay.  So, we'll be getting

20   to that, but we really have first day stuff that we

21   have to get through.

22             THE COURT:  So, there's no sales motions,

23   at least, that you could tell me now you're about to

24   file that are going to raise that issue?

25             MR. SPECTOR:  I would have, if I could

1    have.

2          THE COURT:  Okay.  So, you're going to

3    continue to operate, try to rent, continue to market

4    and then the question is, between now and the 18th

5    discovery.  And since we have until the 18th, I would

6    be inclined to back off my earlier request and allow

7    Mr. Gordich some limited discovery, but I don't want

8    to tie up hours and hours, and days and days of

9    discovery.

10          Who was it that you were supposed to be

11    allowed or that you were permitted to take, Mr. Cooper

12    and Mr. Deaktor, and was there anybody else?

13          MR. GORDICH:  30(b)(6), 7030, person with

14    the most knowledge of the allegations in the pending

15    motions.  Might be Mr. Deaktor, it's their choice.

16          MR. SPECTOR:  We can -- we'll put somebody

17    up.  There are potential -- a lot of the things that

18    he's looking towards on that trustee motion you've

19    heard tell about, were involved with closing agents.

20    We may want to put the closing agent, because if

21    that's where we're going and it's probably the closing

22    agent that was responsible for it, that's the person

23    he wants to get and I'll get that name for him.

24          THE COURT:  Well, I think and it's been a

25    while since I looked at, and certainly a long while

1    since I've done one, but isn't there an obligation to

2    produce one or more --

3              MR. SPECTOR:  Yes.

4              THE COURT:  -- if necessary?

5              MR. SPECTOR:  Yes.

6              THE COURT:  So, that's essentially what

7    you're going to do?

8              MR. SPECTOR:  Well, essentially the

9    obligation, Your Honor, works first on the party

10   that's seeking the deposition.  They have to give you

11   the questions they want answered, the areas and the

12   questions they want answered.

13             THE COURT:  Right.

14             MR. SPECTOR:  And then we decide who is

15   best able to answer those questions.

16             THE COURT:  But if you know it's going to

17   be Mr. Deaktor for a lot of the areas that require

18   some other person from the company with respect to

19   the --

20             MR. SPECTOR:  No, I don't --

21             THE COURT:  -- particular closings, don't

22   you have to produce both?

23             MR. SPECTOR:   No, I'm not sure --

24             MR. GORDICH:  Actually, he has to

25   designate who they are and what they're answering

1  about and then produce them.  That's what it actually

2  says.

3          And we've done our part, which is, we told

4  them what we're going to ask.  We did it in the last

5  hearing.  We did it in the proposed notices that we

6  sent them.  Now, it's incumbent upon him to designate

7  who it is, tell us his designation, who these people

8  are and then produce them.

9          It can be one, it can be three, it can be

10  four, it's up to them.

11          MR. SPECTOR:  You're right.  One or more

12  officers, directors or managing agents, Your Honor.

13  You have 30(b)(6).  All right.  We'll have to do that.

14          Now, some of these people that I think are

15  probably most knowledgeable of some of the areas that

16  Mr. Gordich has raised, are not within the control of

17  the debtor, but they are third parties.  So, I don't

18  know, I mean, I may suggest he may want to get those

19  people instead or in addition.

20          MR. GORDICH:  Well, that might be

21  something that I need to do, but surely the debtor

22  needs to tell me what they did, and how it happened

23  and who in the debtor has the most knowledge of these

24  things.

25          THE COURT:  All right.  I'm going to

1    simply say discovery can proceed.  And furthermore,

2    that prior to Mr. Gordich leaving town or being on

3    vacation, that Mr. Cooper, Mr. Deaktor and any other

4    required 30(b)(6) witness be produced.

5              MR. SPECTOR:  As I understand it,

6    Mr. Cooper is being deposed, but I'm not sure on which

7    contested matter.  Typically, he's being deposed on a

8    matter, not just a 2004, just about anything.

9    Mr. Deaktor likewise.

10              30(b)(6), I have -- I don't recall, I may

11    have it with me, the actual request for dates that I

12    got on May 5th.  Maybe that's specific on that, but it

13    would be helpful, because if we have to give

14    designation of who it is, it would be helpful to say

15    with respect to this motion, we'd like to depose these

16    people.  In a typical lawsuit, an adversary, there's

17    no question, but now we got seven different things.

18    I'd like to know who is being deposed on which.

19              MR. GORDICH:  I don't blame my colleague

20    for wanting me to send over written questions that I'm

21    going to ask so he can look them over, but the point

22    of the matter is that I've done what I've needed to

23    do.  And, again, I don't want to -- I know Your Honor

24    doesn't want to hear who said what, and who did what.

25    So, I'm not going there, but I believe that we've done

1    everything we're supposed to do.  We are consistently

2    trying to get these depositions.  We're still trying

3    to get these depositions.

4              THE COURT:  Well the only, I mean, I guess

5    a fair question is, you want to depose Mr. Cooper in

6    part based on your continuing objection to his

7    retention, and in part --

8              MR. GORDICH:  True.

9              THE COURT:  -- and in part with his

10   knowledge of matters involving this debtor.

11             MR. GORDICH:  True.

12             THE COURT:  And the matters that involve

13   other debtors, and other entities, you know, you can

14   explore that to some degree, certainly beyond what was

15   explored today, but I don't think it should get too

16   far afield into all of the details of everything he's

17   done.  Unless you believe it's going to be relevant to

18   an argument for not allowing the retention based on

19   conflict.

20             MR. GORDICH:  Conflict.  I have to look

21   there.  And also, there's a second issue of, with due

22   respect to the gentleman, what can he do that a

23   trustee can't do?  And I have to ask those questions.

24   I have to ask what he did in the other cases, and

25   there's also the issue of, if Your Honor is inclined

1   to appoint him or re-appoint him or finally appoint

2   him after the mediation, assuming it's not fruitful.

3           I have to ask, well, what is he going to

4   do?  What has he done in other cases?  What is he

5   going to do here?  Who's actually benefitting?  Those

6   are things I have to ask, but I'll try to be

7   sensitive, Your Honor.

8           THE COURT:  Okay.

9           MR. SCHNEIDERMAN:  Your Honor --

10          MR. SPECTOR:  Well, Your Honor --

11          MR. SCHNEIDERMAN:  Can I interrupt, since

12  we're getting to the discovery issues, may I be

13  excused at this point?

14          THE COURT:  Yes.

15          MR. SCHNEIDERMAN:  Thank you.

16          MR. SPECTOR:  Your Honor, if Mr. Cooper is

17  going to be coming in from Atlanta for a deposition,

18  we will need to increase that 25,000.  Now, we're

19  talking about a day, half a day at least of

20  preparation and a day of deposition.  That's not part

21  of the budget we were talking about.  It isn't.

22          MR. GORDICH:  And, Your Honor, Mr. Cooper

23  has been inclined to come into the Southern District

24  of Florida and offer his services, and we appreciate

25  that.  And if he's inclined to come into the Southern

1    District of Florida one would think that he should

2    bear that cost, if he comes in, particularly when they

3    are still contesting the fact that we have to pay for

4    it.

5              THE COURT:  I'm not ruling on what he may

6    ultimately be entitled to as far as fees, but I'm not

7    authorizing further use of cash pending a further

8    hearing.  We're going to get to a further hearing

9    sometime before the end of June, because I'm going to

10   be away from the first two weeks in July.

11             So, you know, it may not be the most

12   lucrative engagement, and Mr. Cooper may have to

13   consider whether he wants to resign or get assurances

14   from other non-debtor parties, but 50,000 -- it's

15   still $50,000 for basically two months of activities.

16   And that's all that -- oh, and 25,000 it recognizes as

17   cash collateral.  The other 25 was posted by a third

18   party.

19             All right.  So -- and we need to talk

20   about, I guess, just for a further hearing date;

21   right?

22             MR. SPECTOR:  Yes, sir.

23             THE COURT:  We have the -- let me see what

24   else we didn't touch on.  Compensation procedures.  I

25   forgot to ask for Mr. Schneiderman's view.

1              MR. SPECTOR:  Yes, I'll address that

2    quickly.  Your Honor, the normal process that is

3    before genius attorneys figured out something that is

4    entirety different than local -- the 331 of the Code,

5    is that you file a fee application after 120 days in

6    period of such.  You can't get an interim fee

7    application in less than 120 days.  That's the

8    statute.   It's more honored than the breach now in

9    big 11's.  And one of the side benefits of the current

10   practice in  most cases, is that everybody knows

11   what's being spent immediately.

12             So, we would have to file, in essence,

13   prepare for everybody's review, the banks, creditors

14   -- 20 of the largest that's opposed, the U.S. Trustee,

15   every 30 days, they would have to know how much we're

16   running up, and what we're doing, because it's going

17   to be detailed.  So, there is a benefit for that

18   bargain, in that bargain.  Instead, of waiting 120

19   days and we drop the bill, that's, you know, mind

20   blowing, because they didn't see it coming.

21             This is one of the side benefits, and I've

22   been converted to that viewpoint over time, having

23   been dubious of it before.  I think it's a benefit to

24   all parties in the case to have professionals filing

25   their request for compensation on a 30 day basis, and

1   getting paid a portion of it as we go.  If the estate

2   is starting to look shaky as a result and the U.S.

3   Trustee can quickly come in and do what he always

4   does.

5           The -- so, I think it's a beneficial

6   modification of Section 331.  I think the amounts of

7   dispute in this case are sufficient to warrant that

8   type of process.  And I would ask the Court to enter

9   an order to that effect.  I don't know how anybody

10  would be prejudiced by it either.

11          THE COURT:  Well, we wind up then with an

12  issue of cash collateral for payment of your 30 day

13  invoices, if the motion is granted, but go ahead,

14  Mr. Gordich.

15          MR. GORDICH:  We wind up with an issue of

16  cash collateral if your invoices are paid on a 30 day

17  basis.  You hit it.

18          THE COURT:  That's the best argument you

19  said.

20          MR. GORDICH:  Geeze, maybe that one will

21  prevail today.

22          THE COURT:  I'm going to deny this motion

23  without prejudice.  I'll allow you to file your first

24  fee app earlier, so let's say by --

25          MR. GORDICH:  It worked.

1                THE COURT:  -- by June --

2                MR. GORDICH:  Geeze, you simply had to do

3     that on the one thing I prevailed and you snatched it

4     from me.

5                THE COURT:  Let's say by as early as June

6     13th, you can file your first fee app, and then we'll

7     -- you can notice it for whatever hearing date we wind

8     up picking at the end of June for the rest of the

9     stuff.

10               MR. SPECTOR:  All right, Your Honor.  June

11    13th.

12               THE COURT:  So, then we need to figure out

13    another --

14               MR. SPECTOR:  Hearing date.

15               THE COURT:  -- date.  June 13th is

16    actually a Saturday.  I had the wrong page open, so

17    June 12th.

18               Eric, can you check, do we have any --

19    check on CM, we don't have it on EST yet, but,

20    Wednesday, June 24th, if that's clear.  So, what I

21    would do is -- does the 24th look clear?

22               MR. GORDICH:  Your Honor, unfortunately,

23    I'm not a BlackBerry guy, but if it's --

24               THE COURT:  It's a Wednesday.

25               MR. GORDICH:  -- unclear, I will

1    immediately get back to the parties and the Court.

2              THE COURT:  It could possibly be a, maybe

3    the Monday of that week, but my last day in the office

4    is Thursday, the 25th.  And I know I have other

5    matters set that day.

6              MR. GORDICH:  The 24th just cleared up for

7    me, Judge.

8              THE COURT:  Okay.

9              MR. SPECTOR:  It's in the morning, Your

10   Honor?

11             THE COURT:  Well, it depends we may need

12   the whole day if we're going to have an evidentiary

13   hearing on various matters.

14             MR. SPECTOR:  Well, I will cancel this if

15   necessary.  I've been asked to speak in Marco Island,

16   Marriott for the County Attorneys, but there is other

17   people at my firm that are capable of doing the same

18   job.  So, if it turns out necessary, I'll ask someone

19   them to cover it.

20             THE COURT:  All right.  So, I think, we'll

21   just reset everything, because there's no point in

22   having another hearing unless there's an emergency

23   before the mediation, and we got to get things

24   resolved either by continuing the status quo or

25   changing it, perhaps, dramatically.  And I would like

1    to do that, certainly, before I get back.  So I will

2    be away the first two weeks.

3             All right.  Let's just review then, I

4    think I'll just do an omnibus --

5             MR. SPECTOR:  Schedule --

6             THE COURT:  -- order, except on cash

7    collateral.  Well, let's just go through them one by

8    one.  The ones that we're resetting without ruling,

9    I'll just put in the order, that's the trustee motion,

10   the abstention motion, the stay relief motions, I take

11   it you've waived the 362(e) 30 days.

12            MR. GORDICH:  Yes, sir.

13            THE COURT:  Okay.  Exclusivity, and motion

14   to dismiss.

15            MR. GORDICH:  There is 1112(b), sir.

16            THE COURT:  What?

17            MR. GORDICH:  1112(b) motions, sir.  You

18   said the abstention.  The dismissal and the abstention

19   would be, and we did not even hear the 1112(b).

20            THE COURT:  What's that?

21            MR. GORDICH:  The dismissal, bad faith

22   filing.

23            THE COURT:  I think I said dismissal.

24            MR. GORDICH:  Okay.  I apologize.

25            MS. TALENFELD:  Yeah.

1          THE COURT:  Okay.  All right.  So,

2    abstention motion, trustee motion, stay relief motion,

3    exclusivity and dismissal, I'll just set.  The Cooper

4    retention, Mr. Spector, you can do a further interim

5    order and on cash collateral, a further interim order.

6    And the difference is in the second interim order, it

7    will be that 25,000.  Otherwise, I think they're

8    pretty much tracking them prior to --

9          MR. GORDICH:  No, sir.  There's also the

10   issue they brought up about the --

11         THE COURT:   The utility.

12         MR. SPECTOR:  I have the budget.  We'll be

13   attaching the revised budget to the order, Your Honor.

14         THE COURT:  But the form of the order.

15         MS. TALENFELD:  Yeah.

16         THE COURT:  And, then you're also doing

17   the Ortiz stay relief.

18         MS. TALENFELD:  Yes, sir.

19         THE COURT:  Okay.  So, I think that covers

20   it.  Deny the motion to strike as moot, based on the

21   order denying.

22         MS. TALENFELD:  Yes.

23         MR. SPECTOR: She's got that.

24         THE COURT:  And I think, that's it.  Now,

25   I guess -- not I guess, what I'll also do then is the

1    order of referral to mediation and you've agreed on

2    Mr. Markowitz?

3              MR. SPECTOR:  Yes.

4              THE COURT:  So, I don't need to put in all

5    that other --

6              MR. GORDICH:  No, sir.

7              THE COURT:  -- stuff about picking the

8    mediator.

9              MR. GORDICH:  And it's June 18th, Your

10   Honor.

11             THE COURT:  Okay.

12             MR. SPECTOR:  And if you want to put the

13   place, we've agreed to do it at Mr. Brickell's --

14             MR. GORDICH:  Mr. Brickell on Gordich

15   Street.

16             MR. SPECTOR:   At Mr. Gordich's office.

17             THE COURT:  Okay.  I don't need to get

18   into that much detail.

19             MR. GORDICH:  Mr. Berlin's coming too.

20             THE COURT:  Okay.  I think we're good for

21   now.

22             MR. GORDICH:  Thank you.

23             MS. TALENFELD:  Thank you, Judge.

24             THE COURT:  Thank you.

25             (Thereupon, the hearing was concluded.)

112

```
 1                      CERTIFICATION

 2

 3   STATE OF FLORIDA )

 4                    )

 5   COUNTY OF MIAMI-DADE)

 6

 7          I, Carmen E. De La Cruz, shorthand Reporter

 8   and Notary Public in and for the State of Florida at

 9   Large, do hereby certify that the foregoing

10   proceedings were taken before me at the date and place

11   as stated in the caption hereto on Page 1; that the

12   foregoing computer-aided transcription is a true

13   record of my stenographic notes taken at said

14   proceedings.

15

16

17          WITNESS my hand this 22nd day of

18   May, 2009.

19

20

21          _____

22          Carmen E. De La Cruz

23          Court Reporter and Notary Public

24          DD545111 Expiration Date 08/2011

25
```