UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                              Chapter 11

LUCKY CHASE II, LLC,                                Case No. 09-18087-BKC-RAM

      Debtor.

_____/

**CHAPTER 11 TRUSTEE'S MOTION FOR THE ENTRY OF AN ORDER (1)
AUTHORIZING TRUSTEE TO SCHEDULE AUCTION SALE OF DEBTOR'S
PROPERTY; (2) APPROVING BIDDING PROCEDURES IN CONNECTION WITH
AUCTION SALE; (3) APPROVING FORM AND MANNER OF NOTICE OF SALE, (4)
SCHEDULING A FINAL HEARING TO APPROVE SALE, AND (5) APPROVING THE
SALE OF THE TRUSTEE'S INTEREST IN DEBTOR'S REAL PROPERTY FREE AND
CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES**

      KENNETH A. WELT, as Chapter 11 Trustee (the "Trustee") for Lucky Chase II, LLC

(the "Debtor"), by and through undersigned counsel, hereby files this Motion for the entry of an

Order (1) authorizing the Trustee to schedule an auction sale of the Debtor's property, (2)

approving bidding procedures in connection with auction sale, (3) approving form and manner of

notice of sale, (4) scheduling a final hearing to approve sale, and (5) approving the sale of the

Trustee's interest in the Debtor's real property, free and clear of liens, claims and encumbrances[1]

(the "Motion").  In support thereof, the Trustee respectfully states as follows:

## JURISDICTION AND VENUE

      1.     The Court has jurisdiction to consider this Motion and to grant the relief requested

herein pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28

U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory

predicates for this Motion are Sections 105, 363 and 365 of Title 11, United States Code (the

---

[1] As set forth herein, if the FDIC is the Successful Bidder, the sale will be subject to the lien of the Miami-Dade
County Tax Collector.

"Bankruptcy Code") and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND AND CURRENT STATUS OF CASE

2.      In 2005, the Debtor purchased the real property currently known as Residences at the Falls, a Condominium, located at 13841 SW 90th Avenue, Miami, Florida (the "Property"). At the time of purchase, the Property was a rental apartment development consisting of 28 two-story garden apartment buildings, with 8 to 36 units per building for a total of 628 units.

3.      On September 15, 2005, a Declaration of Condominium was filed and recorded which converted the rental apartments into condominium units for sale to the general public. As of the date hereof, 293 units have been sold to third parties, leaving 335 units in the Debtor's current inventory.

4.      On April 29, 2009, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date").    Shortly thereafter, AmTrust Bank ("AmTrust"), the Debtor's secured creditor which is owed in excess of $27 million, filed a series of motions including for the appointment of a Chapter 11 trustee. On June 24, 2009, this Court entered an order directing the appointment of a Chapter 11 trustee (C.P. # 137) and on the next day, the United States Trustee appointed Kenneth A. Welt as the Debtor's Chapter 11 trustee (C.P. # 138).

5.      Pursuant to this Court's Order dated August 12, 2009 (C.P. # 206), the Trustee has majority control over the Association's board of directors. The Association has an ad-hoc committee of non-developer unit owners which is represented by Becker & Poliakoff, P.A. The Association is currently insolvent due to lack of maintenance/assessment payments from the current non-developer unit owners. Since his appointment, the Trustee has caused the Debtor to

"deficit fund" the Association in lieu of making assessment payments in respect of its percentage ownership of dwelling units by paying the Association the difference between the Association's monthly expenses and its collections from assessments.

6.      During this case, the Trustee worked closely with AmTrust to formulate and negotiate a joint plan of reorganization for the Debtor (the "Joint Plan").  In the fourth quarter of 2009, the Trustee and AmTrust came to terms on the Joint Plan, pursuant to which AmTrust agreed to fund the costs of confirmation and the Debtor's losses on a monthly basis while the Trustee sought to market and sell the Property in an orderly fashion under a reasonable time schedule.

7.      Just before the Trustee was to file a Joint Plan and Disclosure Statement, on or about December 4, the Office of Thrift Supervision closed AmTrust and the Federal Deposit Insurance Corporation (the "FDIC") was named as AmTrust's receiver.

8.      Shortly thereafter, the Trustee determined that the FDIC's willingness to support the Joint Plan and agree to the necessary funding obligations thereunder was extremely remote. Accordingly, the Trustee began to implement an alternative plan, which contemplated the auction sale of the Property pursuant to Court approved procedures and guidelines.

9.      Specifically, on December 31, 2009, the Trustee filed and served  his Expedited Motion for an order (1) approving bidding procedures in connection with auction sale, (2) approving form and manner of notice of sale, (3) scheduling a final hearing to approve sale, (3) approving the sale of the Debtor's real property free and clear of liens, claims and encumbrances and (4) authorizing the surcharge of funds held at Ruden McClosky[2] to cover marketing costs of sale [C.P. # 286] (the "Initial Sale Motion").

---

[2] Ruden McCloskey previously represented AmTrust and thereafter the FDIC.  The law firm of Segall Gordich, P.A. is currently representing the FDIC in this matter.

10.    In connection with the relief requested in the Initial Sale Motion, the Trustee filed an application to retain Lamar Fisher and Fisher Auction Company (the "Auctioneer") as the Trustee's auctioneer [C.P. # 287] (the "Initial Auctioneer Retention Application").

11.    A preliminary hearing on the Initial Sales Motion and the Initial Auctioneer Retention Application was held on January 14, 2010. On January 15, 2010, the Court entered an Order reserving Ruling on the Initial Sales Motion and the Initial Auctioneer Retention Application [C.P. # 302]

12.    The FDIC and the Trustee determined to work together cooperatively while the FDIC evaluated the Debtor's property and decided whether it would ultimately consent to a sale of the Debtor's property, and upon what terms. On January 22, 2010, the Court gave effect to this agreement and entered a Stipulation and Order Approving Stipulation between the FDIC and the Trustee, which provided for a minimum 90 day delay of the Trustee's proposed sale [C.P. # 311] (the "FDIC Stipulation").

13.    Over the ensuing months, and pursuant to the FDIC Stipulation, the Trustee continued to operate the Debtor and to use AmTrust's cash collateral with the consent of the FDIC [see C.P. #'s 315, 327 and 341]. Meanwhile, the Trustee continued to solicit and consider letters of intent and expressions of interest from prospective purchasers of the Debtor's real property. As set forth herein, the FDIC has submitted an offer which the Trustee deems to be the highest and best bid submitted to date.

## THE FDIC'S STALKING HORSE BID

14.    The FDIC has offered to purchase the Trustee's interest in the Property on the following substantive terms (the "FDIC Bid"):

(a)    the FDIC shall be the stalking horse bidder with an irrevocable credit bid, pursuant to Section 363(k) of the Bankruptcy Code, in the amount of $8,762,867.23;

(b)    if the FDIC is the Successful Bidder, the Auctioneer[3] will receive a fee of 4% of the ultimate sale price, to be paid by the FDIC within 4 business days following the Sale Hearing, with 1% of the ultimate sale price to be allocated by the Auctioneer for the benefit of the Debtor's general unsecured creditors;

(c)    if a bidder other than the FDIC is the Successful Bidder, the Auctioneer will receive a fee of 5% of the ultimate sale price, to be paid out of the sales proceeds, with 1% of the ultimate sale price to be allocated by the Auctioneer for the benefit of the Debtor's general unsecured creditors;

(d)    if the FDIC is the Successful Bidder, the sale shall be free and clear of all liens except for the lien of the Miami-Dade Tax Collector;

(e)    if a bidder other than the FDIC is the Successful Bidder, the sale shall be free and clear of all liens, with all liens including those of the Miami-Dade Tax Collector to be satisfied from the sale proceeds in the order of priority of such liens;

(f)    the FDIC shall advance up to $68,000 in marketing and advertising costs (the "Marketing Advance") to the Trustee's Auctioneer, with all such advances being added to the FDIC's allowed secured claim.  In the event

---

[3] Contemporaneous with the filing of this motion, the Trustee is filing an amended application to approve the retention of the Auctioneer.

that a bidder other than the FDIC is the Successful Bidder, the Marketing

Advance shall be repaid from the sale proceeds;

(g)    the initial overbid shall be at least $9,000,000 and all subsequent bids shall

be in increments of $100,000;

(h)    within two (2) business days of the final hearing to approve the sale of the

Property to the highest and best bidder, the FDIC shall notify the Trustee

of any executory contracts and/or unexpired leases it wishes to have

assumed and assigned, and will file a notice of filing of same. If it is the

Successful Bidder, the FDIC shall be responsible for curing any defaults

or providing adequate assurance of prompt cure of any defaults under such

assumed contracts; and

(i)    pursuant to the FDIC Stipulation, all allowed fees, costs and statutory

commissions of the Trustee and his professionals, including any

contingency fee awarded to Mitchell Feldman and FBS Property Tax

Abatement Group (the "Professional Fees") shall be paid as follows: (i) if

the FDIC is not the Successful Bidder, then the Professional Fees shall be

paid from the sale proceeds, and (ii) if the FDIC is the Successful Bidder,

then the FDIC will pay such Professional Fees by way of surcharge or

otherwise within the later of 10 business days of closing or an Order

allowing such Professional Fees.

15.    The Trustee has received several letters of intent and expressions of interest from

prospective purchasers. The Trustee has determined that the FDIC's bid represents the highest

and best out of all offers made to date. However, given the other offers that the Trustee received,

6

the Trustee is hopeful that there will be competitive bidding if an auction sale is held without further delay.

16.    Accordingly, by this Motion, the Trustee respectfully requests that the Court approve an auction and sale process as set forth herein.

**RELIEF REQUESTED**

**A.    <u>Approval of Bidding Procedures</u>**

17.    In order to ensure that the estate is able to derive maximum value from the Property, the proposed sale will be to the highest and best bidder at auction.  The Trustee seeks to adopt procedures which will foster competitive bidding among potential buyers, without eliminating or discouraging any qualifying bids.  In connection therewith, the Trustee requests that the Court approve the following bidding and sale procedures, which the Trustee believes are likely to maximize the realizable value of the Property for the benefit of the estate (the "Bidding Procedures").

> <u>Participation Requirements</u>:  Unless otherwise ordered by the Court, in order to participate in the bidding process, an interested bidder must (i) wire into the trust account of Genovese Joblove & Battista, P.A., an escrow deposit of $500,000 no later than 5:00 p.m. on _____, 2010, which is two (2) business days prior to the scheduled auction (the "Bid Deadline") and (ii) submit to Genovese Joblove & Battista, P.A. a fully executed asset purchase agreement substantially in the form attached hereto as **Exhibit "B"** (the "Purchase Agreement"), which shall include a purchase price of no less than $9,000,000, on or before the Bid Deadline (the effectiveness of such Purchase Agreement being contingent only upon the Qualified Bidder becoming the Successful Bidder pursuant to these procedures, subject only to Bankruptcy Court Approval, with no due diligence or financing contingencies).  A person who timely complies with these requirements shall be a "Qualified Bidder".

> The FDIC shall be deemed a Qualified Bidder by virtue of the FDIC Bid.

> <u>Marketing Plan</u>:  The Trustee, by separate application filed contemporaneously herewith, is seeking to retain the services of Fisher Auction Co., Inc. (the "Auctioneer") to implement an extensive Accelerated Marketing Plan to advertise the bulk sale of the Property and to conduct the auction sale thereof (the "Marketing Plan").  A copy of the Marketing Plan, which outlines the Auctioneer's proposed marketing activities, is attached hereto as **Exhibit "A"**.

<u>Participation in Auction</u>: Provided that a Qualified Bid is submitted on a timely basis, the Trustee, by and through the Auctioneer, will conduct an auction (the "Auction"). The Auction shall take place in the clubhouse at the Property, which is located at 13841 S.W. 90th Avenue, Miami, Florida, 33176-6903, on _____, 2010, which is the date that is one business day prior to the requested hearing date on the proposed sale, beginning at 10:00 a.m. or such other time or place as the Trustee shall notify all Qualified Bidders.

<u>Auction Procedures</u>: At the Auction, the opening bid will be the FDIC Bid. All Qualified Bidders shall be entitled to make any subsequent bids, provided however, that the initial overbid shall be at least $9,000,000.00 and all subsequent bids shall be in increments of $100,000. Bidding at the Auction shall continue until such time as the highest and best offer is determined, which shall be determined by the Trustee in the exercise of his business judgment. The Trustee reserves the right to modify the bidding increments or announce at the Auction additional procedural rules for conducting the Auction in the exercise of his business judgment.

<u>Successful Bid</u>: After the conclusion of the Auction, the Trustee shall submit the highest or best bid (the "Successful Bid") for approval by the Bankruptcy Court on _____, 2010, at 51 S.W. 1st Ave., Room 1406, Miami, FL 33130 (the "Sale Hearing"). The Qualified Bidder who has the Successful Bid presented for approval to the Court shall be referred to herein as the "Successful Bidder." Closing shall take place within twenty (20) days of entry of the Sale Order or 6 days after the Sale Order becomes final and non-appealable, whichever is later. The Successful Bidder, if not the FDIC, must be prepared and must in fact consummate the purchase of the Property in accordance with the Purchase Agreement. Upon the failure of the Successful Bidder to consummate the closing of the purchase of the Property because of a breach or failure on the part of the Successful Bidder, then the Trustee may elect in his business judgment the next highest or otherwise best Qualified Bidder to be the Successful Bidder (the "Back Up Bidder"). At the Sale Hearing, the Trustee intends to seek approval from the Court for the next highest or best bid (the "Back Up Bid"), which approval shall authorize the Trustee to consummate the Back Up Bid immediately after a default under the Successful Bid without further order of the Court. Promptly following the conclusion of the Sale Hearing, the Trustee shall return the deposits to each unsuccessful Qualified Bidder (except the Back Up Bidder whose deposit shall either be returned upon the closing of the sale to the Successful Bidder or applied to the purchase price in a closing with such Back Up Bidder). The ultimate purchaser, upon closing, whether the Successful Bidder or the Back Up Bidder, shall be referred to herein as the "Purchaser".

<u>As Is Where Is</u>: The Property will be sold in its "As Is", "Where Is" condition and with all faults, with no guarantees or warranties express or implied.

<u>Executory Contracts and Unexpired Leases</u>: No later than one (1) business day prior to the Auction Sale, the Purchaser shall designate for the Trustee those executory contracts and unexpired leases which are to be assumed by the Trustee and assigned to the Successful Bidder (each a "Designated Contract"). Subsequent to the Sale Hearing, the Trustee may file a separate motion seeking the Court's approval of the assumption and assignment of the Designated Contracts to the Successful Bidder.

8

Real Estate Commissions: The Auctioneer shall be entitled to a commission as outlined in the FDIC Bid. The Trustee shall not be responsible for any other real estate commissions. The Purchaser shall indemnify and hold the estate harmless for any other claimed real estate commissions.

Objections: Objections, if any, to the Sale, must (a) be in writing; (b) set forth the nature of the objector's claims against or interest in the Debtor's estate, and the basis for the objection and the specific grounds therefore; (c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of Florida and all Orders of this Court; (d) be filed with the Court and served upon counsel to the Trustee, the United States Trustee for the Southern District of Florida and counsel to the FDIC, so as to be RECEIVED no later than 5:00 pm (Eastern) two (2) businesses days prior to the Sale Hearing (the "Objection Deadline"). Only timely filed and served responses, objections, or other pleadings will be considered by this Court at the Sale Hearing. The failure of any person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Sale or the consummation and performance of the Agreement.

**B.    Authority to Offer Stalking Horse Bid Protections**

18.    As set forth above, the Trustee has determined, in the exercise of his best business judgment, that a sale of the Property at this time to the FDIC as the Stalking Horse Bidder, subject to higher or better offers, is warranted and necessary. As set forth above, the Trustee requests authority to conduct an auction sale with the FDIC Bid as the Stalking Horse Bid and approval of the Bidding Procedures.

19.    The ability of the Trustee to offer the Stalking Horse Bidder the proposed bidding protections is beneficial to the Debtor's estate and creditors and allows the Trustee to establish a floor and appropriate paramaters for the submission of Bids prior to the Auction. Approval of overbid protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases.

20.    Three different approaches have been used by the bankruptcy courts in assessing the validity and enforceability of bidding incentives. The first approach – the business judgment test – is based on the corporate control cases and applies the business judgment rule to make certain that bidding is promoted, not deterred, and that the fees are reasonable in relationship to

the size of the transaction and the bidder's efforts. *See In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Col. 1992), adopting *In re Integrated Resources, Inc.*, 135 B.R. 746, 753 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *In re Metaldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009) (applying business judgment test to Debtor's selection of stalking horse bidder); *see also Cottle v. Stores Communications, Inc.*, 849 F. 2d 570 (11th Cir. 1988) (using business judgment test in corporate control context). This approach also has been endorsed by a leading bankruptcy treatise. See 3 *Collier on Bankruptcy* § 363.02[6] at 363-21 (15th ed. 2005) (courts "should approve [bidding incentives] unless they are unreasonable or appear more likely to chill the bidding process than to enhance it.").

21.     The second approach – the best interests of the estate test – focuses on whether the bidding incentive at issue is in the best interests of the estate to ensure that the debtor's estate is not unduly burdened and that the relative rights of the parties are protected. See *In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) ("this Court declines to follow other Bankruptcy Court's opinions where break-up fees are treated as another topic of corporate negotiation without reference to what in fact is in the best interests of the estate."); see also *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) (adopting *America West*); *In re Tiara Motorcoach Corp.*, 212 B.R. 133, 137 (Bankr. N.D. Ind. 1997) (same).

22.     The third approach – the administrative claim test – considers whether the bidding incentive at issue is "actually necessary to preserve the value of the estate." See *In re O'Brien Environmental Energy, Inc.*, 181 F. 3d 527, 535 (3d Cir. 1999) (concluding that none of the cases which support the first two approaches "offers a compelling justification for treating an application for break-up fees and expenses under § 503(b) differently from other applications for

administrative expenses under the same provision"); see also *AgriProcessors, Inc. v. Iowa Quality Beef Supply Network, L.L.C. (In re Tama Beef Packing, Inc.)*, 290 B.R. 90, 97-98 (B.A.P. 8th Cir. 2003) (adopting reasoning of *O'Brien* and holding that administrative expense jurisprudence is applicable); *In re President Casinos, Inc.*, 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004) (citing *Tama Beef* as applicable circuit precedent); *In re Dorado Marine, Inc.*, 332 B.R. 637 (M.D. Fla. 2005) (using administrative expense test, citing *O'Brien*); *In re Beth Israel Hospital Ass'n of Passaic*, 2007 WL 2049881 at *15 (Bankr. D.N.J. July 12, 2007) (break-up fees must be determined by the same standard applied to the allowance of any administrative expense); (*In re Reliant Energy Channelview, LP*, 403 B.R. 308, 311 (D. Del. 2009) (parties agreed that *O'Brien* set forth correct standard).

23.     The Trustee submits that under each of the above tests the proposed overbid protections will not chill bidding, but rather enhance it and that the proposed overbid protections will preserve and enhance the value of the estates' assets.  Furthermore, there is no "break up fee" associated with this sale.

**C.     Form and Manner of Notice of Bidding Procedures and Sale**

24.     Pursuant to Bankruptcy Rule 2002(a), the Trustee is required to provide creditors with 20 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested.

25.     The Trustee has served or will serve this Motion on all creditors and the Office of the United States Trustee.  In addition, the Trustee proposes to serve upon all creditors and parties who have expressed an interest in acquiring the Property the Notice of Sale and Bidding Procedures (the "Notice") substantially in the form attached hereto as **Exhibit "C"**.  The Notice

will include, among other things, the proposed Bidding Procedures, the deadline for filing

objections and competing bids, the location of the Auction (if necessary) and the date and time of

the Sale Hearing.  Moreover, the Auctioneer will aggressively market the Property pursuant to

the Marketing Plan.

**D.**     **Sale of Substantially all Assets Pursuant to Section 363(b) of the Bankruptcy Code**

26.     The Trustee requests authority to sell, assign and transfer the Property to the

FDIC, or the highest and best bidder, pursuant to Section 363(b) of the Bankruptcy Code, which

Section provides that a Trustee "after notice and a hearing, may use, sell or lease, other than in

the ordinary course of business, property of the estate."

27.     The sale of the Purchased Assets pursuant to the FDIC Bid constitutes

substantially all of the Debtors' assets.  Courts interpreting Section 363(b) have approved non-

ordinary course sales even where substantially all of a debtor's assets were being sold prior to

proposal of a plan of reorganization.  *In re Parkstone Med. Info. Sys.*, 2001 WL 36189822 at *1

(Bankr. S.D. Fla. Oct. 16, 2001) (Hyman, J.); *In re Lionel Corporation*, 722 F.2d 1063, 1070-71

(2nd Cir. 1983); *In re Baldwin United Corp.*, 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984); *In re

Tower Automotive, Inc.*, 342 B.R. 158, 163-64 (Bankr. S.D.N.Y. 2006 (discussing legal

standards governing asset sales outside the plan process). Following the guidelines established

by the seminal decision of the Second Circuit in the *Lionel* case and its progeny, a debtor may

sell all of the assets of the estate under Bankruptcy Code section 363 outside of a plan.  As the

*Lionel* court observed:

> Resolving the apparent conflict between Chapter 11 and section 363(b) does not
> require an all or nothing approach.   Every sale under 363(b) does not
> automatically short-circuit or side step Chapter 11; nor are these two statutory
> provisions to be read as mutually exclusive.  Instead, if a bankruptcy judge is to
> administer a business reorganization successfully under the Code, then ... some
> plan for the operation of both 363(b) must be allowed for. ... The rule we adopt

requires that a judge determining a section 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.

*In re Lionel Corporation*, 722 F.2d at 1070-71; see also *In re General Motors Corp.*, 407 B.R. 463, 498 (Bankr. S.D.N.Y. 2009) (holding that proposed 363 transaction did not constitute an impermissible *sub rosa* plan); *In re Chrysler LLC*, 405 B.R. 84, 94 (Bankr. S.D.N.Y. 2009) (applying *Lionel* factors).

28.    Therefore, as a general rule, courts approve the sale of all or substantially all of a debtor's assets, prior to confirmation of a plan and pursuant to Section 363(b), provided the Trustee establishes "sound business judgment" for such a transaction. *Parkstone Med. Info. Sys.*, 2001 WL 36189822; *In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995) ("courts consistently have acknowledged that assets of an estate can be sold prior to the confirmation, or even filing, of a plan").; *In re Lorraine Brooke Associates, Inc.*, 2007 WL 2257608 at *4 (Bankr. S.D. Fla. Aug. 2, 2007) (Cristol, J.) (applying business judgment test in assessing 363(b) motion in chapter 7 proceedings) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 175-176 (D. Del. 1991)); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).  The "sound business judgment" test requires the Trustee to establish: (a) that a sound business reason justifies the sale outside the ordinary course of business, (b) that accurate and reasonable notice has been provided to interested parties, (c) that the Trustee has obtained a fair and reasonable price, and (d) good faith.  *Id.*; see also *In re Equity Management Systems*, 149 B.R. 120, 124 (applying same factors); *In re Phoenix Steel Corporation*, 82 B.R. 334, 335 (Bankr. D. Del. 1987) (same); *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 136 (Bankr. W.D.N.Y. 2009) (same) (citing *In re Lionel Corp.*, 722 F.2d at 1071 and *Phoenix Steel*, 82 B.R. at 335).

*(i)    Sound Business Reasons Exist to Sell the Assets at this Time*

13

29.    The Trustee respectfully submits that all of the factors demonstrating his sound business judgment are met, and that the sale should be approved.  There are sound business reasons justifying the sale of the Purchased Assets to the FDIC, or the highest and best bidder, at this time.    The Trustee is concerned about the ability to effectuate a true "internal" reorganization, nor does the Trustee have the luxury of time to negotiate, formulate and propose another plan of reorganization and disclosure statement.  Rather, the Trustee has determined that the best way to maximize the value of the Debtor's assets is to sell its business and property, for fair market value, to the highest and best bidder pursuant to a section 363 sale.

30.    As set forth above, in late June 2009, the Trustee took over control of the Debtor. The Trustee immediately took steps to reduce liabilities and improve the net operations of the Debtor.  However, even with these improved operations, the Debtor may not have the ability to restructure its financial affairs solely based on its business revenue.

31.    As set forth above in detail, the Trustee solicited and considered several offers from prospective purchasers.  The result of such process was the proposed sale of the Property to the FDIC pursuant to its Stalking Horse Bid.  If the Trustee were required to effectuate the sale pursuant to the typical plan and disclosure statement process, the closing would not occur for several more months.  Therefore, in order to avoid losing these valuable opportunities, and in order to preserve the maximum value of the Property for the estate, the Trustee was required to seek approval of the sale by way of motion rather than pursuant to a plan of reorganization.

(ii)    *Alternatives to Sale Motion.*

32.    Rather than seeking to sell substantially all of the Debtor's assets, the Trustee could have sought to restructure the Debtor's financial affairs through a plan of reorganization. In such a scenario, the Trustee would have been required to demonstrate to the Court, and to

creditors of the estate, that the Debtor had the ability to emerge from Chapter 11 as a "reorganized entity". The Trustee would have to show, among other things, that the Debtor had the financial ability to meet the requirements of Section 1129 of the Bankruptcy Code, which requires a trustee to demonstrate, among other things (a) that creditors will receive or retain under such plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor was liquidated on such date under chapter 7 of the Bankruptcy Code, and (b) confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor. Based on the financial condition of the Debtor, it is unclear at best whether the Trustee could satisfy these requirements.

33.    Another alternative to the proposed sale would be the conversion of this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code, which would require the immediate closure and cessation of the Debtor's business operations and the liquidation of all assets of the Debtor and the Debtor's estate by a Chapter 7 bankruptcy trustee. The Trustee believes that conversion of this case to Chapter 7 would only create additional administrative expenses and delays that will ultimately reduce the eventual recovery of creditors.

34.    Yet another alternative to the proposed sale to the Stalking Horse Bidder is the dismissal of this Chapter 11 case. In that event, however, the Trustee readily anticipates that the FDIC will commence proceedings to foreclose on its collateral. In addition, the Trustee anticipates that certain other creditors would quickly file suit against the Debtor. The court presiding over any particular court proceeding would not have jurisdiction over any other proceeding, and as a consequence each creditor would be free to undertake such collection activity, including lawsuits, as such creditor deemed appropriate, all in what would amount to a

"race to the courthouse."  These consequences are exactly the types of activities that the bankruptcy process is designed to avoid.  It is only through the bankruptcy process that the Debtor's creditors can be treated in accordance with each creditor's respective rights.

35.    Collectively, these factors clearly evidence that the Trustee's proposed sale of the Property to Stalking Horse Bidder, or the highest and best bidder, is in the best interest of all creditors of the estate.

### (iii)    The Trustee has Obtained a Fair and Reasonable Price

36.    The Trustee believes that the sale proposed herein is the best way to preserve the going concern, enterprise value of the Property and to maximize the value of the estate for the benefit of all creditors.  The value of the FDIC Bid to ($8,762,867.23) will be tested by the market in connection with the Auctioneer's marketing plan and the fact that the sale will be subject to higher and better offers.

### (iv)    The Sale is in Good Faith

37.    The Purchase Agreement is the product of good faith, arms' length negotiations between the Trustee and the FDIC.  The FDIC is not an insider of the Debtor within the meaning of Section 101(31) of the Bankruptcy Code, and does not control or act on behalf of any insider of the Debtor.  Therefore, the sale has been proposed in good faith.  See *In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993) ("deference to a DIP's decision as to a successful bidder of its assets is appropriate, and that decision may be honored unless it is proven that the DIP abused that discretion"); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149, n.5 (3d Cir. 1986) (purpose of good faith requirement is to "prevent[] a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11."); see also *In re Lorraine Brooke Associates*, 2007 WL 2257608 at *4; *In re Grand Prix Associates, Inc.*, 2009 WL 1850966 at *4

(Bankr. D.N.J. June 26, 2009) ("A court may not find good faith if fraud, collusion, or unfair advantages are determined.") (citing *Abbotts Dairies*, 788 F.2d at 149-50).

**E.**     **Sale of Property Free and Clear of Liens, Claims and Encumbrances**

38.     The Trustee seeks to sell the Property to the highest and best bidder following the Auction, free and clear of liens, claims and encumbrances.[4]

39.     Section 363(f) of the Bankruptcy Code authorizes the Trustee to sell property of the estate free and clear of any liens, claims or encumbrances if one of the following is met: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents, (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (4) such interest is in bona fide dispute or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. The language of Section 363(f) is in the disjunctive, so that a sale free and clear of interests can be approved if any of the aforementioned conditions is met. *In re Heine*, 141 B.R. 185, 189 (Bankr. D.S.D. 1992); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

40.     The Trustee submits that the sale should be free and clear of all liens, claims and encumbrances, with any such liens, claims or encumbrances to attach to the proceeds of the sale (if the FDIC is not the Successful Bidder). The Trustee intends to demonstrate at the Sale Hearing that the sale should be approved pursuant to Section 363(f) of the Bankruptcy Code. There are sound business reasons justifying the sale of the Property to the highest and best bidder, at this time. Prior to the closure of AmTrust, the Trustee had negotiated a Joint Plan pursuant to which AmTrust would have funded confirmation costs and the shortfalls of the

---

[4] The Trustee is not transferring certain Excluded Assets (as defined in the Purchase Agreement), including any pre-closing insurance claims, cash and causes of action including any avoidable transfers under the Bankruptcy Code.

Debtor's operations on a monthly basis while the Trustee pursued sale of the Property over a reasonable period of time.

41.     The Trustee will have provided notice of the sale and Bid Procedures to all creditors and interested parties and Fisher will have extensively marketed the Property in accordance with the Marketing Plan.  The Trustee submits that, as a result of the Auction, the sale will be for a fair and reasonable market price and, of course, conducted in good faith.

42.     Collectively, these factors clearly evidence that the Trustee's proposed sale of the Property to the highest and best bidder at auction, without any further delay, is in the best interest of all creditors of the estate.

43.     Additionally, the proposed Stalking Horse Bid shall be a credit bid of the FDIC pursuant to Section 363(k) of the Bankruptcy Code, which provides that:

> At a sale under [Section 363(b)] of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

44.     Courts have generally held that creditors may "bid the full face value of their secured claims under § 363(k)." *In re SubMicron Systems Corp.*, 432 F.3d 448, 459 (3rd Cir. 2006) (citing *In re SunCruz Casinos, LLC*, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) and *In re Midway Invs., Ltd.*, 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla. 1995)).

45.     The Trustee additionally submits that the proposed sale is in the best interests of the estate because the proposed bidding procedures and stalking horse protections to the FDIC provide pre-established procedures for addressing the FDIC's rights under Section 363(k).

**F.**     **Assumption And Assignment of Executory Contracts and Unexpired Leases**

18

46.     The assumption and assignment of the Designated Contracts is an integral part of the proposed sale and should be approved by the Court. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a trustee, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a). By enacting section 365(a) of the Bankruptcy Code, Congress intended to allow a debtor to assume those leases/contracts that benefit the estate, and to reject those that are of no value or are burdensome to the estate. *See Cinicloa v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *In re Gardinier, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983); *In re Chira*, 367 B.R. 888, 898 (S.D. Fla. 2007); *In re Sandman Assocs., LLC*, 251 B.R. 473; 481 (W.D. Va. 2000) (noting that "[t]he authority granted by section 365 allows the trustee or debtor in possession to pick and choose among contracts, assuming those that are favorable and rejecting those that are not.").

47.     On or before the third business day prior to the Auction, the Trustee shall file with the Court and serve upon all Qualified Bidders an updated list of the Debtor's executory contracts and unexpired leases.   No later than one (1) business day before the Auction, the Purchaser shall designate for the Trustee those executory contracts and unexpired leases which are to be assumed by the Trustee and assigned to the Successful Bidder.  Subsequent to the Sale Hearing, the Trustee may file a separate motion seeking the Court's approval of the assumption and assignment of the Designated Contracts to the Successful Bidder.

**F.     Scheduling Final Hearing on Sale Motion**

48.     The Trustee requests that the Court set a final hearing on the Sale Motion, which the Trustee requests be approximately 30 to 45 days following the initial hearing on this Motion to allow the Auctioneer to implement its marketing plan.

**WHEREFORE**, the Trustee respectfully requests that this Court enter an order (1) authorizing the Trustee to schedule an auction sale of the Debtor's property, (2) approving bidding procedures in connection with auction sale, (3) approving form and manner of notice of sale, (4) scheduling a final hearing to approve sale, (5) approving the sale of the Debtor's real property free and clear of liens, claims and encumbrances, and (6) granting such other and further relief as is proper.

Respectfully submitted this 30th day of August, 2010.

**I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A)**

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for Chapter 11 Trustee
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By:  /s/ Michael L. Schuster
      Glenn D. Moses
      Florida Bar No. 174556
      gmoses@gjb-law.com
      Allison R. Day
      Florida Bar No. 494097
      aday@gjb-law.com
      Michael L. Schuster
      Florida Bar No. 57119
      mschuster@gjb-law.com

# EXHIBIT A



## Accelerated Marke[ting]

**Introduction:**

Fisher Auction Co., Inc. continues to lead our industry by formulating new techniques in Accelerated Marketing, which in turn outperforms any competition and maximizes value for its clients.

Our recently designed technique of offering an inventory of properties / portfolio is a hybrid of traditional methods with specific bidder pre-qualifications to insure a closed transaction in today's economy. There is no post due diligence periods or any possibility of re-trading price.

Fisher Auction Co., Inc. has utilized this successful technique on several initiatives within the last twenty-four (24) months generating over $47,800,000.00 in sales. It has produced qualified bidders throughout the United States and abroad.

This Accelerated Marketing Plan is based upon the above strategy with its proven track record.

**Scope of Services:**

Fisher Auction Co., Inc. proposes to conduct a live open-outcry public auction event (the "event") on the "RESIDENCES AT THE FALLS", Miami, Florida, which consists of approximately three hundred thirty-five (335) remaining unsold condominiums.

The event is accomplished via the United States Bankruptcy Court ("Court") Ordered 363 Sale.

The terms of the offering are predefined and qualified bidders will competitively bid the preset date and time.

The offering will be a portfolio sale (bulk sale of all 335 units to a single purchaser).

Our goal is to deliver a distinct message to any and all potential buyers that the Court wants to sell **now** to generate the highest level of interest in order to obtain the highest sales price for all Creditors.

Our objective is to present the portfolio in a first class, impressive manner and promote the "RESIDENCES AT THE FALLS", as a unique investment opportunity.

 **Accelerated Market**

**Event Timeline:**

Upon Court appointment to proceed, the event will take place within 60 days which allows for sufficient time to prepare the necessary due diligence package for the bidders and implement our specially designed presale auction-marketing program.

The event day/date/time will be mutually agreed upon my all parties involved.

**Event Location:**

The event can be conducted either onsite at the "RESIDENCES AT THE FALLS", with the Court confirmation hearing of the Sale scheduled the following day or conducted in Judge Mark's chambers followed by the Court confirmation hearing of the Sale.

**Property Tours:**

Fisher Auction Co., Inc. will coordinate with the existing property management staff to set specific dates and times for prospective buyers to inspect the units and tour the property. We will also show by special appointment. For liability purposes, potential purchasers will be required to execute a "Preview Release of Liability Form" to gain entry. Representatives from the marketing team will be present during all tours.

**Marketing Strategy:**

The portfolio will be marketed on an international, national, regional and local basis to give the broadest range of coverage and attract the maximum number of buyers from all regions. Our marketing campaigns reach worldwide and continue to produce buyers from multiple foreign countries.

The strategy will be to promote the portfolio to our international / national buyer database, business professionals, investors, fractured condominium "bulk buyers," investment funds, real estate brokerage firms, etc. The promotional campaign will stress the Court's urgency for buyers to act now knowing that they will not have an opportunity to wait for any price reduction in the future.

**Marketing Highlights:**

The event to be presented and positioned as **"By Order of the United States Bankruptcy Court, Southern District of Florida, Kenneth A. Welt, Trustee, Case No. 09-18087-BKC-RAM/ Real Estate Auction."**

*Fisher Auction Co., Inc. Produces Top Dollar For You...*

**FISHER**
AUCTION CO. INC.
*The Standard of Excellence*



## Accelerated Marke

The marketing highlights will include;

- **Direct Mail:** A direct mail promotional brochure will be designed and sent to all logical, identifiable demographic groups. The identification of new buyers through the market segmentation process will benefit the direct mail marketing program. We will work with the Creditors and send information to any individuals / groups who may have previously expressed interest in the portfolio. Fisher Auction Co., Inc. has a database of more than 40,000 from which to draw.

- **Public Relations:** A valuable aspect of a major auction marketing program is the public relations campaign. Properly conceived plans often result in the generation of free publicity at the level of ten (10) times the direct media placement budget. Utilizing our public relations team to plan and coordinate international, national, regional and local focus, we are confident the public relations will effectuate results on behalf of the auction effort.

- **Public Relations Strategy:** To employ all appropriate print and broadcast consumer, business and trade news media via a program of press releases, informational background kits, interviews, personal follow-up, editorial boards and paid distribution services to deliver the message of the above objectives to the right target audiences.

- **Print Medias:** The international, national, regional and local print media campaign will be scheduled for a seven (7) week program. Sample medias will include Global Wall Street Journal, Toronto Star, Globe & Mail, New York Times, Miami Herald, International Herald Tribune, Chicago Tribune, Sun-Sentinel, etc.

  We will continuously monitor the prospective bidder response from each advertisement allowing daily analysis. In this manner, the campaign can be altered to focus in on the most effective media throughout the program. All responses from prospective bidders are logged by date and source into our advertising

*Fisher Auction Co., Inc. Produces Top Dollar For You...*





## Accelerated Market

response computer software system allowing reporting and analysis on a real time basis.

- **Telemarketing:** After the market segmentation, we will utilize all information to develop a plan for our team of personnel to contact potential purchasers, introduce them to the upcoming event and provide the promotional materials.

  Inquiries will be handled on a real time basis for the dissemination of promotional materials and due diligence packages. We believe it is of critical importance to recognize that typical prospective purchaser questions and objections are answered and dealt with differently in an auction marketing setting, especially in the Bankruptcy Court arena.

- **E-Platforms:** The event will be prominently featured on Fisher Auction Co., Inc.'s web-site. Our site receives thousands of hits on a monthly basis. We will also advertise / list on appropriate-targeted real estate sites (costar.com, investornet.com, auctionzip.com, National Auctioneers Assoc, realtyinvestor.com, glo-con.com, propertyauction.com, costar.com, commercialiq.com, cmailmarketing.com, dealmakers.net, cityfeet.com, Realup.com, Florida Real Estate Journal Website, Loopnet, Property Line, Propertyauction.com, The Florida Investor, Propertyblast.com, Cmail, condo.com, etc.).

- **Additional Utilized Marketing Tools:**
    - Specialty journals
    - Signage (possible billboards)
    - Personal solicitations

**Auction Methodology:**

Our Accelerated Marketing process combines traditional / modern distribution channels and portals to provide synergy through an expansive advertising program "spotlighting" an inventory of properties or portfolio for purchase. Our process removes the paradigm of pricing thereby creating maximum competition, <u>which equals maximum value received under the terms of the offering.</u>





# Accelerated Market

Our successful program will eliminate any future holding costs / expenses and convert the portfolio into liquidity for the Creditors as well as the release of all developers' liabilities; including environmental issues.

The portfolio will be offered to the highest and successful bidder subject to the Bankruptcy Court's / FDIC's approval. FDIC will have the right to credit bid.

**Non-Refundable Auction Day Escrow Deposits:**

For any bidder to qualify to register and participate on auction day, we will require all bidders to wire into the Settlement Agent's law firm's trust account, an escrow deposit of $500,000.00 three (3) days prior to the scheduled live event date.

The highest bidder must also wire an additional deposit bringing the total deposit to an amount equal to 10% of the purchase price twenty four (24) hours after the Court confirmation of the Sale.

**Purchase and Sale Agreement:**

The highest bidder will execute a pre-approved non-contingent Purchase and Sale Agreement with no post event due diligence period immediately following the conclusion of the auction.

We recommend the back-up bidder also execute a Purchase and Sale Agreement at their bid price with their escrow deposit of $500,000.00 being placed in an interest bearing account and returned upon closing with the successful Buyer.

**Property Guarantees:**

The portfolio will be sold in its "As Is", "Where Is" condition and with all faults, with no guarantees or warranties express or implied.

The only guarantee is that the Debtor is able to pass title free and clear of all liens and monetary encumbrances. This is accomplished through the Court Ordered 363 Sale.

**Real Estate Closing:**

The closing will take place within 20 - 30 days from the Court confirmation of the Sale and will be coordinated through the Settlement Agent's law firm's office.



# Accelerated Marke

**Property Information Package:** Our experience selling real property and conducting governmental auctions, including for the FDIC and RTC, of properties over the last thirty eight (38) years has taught us that the better a buyer is informed about the property prior to buying; the more they will pay for the property.

We will prepare and provide via hard copy, cd rom and for free download from our web-site to interested potential purchasers, complete property information packages (due diligence packages) detailing information such as an executive summary, property description, unit mix, amenities, floor plans, location maps, photographs, condominium documents / fees, rent rolls, financial analysis, rent comparables, market overview, broker participation form, purchase and sale agreement, terms of sale, exhibits, etc. We can provide a sample property information package upon request.

**Marketing Campaign Budget:** The Bankruptcy Estate will be responsible for the "Hard" marketing and promotional costs to conduct the auction, which are estimated to be $68,000.00. We have prepared and attached a detailed line by line marketing campaign budget, encompassing all costs, for your review and will provide a complete expense portfolio with copies of paid invoices, advertisements, etc. verifying each expense.

All promotional materials will require your approval signature before any printing / placement takes place. The agreed upon advertising expenses are advanced to Fisher Auction Co., Inc. at the time of Court appointment.

_The amount proposed for marketing and advertising expenses is based on over 38 years of national and international experience of conducting major real estate sales initiatives with closings in excess of $2 billion (100+ sample letters of reference from institutional and government related real estate projects are available upon request)._



 **Accelerated Market**

**Real Estate Commissions:**

Commissions paid by Buyer in the form of a 5% Buyer's Premium and will be divided as follows;

■   Fisher Auction Co., Inc. to receive 5% of the Bid Price as earned real estate commissions with 1% being given to the Estate for the Unsecured Creditors.

■   Buyer's Broker, if any, will be compensated by their respective Buyer and not by the Court.

Credit and / or Non Acceptance of Highest Bid; (Fee Paid by the Estate)

■   If a Credit Bidder is the highest bidder and / or the highest bid is not accepted, Fisher Auction Co., Inc. to receive 4% of the Bid Price for their services rendered with 1% being given to the Estate for the Unsecured Creditors.

**Conclusion:**

Fisher Auction Co., Inc. is an internationally recognized firm with over 38 years experience as the "Standard of Excellence" in the field of accelerated marketing. Our previous experience in conducting major real estate sales initiatives is extensive.

**We know we can obtain the highest net realizable value for you through this auction marketing program - not a liquidation value but real market value.**

Thank you for giving us the opportunity to present this proposal to you. We look forward to the opportunity to work with you to maximize the value of the "Residences at the Falls" and are prepared to meet any court required documents as it deems appropriate; e.g. affidavit of disinterestedness, posting of a bond, etc.

*Fisher Auction Co., Inc. Produces Top Dollar For You...*



# **EXHIBIT B**

PURCHASE AND SALE AGREEMENT

BETWEEN

KENNETH A. WELT, AS CHAPTER 11 TRUSTEE OF LUCKY CHASE II, LLC

as Seller

AND

_____

as Buyer

Property:  Residences at the Falls, a Condominium, Miami, Florida

Dated as of:  _____, 2010

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "*Agreement*"), dated as of the _____ day of _____, 2010, between KENNETH A. WELT, not individually but solely as Chapter 11 Trustee ("*Seller*") for LUCKY CHASE II, LLC (the "*Debtor*"), and _____ ("*Buyer*"), recites and provides:

### RECITALS

The Debtor is the owner of 335 condominium units and related rights as developer at the real property currently known as Residences at the Falls, a Condominium located at 13841 S.W. 90th Avenue, Miami, Florida, which real property is described on Exhibit A hereto, together with all improvements thereon and appurtenances thereunto belonging (the "*Real Property*").

A voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "*Bankruptcy Code*") was filed by the Debtor in the United States Bankruptcy Court for the Southern District of Florida (the "*Bankruptcy Court*") on April 29, 2009. Thereafter, on June 25, 2009, Seller was appointed as the Chapter 11 trustee for the Debtor. The case of the Debtor is pending in the Bankruptcy Court as Case No. 08-18087-BKC-RAM (the "*Bankruptcy Case*"). The bankruptcy estate of the Debtor is referred to herein as the "*Estate*."

Seller believes that it is in the best interests of the Estate to sell the Property (defined below) to Buyer, and Buyer wishes to purchase the Property from Seller and assume certain liabilities of Debtor, all subject to the approval of the Bankruptcy Court and as more particularly provided below.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows.

1.    Court Approval.  The parties' respective obligations to purchase and sell the Property pursuant to this Agreement are subject to Bankruptcy Court approval after notice and a hearing, subject to higher and better offers, and the provisions, requirements and limitations of the Sale Order (defined below).

2.    Sale and Purchase of Property.  Subject to the terms and conditions of this Agreement and the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to Buyer, and Buyer shall purchase and acquire from Seller, Seller's right, title and interest in and to the following (collectively, the "*Property*"):

2.1    the Real Property;

2.2    the Assumed Contracts (defined below);

2.3     (i) all tangible personal property and equipment, if any, owned by Debtor and located on the Real Property, described on Exhibit "B" hereto; and (ii) to the extent in Seller's actual possession, all books, records, correspondence and documents of Debtor related to the operation of the Real Property and all plans, specifications, floor plans, drawings and renderings of all or any part of the Real Property (the "*Tangible Personal Property*"); and

2.4     all transferable development rights, consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality solely in respect of the Real Property, all transferable warranties and guaranties, if any, held by Debtor in connection with the Property, and any rights to use the name "Residences at the Falls" and any correlative name (collectively, the "*Intangible Personal Property*").

3.     Executory Contracts and Unexpired Personal Property Leases.  At the Closing, Seller shall assign to Buyer and Buyer shall assume from Seller the executory contracts and unexpired personal property leases which are listed on *Schedule A* attached hereto (the "*Assumed Contracts*").  Buyer shall file a notice with the Bankruptcy Court, at least one (1) business day prior to the final hearing to approve the sale of the Property, setting forth a final schedule of Assumed Contracts.  Buyer agrees to: (a) cure all defaults, if any, existing under the Assumed Contracts or provide adequate assurance that it will promptly cure all defaults; (b) compensate or provide adequate assurance that it will promptly compensate the parties to the Assumed Contracts other than Seller or Debtor for any actual pecuniary loss to such parties resulting from all defaults; and (c) provide adequate assurance of future performance under the Assumed Contracts, in each case as determined by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code.  If Buyer is required to make any payments to fulfill its obligations under this Section, such payments shall be in addition to the Purchase Price.

4.     Conveyance of Property.  Subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, Seller shall execute and deliver to Buyer on the Closing Date the following instruments pursuant to which Seller shall sell, assign, transfer, convey and deliver the Property to Buyer free and clear of all Liens in accordance with sections 363(b) and (f) of the Bankruptcy Code, with such Liens to attach to the proceeds of sale, on an AS-IS, WHERE-IS BASIS, WITHOUT REPRESENTATIONS OR WARRANTIES:

4.1     Trustee's Quitclaim Deed (the "*Deed*") conveying the Real Property to Buyer shall occur by Quitclaim Deed which shall be free and clear of any and all encumbrances and restrictions in accordance with section 363(f) of the Bankruptcy Code, except those approved by Buyer.

4.2     Bill of Sale (the "*Bill of Sale*") transferring the Tangible Personal Property to Buyer; and

4.3     Separate Assignment and Assumption Agreements for all of the Assumed Contracts.

5.    Excluded Assets.  The term *"Excluded Assets"* means the following assets of Seller, all of which are excluded from the purchase and sale transaction provided for in this Agreement:

5.1    the Purchase Price and all cash, cash equivalents, bank accounts or similar types of investments, such as certificates of deposit, treasury bills and other marketable securities;

5.2    all tax returns and all tax credits, tax benefits and claims for refunds in respect of any federal, state, local, and/or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real estate, personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, severance, estimated or other taxes, including any interest or addition thereto, for periods ending on or before the Closing Date;

5.3    subject to Section 17, any and all right, title and interest in any insurance policy(ies) in connection with the ownership or operation of the Property by the Seller and/or the Debtor and any and all amounts claimed and/or collected pursuant to such insurance policy(ies);

5.4    all rights and properties not owned by the Debtor;

5.5    the membership interests and any other ownership interests in the Debtor, and the company minute books, transfer records, and all other company documents of Debtor;

5.6    all contract rights, rights of action, claims for damages, rights of setoff, rights of recoupment, claims, demands, actions, causes of action, judgments, and pending litigation, except those that specifically relate to the Assumed Contracts;

5.7    all rights, claims, defenses and other matters that relate to any construction contracts affecting the Property, except that Buyer shall have all such rights, claims and defenses if such contracts are Assumed Contracts; notwithstanding anything herein to the contrary, any construction defect or related claims which arose prior to Closing shall be an Excluded Asset;

5.8    all rights, claims, causes of action, defenses and other matters that relate or belong to the Debtor and/or the Seller, including without limitation and any claims, or causes of action which are property of the estate under section 541 of the Bankruptcy Code including those arising under or in connection with Chapter 5 of the Bankruptcy Code (e.g., preferences, fraudulent conveyances, recovery of improper post-petition transfers, etc.);

5.9    any prepaid expenses, advance payments, security deposits, rents and other items related to the Property that are applicable to the period prior to Closing, or that relate to executory contracts or unexpired leases, other than with respect to any Assumed Contracts;

5.10    the Debtor's accounts receivable; and

5.11    any asset not specifically included in the definition of "Property".

6.    Deposit

6.1    Upon execution of this Agreement, Buyer shall have deposited the sum of $500,000.00 of the Purchase Price with Seller's Counsel, Genovese Joblove & Battista, P.A. (the "**Deposit Agent**"), in the form of a wire transfer or certified check payable to Deposit Agent, in escrow, as Buyer's initial deposit under this Agreement (the "**Deposit**"), which Deposit shall be held without interest and shall be applied against the Purchase Price at Closing, or returned to Buyer if this Agreement is not approved by the Bankruptcy Court, or paid to Seller in the event of Buyer's unexcused failure to perform its obligations at Closing.

6.2    If all of the contingencies set forth in Section 11 are satisfied or waived in writing by Buyer, and Seller then fails, after the entry of the Sale Order, to close on the sale of the Property to Buyer as required by this Agreement, Buyer shall be entitled to a refund of the Deposit, as its sole and exclusive remedy and as liquidated damages for Seller's failure to close.

7.    Purchase Price.

7.1    Purchase Price.    The purchase price for the Property shall be $_____ (the "**Purchase Price**"). At the Closing, Buyer shall:  (i) pay to Seller the Purchase Price, plus or minus the net amount of any prorations provided for in Section 13, by wire transfer of immediately available funds to such account(s) as Seller shall designate; and (ii) execute an assumption agreement pursuant to which Buyer assumes the Assumed Liabilities (as defined in Section 8).  As additional consideration, at the Closing, Buyer shall pay the Buyer's Premium to the Auctioneer as set forth in Section 18.

8.    Assumption of Liabilities.

8.1    The term *"Assumed Liabilities"* refers to all of Debtor's obligations listed on ***Schedule B***, as well as any liabilities that this Agreement expressly provides that Buyer shall assume.  Buyer shall file a notice with the Bankruptcy Court, at least one (1) business day prior to the final hearing to approve the sale of the Property, setting forth a final schedule of Assumed Liabilities.  Other than the Assumed Liabilities, Buyer is neither assuming nor agreeing to pay or discharge any of the liabilities or obligations of Seller, and nothing in this Agreement or otherwise shall be construed to the contrary.  Other than as specifically set forth herein, all liabilities and obligations of Seller, whether known or unknown, direct or contingent, in litigation or threatened, or not yet asserted, are and shall remain the responsibility of Seller.

9.    Bankruptcy Court Approval, Competing Transactions and no Due Diligence Period.

9.1    Seller shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the sale of the Property to Buyer pursuant to this Agreement (the "*Sale Order*"), which shall contain the following provisions:

(a)    a finding that Seller prepared and mailed a motion seeking the Sale Order, and such motion and notice were proper and sufficient as to all parties entitled to same;

(b)    the sale and transfer of the Property to the Buyer is approved pursuant to Sections 105, 363(b), (f) and (m) of the Bankruptcy Code;

(c)    the assignment and assumption of the Assumed Contracts as provided herein is approved pursuant to Sections 363(b), (f) and (m), and 365(a) and (f) of the Bankruptcy Code;

(d)    all defaults under the Assumed Contracts have been cured or waived by the counterparties to the Assumed Contracts or Buyer has provided adequate assurances of future performance in respect of the Assumed Contracts;

(e)    the sale of the Property to Buyer pursuant to this Agreement will be free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens, attaching to the sale proceeds;

(f)    Buyer is not merely a continuation of Seller or Debtor, there is no continuity of enterprise between Seller or Debtor and Buyer, Buyer is not a successor to Seller or Debtor and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or *de facto* merger of Buyer and Seller or Debtor;

(g)    Buyer has acted in good faith within the context of and is entitled to the protections of Section 363(m) of the Bankruptcy Code;

(h)    the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code;

(i)    Buyer is not assuming or acquiring any of the Excluded Assets;

(j)    all Persons are enjoined from in any way pursuing Buyer or the Property by suit or otherwise to recover on any Liens which they may have against Debtor or the Property as of the Closing Date; and

(k)    the Sale Order shall be effective immediately notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d).

9.2 .    Competing Transaction.    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids other than from Buyer pursuant to procedures approved by the Bankruptcy Court (each a "**Competing Bid**"). From the date hereof (and any prior time) and until the completion of the auction contemplated hereby or as otherwise directed by the Bankruptcy Court, Seller is permitted to cause his respective representatives to initiate contact with, solicit or encourage submission of any inquiries proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Property. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Property and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Property to prospective buyers.

If a Competing Bid is approved by the Bankruptcy Court, this Agreement will nevertheless survive and remain in effect during the period specified in the Order approving the Bid Procedures Motion and shall serve as a stand-by bid as contemplated in such Order.

9.4    No Due Diligence Period.    There shall be no due diligence period following execution of this Agreement.

10.    Conditions to Obligations of Buyer.    The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before Closing of each and every one of the following conditions, which may be waived in whole or in part by Buyer:

10.1    the Sale Order shall have been entered by the Bankruptcy Court, and the Sale Order shall contain findings set forth in Section 9 above; and

10.2    the representations and warranties of Seller shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Seller shall not be in default in any material respect under the provisions of this Agreement.

10.3    If any of the foregoing conditions is not satisfied by Seller or waived by Buyer before or at the Closing, Buyer may terminate this Agreement and Seller shall forthwith return the Deposit to the Buyer, and neither Party shall have any further obligations to the other, other than under Section 18 and any other provision of this Agreement that expressly provides for such survival.

11.    Conditions to Obligations of Seller.    The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before the Closing of the following conditions, which may be waived in whole or in part, by Seller:

11.1    the Sale Order shall have been entered by the Bankruptcy Court;

11.2    the representations and warranties of Buyer shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Buyer shall not be in default in any material respect under the provisions of this Agreement; and

11.3    Buyer shall have paid to Seller the Purchase Price and paid or escrowed the other amounts required by this Agreement to be paid or escrowed at Closing.

12.    Closing.

12.1    Unless otherwise agreed to by the Seller and Buyer in writing, the closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place on the later of (a) twenty (20) calendar after the entry of the Sale Order or (b) six (6) calendar days after the Sale Order is final and not subject to appeal (the "*Closing Date*"). Notwithstanding anything

herein to the contrary, if the Sale Order has been stayed by an order of a court of competent jurisdiction, then the Closing Date shall be postponed until not more than five (5) business days after the stay has been finally dissolved. If such postponement is longer than 120 days, Buyer and Seller shall each have the right to terminate this Agreement by giving written termination notice to the other, in which case neither Party shall have any further obligations under this Agreement except those that expressly survive the termination of this Agreement.

12.2    Closing shall be conducted through an escrow arrangement by the title insurance agent through which Buyer is purchasing title insurance for the Property (the "*Closing Agent*"), provided such Closing Agent is reasonably satisfactory to Seller. Closing shall take place at the offices of Genovese Joblove & Battista, P.A., 100 S.E. 2nd Street, 44th Floor, Miami, Florida 33131 (or such other place as the parties may designate in writing). Each Party shall deliver written closing instructions to the Closing Agent consistent with the provisions of this Agreement.

12.3    At the Closing, Seller shall deliver to Buyer:

(a)    the transfer instruments provided for in Section 4; and
(b)    such other documents as Buyer may reasonably request to consummate the transaction provided for in this Agreement.

12.4    At the Closing, Buyer shall deliver to Seller:

(a)    the Purchase Price as provided in Section 7;
(b)    the transfer instruments provided for in Section 4; and
(c)    such other documents as Seller may reasonably request to consummate the transaction provided for in this Agreement.

12.5    The cost of providing title evidence covering the period prior to closing, state documentary stamps which are required to be affixed to the instrument of conveyance, and the cost of recording any corrective documents shall be paid by Buyer. The cost of recording the deed and the cost of the issuance of the Title Insurance Policy shall be paid by Buyer. Each party shall pay its own attorney's and accounting fees.

12.6    Buyer shall pay, on the Closing Date, the cost of recording the deed and the cost of the issuance of the title insurance policy premium for any owner's title insurance policy (and any loan policy) obtained by Buyer, the cost of all title updates, title examination, and lien searches, and the cost of any inspections and/or surveys, any settlement fees charged by the Person conducting the Closing, and all other costs and charges of Closing. Each Party shall pay its own attorneys' fees.

13.    Prorations.

13.1    Real property taxes and assessments for the tax year in which the Closing occurs, and all utility bills shall be apportioned between Buyer and Seller as of the Closing Date. Subject to the other express provisions of this Agreement and Seller's avoidance rights, Seller shall be entitled to retain all amounts paid or payable by tenants or licensees operating at the

Property through the day prior to the Closing Date, and Buyer shall be entitled to receive and collect any amounts paid or payable by tenants or licensees operating at the Property from the Closing Date and thereafter. For clarification, it is the intention of the parties that, subject to the other express provisions of this Agreement and Seller's avoidance rights, Seller receive the benefit of all income generated by the Property and pay for all expenses of the Property through the day prior to the Closing Date, and that Buyer receive the benefit of all income generated by the Property and pay for all expenses of the Property from and after the Closing Date. If final documentation of any such item is not available at the Closing, the required proration shall be made on the basis of the best available documentation and a further proration shall be made between the parties when the final documentation or billing becomes available, provided that if the final documentation or billing is not available within 30 days after the Closing, then no further proration shall be made. The provisions of this Section 13 shall survive the Closing.

       13.2     The parties agree that, after the Closing Date, each shall hold and shall promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements or other property that they may receive on or after the Closing Date which properly belong to the other Party, including any insurance proceeds, and shall account to the other for all such receipts.

       14.     <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Buyer that Seller was duly appointed as Chapter 11 for the Debtor and approved by Order of the Bankruptcy Court, and that, subject to the entry of the Sale Order without any stay being obtained by any party in interest within the requisite period, Seller has the power to convey the Property to Buyer pursuant to this Agreement and subject to and in accordance with the provisions of the Sale Order.

       15.     <u>Representations and Warranties of Buyer</u>. Buyer hereby represents and warrants to Seller, which representations and warranties shall survive Closing, as follows:

       15.1     At the time of closing, Buyer will be a corporation duly organized and validly existing under the laws of the State of Florida.

       15.2     The execution, delivery and performance by Buyer of this Agreement and the other documents and instruments contemplated hereby are within the power of Buyer and have been duly authorized by all necessary action by Buyer. This Agreement is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

       15.3     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, and any rules, regulations, permits, licenses and orders promulgated thereunder.

       15.4     BUYER, ON BEHALF OF ITSELF AND ANY AFFILIATES OR RELATED PARTIES, UNDERSTANDS AND AGREES THAT THE PROPERTY IS SOLD,

ASSIGNED, LEASED, TRANSFERRED AND CONVEYED TO BUYER IN "AS IS" CONDITION ON A "WHERE IS" BASIS, WITH NO CONTINGENCIES OF ANY KIND INCLUDING FINANCING OR DUE DILIGENCE AND WITHOUT ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT.

      16.    <u>Default and Remedies.</u>

      16.1    If the Closing fails to occur because of a default, misrepresentation or breach of warranty by Buyer, Seller shall be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property. In any such event, Buyer shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

      16.2    If the Closing fails to occur solely because of a default by Seller under the provisions of this Agreement, the Sale Order or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, then Buyer may, as its exclusive remedy, receive a return of its Deposit and terminate this Agreement by notice to Seller.

      17.    <u>Risk of Loss.</u> Risk of loss to the Real Property or any part thereof from damage or destruction by fire or other casualty or by reason of condemnation shall remain upon Seller until the Closing. If, between the date hereof and the Closing, any portion of the Real Property shall be damaged or destroyed by fire or other casualty or be subject to any claim of condemnation, Seller shall notify Buyer in writing of said damage, destruction, casualty or loss and the extent thereof or of such condemnation claim as the case may be. If the cost to repair any such damage exceeds $500,000 or in the event of any such claim for condemnation, Buyer shall have the option, exercisable by notice to Seller given within ten days after Seller's notice to Buyer of said damage, destruction, casualty, loss or condemnation, to either: (a) terminate this Agreement, whereupon Deposit Agent shall forthwith refund the Deposit to Buyer and upon such refund this Agreement shall terminate and neither party shall have any further liability to the other hereunder (except for any rights and obligations arising under this Agreement which by their terms survive such termination); or (b) elect to proceed with this Agreement and pay the full Purchase Price, in which case Seller shall assign to Buyer any insurance or condemnation proceeds to which Seller or its successors may be entitled as a result of such damage, destruction, condemnation, loss or casualty without Seller replacing or repairing any such damage. If Buyer fails to give such written notice, Buyer shall be conclusively deemed to have chosen option (b). If the cost to repair any such damage is equal to or less than $500,000, Buyer shall proceed to Closing, in which event Seller agrees to pay to Buyer at the Closing all insurance or condemnation proceeds which Seller has received as a result of the same, if any, and assign to Buyer all insurance proceeds payable as a result of the same without Seller replacing or repairing such damage, and Seller will have no further obligations to Buyer in respect of such loss or damage.

      18.    <u>Buyer's Payment of Buyer's Premium and No Claims of Brokers.</u> The commissions earned by Fisher Auction Company (the "Auctioneer") shall be paid out of the sale

proceeds and shall not be in the form of a "Buyer's Premium". Seller shall not be responsible for any broker's commissions. Buyer shall indemnify and hold the Seller harmless from the claims of any other broker or finder claiming through the Buyer. The provisions of this Section shall survive the Closing and any termination of this Agreement.

19.    Parties' Access to Records after Closing. Except as provided in Section 20, the Parties agree to preserve until the earlier of the first anniversary of the Closing Date or the date the Debtor's bankruptcy estate is closed, all records in their possession relating to any of the Property. Buyer shall permit authorized the Seller or his representatives to gather and prepare such information as the Seller may reasonably require for preparing its tax returns for periods prior to the Closing Date. If either Seller or Buyer needs access to records in the possession of the other Party relating to any of the Property for purposes of preparing income tax returns or for complying with any audit request, subpoena or other investigative demand by any governmental authority or for any civil litigation or for any other legitimate purpose not injurious to the other Party, such Party shall allow representatives of the other Party access to such records, including reasonable use of office space and facilities, during regular business hours at such Party's place of business for the sole purpose of obtaining information for use as provided for in this Section and shall permit such other Party to make extracts and copies thereof as may be necessary or convenient.

20.    Disposal of Records. Either Party may at any time and from time to time after the Closing Date and prior to the earlier of the first anniversary of the Closing Date or the date the Debtor's bankruptcy estate is closed, dispose of the records in its possession relating to the Property after giving 60 days prior notice of such disposal to the other Party; provided, however, that if such records are pertinent to any dispute, claim, litigation, governmental investigation or the determination of any federal, state or local tax liability of the other Party, then such other Party shall have the right, by giving written notice to the Party desiring to dispose of records within such 60 day period, to require the Party desiring to dispose of records to retain such records until such time as the other Party may specify or provide such records to the other Party.

21.    Further Assurances. Each Party shall cooperate with the other and execute and deliver to the other Party such other instruments and documents and take such other actions as may be reasonably requested from time to time by the other Party as necessary to carry out, evidence, and confirm the intended purposes of this Agreement.

22.    Deposit Agent Provisions.

22.1    If conflicting demands relating to this Agreement are made upon the Deposit Agent, the parties hereto expressly agree that the Deposit Agent shall have the absolute right to do either or both of the following: (i) withhold and stop all actions in performance of this escrow and await settlement of the controversy by final appropriate legal proceedings or as otherwise mutually directed in writing by Buyer and Seller; or (ii) file suit in declaratory relief or interpleader and obtain an order from the Bankruptcy Court requiring the parties to interplead and litigate in such court their several claims and rights amongst themselves. Upon the filing of any such declaratory relief or interpleader suit and depositing with the Bankruptcy Court all funds deposited by the parties under this Agreement, the Deposit Agent shall thereupon be fully

released and discharged from any and all obligations to further perform the duties or obligations imposed upon it by this Agreement.

22.2    In no event shall Deposit Agent be liable for any act or omission under or in respect of this Agreement except where Deposit Agent's acts or omission is the result of its gross negligence or willful misconduct. Accordingly, Deposit Agent shall not incur any liability with respect to (i) any action taken or omitted in good faith, including upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of the Deposit Agent under this Agreement, or (ii) any action taken or omitted in reliance on any instrument, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which Deposit Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

22.3    Buyer and Seller reserve the right, at any time and from time to time, by mutual agreement, to substitute a new escrow agent in place of Deposit Agent. In addition, Deposit Agent reserves the right to resign from its role as escrow agent by giving the Seller and the Buyer written notice of such resignation. If Seller and Buyer have jointly designated a successor escrow agent in writing, then Deposit Agent shall deliver any funds held by Deposit Agent under this Agreement to such successor escrow agent. However, if no such successor escrow agent is designated by Seller and Buyer in writing within ten days after any notice of resignation from Deposit Agent, then Deposit Agent may deliver any such funds to the Bankruptcy Court, and interplead Buyer and Seller in connection therewith.

22.4    Seller acknowledges that Deposit Agent also serves as Seller's legal counsel in connection with this Agreement, and both Seller and Buyer consent to Deposit Agent serving in such dual capacity. In the event of any actual dispute or adversity between Seller and Buyer, Deposit Agent shall be entitled to resign as Deposit Agent and to represent Seller in such dispute or adversity, and in such case shall deliver any funds held by Deposit Agent pursuant to this Agreement the Funds either to a successor escrow agent designated by Seller and Buyer as provided above, or to a court of competent jurisdiction as provided for above.

23.    <u>Definitions; Rules of Construction.</u>

23.1    The following terms have the following meanings in this Agreement:

(a)    "*Legal Costs*" means court costs and attorneys' fees and costs, including the costs of paralegals, whether or not any mediation, arbitration or legal proceeding is filed, or if any mediation, arbitration or legal proceeding is filed, then all such costs incurred at any point in such mediation, arbitration or legal proceeding, including trial and all levels of appeal.

(b)    "*Lien*" means "any interest in" the Property as used in Section 363(f) of the Bankruptcy Code and includes any lien (including any tax lien or judgment lien), pledge, security interest, mortgage or lis pendens, contracts, options or other rights to acquire any

condominium units or any other interest in the Property, but does not include any easements or restrictions of record.

           (c)    *Party*" or "*Parties*" mean Seller and/or Buyer, as the context may require.

           (d)    "*Person*" means any individual or any corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or other legal entity or a government or governmental entity.

           23.2     As used in this Agreement: (i) words in the singular shall be held to include the plural and vice versa, (ii) words of one gender shall be held to include the other genders as the context requires, (iii) the terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (iv) references to Section, paragraph, Exhibit and Schedule are references to the Sections, paragraphs, Exhibits and Schedules of this Agreement, unless otherwise specified, (v) section headings in this Agreement are solely for convenience of reference, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement, (vi) the word "including" and words of similar import when used in this Agreement, shall mean "including, without limitation," unless otherwise specified, and (vii) the word "or" shall not be exclusive.

           23.3     Each Party and its counsel have reviewed and revised this Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

     24.    <u>Miscellaneous</u>

           24.1    This Agreement and the Schedules to this Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

           24.2     This Agreement, together with the Schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

           24.3     All notices and other communications under this Agreement shall be in writing and shall deemed given if delivered personally or mailed by registered or certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged) or delivered by an recognized overnight delivery system (such overnight notice to be effective on the date of receipt) as follows:

If to Buyer, addressed to:

[]

With a copy to:

[]

If to Seller, addressed to:

      Kenneth A. Welt, Trustee
      8255 W. Sunrise Blvd, #177
      Plantation, FL 33322

With a copy to:

      Genovese Joblove & Battista, P.A.
      100 S.E. 2nd Street, Suite 4400
      Miami, Florida 33131
      Attention: Glenn D. Moses, Esq.
      Facsimile: (305) 349-2310
      gmoses@gjb-law.com

or to such other place and with such other copies as either Party may designate as to itself by written notice to the others.

      24.4    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures shall be accorded the same enforcement rights as an original. Regardless of whether the transactions contemplated by this Agreement are consummated, each Party shall pay its or their own costs and expenses, including Legal Costs and investment banking, accounting, consulting, and other professional fees, incurred in connection with the negotiation, preparation, investigation and performance by such Party of this Agreement and the transactions contemplated under this Agreement.

      24.5    Time is of the essence with respect to each Party's obligations hereunder.

      24.6    This Agreement shall not be recorded by Buyer and, if recorded by Buyer, Seller may immediately terminate all of its obligations under this Agreement, and Buyer shall pay Seller's Legal Costs in removing this Agreement of record. The provisions of this Section 24.6 shall survive the Closing.

      24.7    If the last day of any time period provided for in this Agreement falls on a Saturday, Sunday or holiday, the last day shall be extended until the next business day that banks operating in Miami, Florida are open for business, but in no case will the extension be for

more than three days.  For purposes of this Agreement, "business day" shall mean any day other than a Saturday, a Sunday, or any other day on which banking institutions in Miami, Florida, are closed or are authorized to be closed, including all legal holidays.

24.8      Notwithstanding any other provision of this Agreement, any representation, warranty or covenant of Seller contained in this Agreement that by its terms survives Closing or the termination of this Agreement, shall not survive the closing of the Bankruptcy Case.

24.9      Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.   Additional information regarding radon and radon testing may be obtained from county public health units.

24.10      The determination that any covenant, agreement, condition or provision of this Agreement, which is not necessary to the enjoyment by either party of the benefit contemplated herein, is invalid shall not affect the enforceability of the remaining covenants, agreements, conditions or provisions hereof and, in the event of any such determination, this Agreement shall be construed as if such invalid covenant, agreement, condition or provision were not included herein.

24.11      No failure or delay of either Party in the exercise of any right given to such Party hereunder shall constitute a waiver thereof unless the time specified herein for exercise of such right has expired, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or of any other right.  The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

24.12      The rights and obligations of Buyer hereunder may be assigned to one or more affiliated entities without the consent of Seller, and to any unaffiliated third party with the prior written consent of Seller.  No assignment under this provision shall relieve Buyer of liability to Seller for amounts accruing under this Agreement.  This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the parties hereto. The Parties neither intend to confer any benefit hereunder on any Person other than the parties hereto, or shall any such third party have any rights hereunder.

24.13      This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without reference to its choice or conflicts of laws principles.  Each Party:  (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

24.14      BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO,

THE SUBJECT MATTER OF THIS AGREEMENT.

[THE REST OF THIS PAGE INTENTIONALLY IS BLANK]

WITNESS the following signatures as of the date in the preamble.

BUYER:

_____

[]

SELLER:

_____

Kenneth A. Welt, not individually, but solely
as Chapter 11 Trustee of LUCKY CHASE II,
LLC

**EXHIBIT A**

**LEGAL DESCRIPTION**

**<u>EXHIBIT B</u>**

**<u>PERSONAL PROPERTY</u>**

**SCHEDULE A**

**CONTRACTS**

| CONTRACT PARTY | NATURE OF CONTRACT/LEASE |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**SCHEDULE B**

**ASSUMED LIABILITIES**

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                          Chapter 11

LUCKY CHASE II, LLC,                            Case No. 09-18087-BKC-RAM

        Debtor.
_____/

**NOTICE OF PROPOSED AUCTION SALE OF DEBTOR'S REAL PROPERTY, FREE
AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND
OPPORTUNITY TO BID**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On April 29, 2009, Lucky Chase II, LLC (the **"Debtor"**) filed a voluntary petition
under chapter 11 of title 11 of the United States Code (the **"Bankruptcy Code"**) in the United
States Bankruptcy Court for the Southern District of Florida (the **"Bankruptcy Court"**).  On
June 25, 2009, the United States Trustee appointed Kenneth A. Welt as the Chapter 11 Trustee in
this case.

2.      On August 30, 2010, the Trustee filed a motion (the **"Sale Motion"**) with the
Bankruptcy Court seeking, among other things, an order of the Bankruptcy Court (1) authorizing
the Trustee to schedule an auction sale of the Debtor's property, (2) approving bidding
procedures in connection with auction sale, (3) approving form and manner of notice of sale, (4)
scheduling a final hearing to approve sale, and (5) approving the sale of the Trustee's interest in
the Debtor's real property, free and clear of liens, claims and encumbrances.

3.      Pursuant to the Sale Motion, the Trustee seeks to sell the Debtor's interest in 335
units at the property located at Residences at the Falls, a Condominium, 13841 SW 90th Avenue,
Miami, Florida (the **"Property"**).  The Sale Motion provides that the FDIC has offered to
purchase the Property, by way of credit bid on its secured claim, the total sum of **$8,762,867.23**.

4.      The sale of the Property is subject to higher and better offers and Bankruptcy
Court approval.  Therefore, this notice sets forth the procedures for submitting bids for the
Property.

5.      A hearing on that portion of the Sale Motion dealing with the Bidding Procedures
was held before the Bankruptcy Court on _____, 2010, after which the Bankruptcy Court
entered an order, among other things, approving the Bidding Procedures set forth in the Sale
Motion (the **"Bid Procedures Order"**).

6.    A copy of the Bid Procedures Order is attached hereto as **Annex "1"**. The Bid Procedures Order establishes the Bidding Procedures that govern the manner in which the Property is to be sold.

7.    The complete Bidding Procedures are as follows:

- Participation Requirements:  Unless otherwise ordered by the Court, in order to participate in the bidding process, an interested bidder must (i) wire into the trust account of Genovese Joblove & Battista, P.A., an escrow deposit of $500,000 no later than _____, 2010, which is two (2) business days prior to the scheduled auction (the "**Bid Deadline**") and (ii) submit to Genovese Joblove & Battista, P.A. a fully executed asset purchase agreement substantially in the form attached hereto as **Exhibit "B"** and which shall include a purchase price of at least $9,000,000.00 (the "**Purchase Agreement**") no later than the Bid Deadline (the effectiveness of such Purchase Agreement being contingent only upon the Qualified Bidder becoming the Successful Bidder pursuant to these procedures, subject only to Bankruptcy Court Approval, with no due diligence or financing contingencies).  A person who timely complies with these requirements shall be a "**Qualified Bidder**".

  The FDIC shall be deemed a Qualified Bidder by virtue of the FDIC Bid.

- Participation in Auction:  Provided that a Qualified Bid is submitted by the Bid Deadline, the Trustee, through Fisher Auction Co., Inc., the Trustee's court approved auctioneer (the "Auctioneer"), will conduct an auction (the "Auction"). The Auction shall take place in the card room at the Property, which is located at 13841 S.W. 90th Avenue, Miami, Florida, 33176-6903, on _____, 2010, which is the date that is one business day prior to the requested hearing date on the proposed sale, beginning at 10:00 a.m. or such other time or place as the Trustee shall notify all Qualified Bidders.

- Auction Procedures:  At the Auction, the opening bid will be the FDIC Bid.  All Qualified Bidders shall be entitled to make any subsequent bids, provided however, that the initial overbid shall be at least $9,000,000.00.  All subsequent bids shall be in increments of $100,000.  Bidding at the Auction shall continue until such time as the highest and best offer is determined, which shall be determined by the Trustee in the exercise of his business judgment. The Trustee reserves the right to modify the bidding increments or announce at the Auction additional procedural rules for conducting the Auction in the exercise of his business judgment.

- Successful Bid:  After the conclusion of the Auction, the Trustee shall submit the highest or best bid (the "Successful Bid") for approval by the Bankruptcy Court on _____, 2010, at 51 S.W. 1st Ave., Room 1406, Miami, FL 33130 (the "Sale Hearing").  The Qualified Bidder who has the Successful Bid presented for approval to the Court shall be referred to herein as the "Successful Bidder." Closing shall take place within twenty (20) days of entry of the Sale Order or 6

days after the Sale Order becomes final and non-appealable, whichever is later. The Successful Bidder, if not the FDIC, must be prepared and must in fact consummate the purchase of the Property in accordance with the Purchase Agreement. Upon the failure of the Successful Bidder to consummate the closing of the purchase of the Property because of a breach or failure on the part of the Successful Bidder, then the Trustee may elect in his business judgment the next highest or otherwise best Qualified Bidder to be the Successful Bidder (the "Back Up Bidder"). At the Sale Hearing, the Trustee intends to seek approval from the Court for the next highest or best bid (the "Back Up Bid"), which approval shall authorize the Trustee to consummate the Back Up Bid immediately after a default under the Successful Bid without further order of the Court. Promptly following the conclusion of the Sale Hearing, the Trustee shall return the deposits to each unsuccessful Qualified Bidder (except the Back Up Bidder whose deposit shall either be returned upon the closing of the sale to the Successful Bidder or applied to the purchase price in a closing with such Back Up Bidder). The ultimate purchaser, upon closing, whether the Successful Bidder or the Back Up Bidder, shall be referred to herein as the "Purchaser".

- <u>As Is Where Is</u>: The Property will be sold in its "As Is", "Where Is" condition and with all faults, with no guarantees or warranties express or implied.

- <u>Executory Contracts and Unexpired Leases</u>: No later than one (1) business day prior to the Auction Sale, the Purchaser shall designate for the Trustee those executory contracts and unexpired leases which are to be assumed by the Trustee and assigned to the Successful Bidder (each a "Designated Contract"). Subsequent to the Sale Hearing, the Trustee may file a separate motion seeking the Court's approval of the assumption and assignment of the Designated Contracts to the Successful Bidder.

- <u>Real Estate Commissions and Surcharge</u>: The Auctioneer shall be entitled to a commission as outlined in the FDIC Bid. The Trustee shall not be responsible for any other real estate commissions. The Purchaser shall indemnify and hold the estate harmless for any other claimed real estate commissions.

- <u>Objections</u>: Objections, if any, to the Sale, must (a) be in writing; (b) set forth the nature of the objector's claims against or interest in the Debtor's estate, and the basis for the objection and the specific grounds therefore; (c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of Florida and all Orders of this Court; (d) be filed with the Court and served upon counsel to the Trustee, the United States Trustee for the Southern District of Florida and counsel to the FDIC, so as to be RECEIVED no later than 5:00 pm (Eastern) two (2) businesses days prior to the Sale Hearing (the "<u>Objection Deadline</u>"). Only timely filed and served responses, objections, or other pleadings will be considered by this Court at the Sale Hearing. The failure of any person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Sale or the consummation and performance of the Agreement.

8.      The Sale Hearing is currently scheduled to be conducted on _____, 2010 at **10:00 a.m. (Eastern Time)** at the United States Bankruptcy Court for the Southern District of Florida, 51 S.W. 1st Ave., Room 1406, Miami, FL 33130 before the Honorable Robert A. Mark, United States Bankruptcy Judge, to consider the approval of the sale to the Successful Bidder (as defined in the Sale Motion). The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing.

9.      The failure of any person or entity to file an Objection on or before the Objection Deadline shall be deemed a consent to the sale transaction contemplating the sale of the Property to the Purchaser and the other relief requested in the Sale Motion, and be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Bidding Procedures, the Sale Motion, the Auction, and the sale of the Property.

10.     This Notice is subject to the full terms and conditions of the Sale Motion, the Bidding Procedures Order and the Bidding Procedures, which shall control in the event of any conflict. The Trustee encourages parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice in connection therewith.

11.     For further information about the sale, please contact the Trustee's Auctioneer at:

**Lamar P. Fisher, President/CEO**
Fisher Auction Co., Inc.
619 East Atlantic Boulevard
Pompano Beach, Florida 33060-6343
954.942.0917 x 13
800.331.6620 x 13
954.931.0585 Cellular
954.782.8143 Facsimile
lamar@fisherauction.com
www.fisherauction.com

[Remainder of Page Intentionally Left Blank]

Dated:  August 30, 2010

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for Chapter 11 Trustee
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By: /s/ Michael L. Schuster
      Glenn D. Moses
      Florida Bar No. 174556
      gmoses@gjb-law.com
      Allison R. Day
      Florida Bar No. 494097
      aday@gjb-law.com
      Michael L. Schuster
      Florida Bar No. 57119
      mschuster@gjb-law.com

Annex 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                                 Chapter 11

LUCKY CHASE II, LLC,                                   Case No. 09-18087-BKC-RAM

      Debtor.
_____/

**ORDER GRANTING CHAPTER 11 TRUSTEE'S MOTION FOR THE ENTRY OF AN
ORDER (1) AUTHORIZING TRUSTEE TO SCHEDULE AUCTION SALE OF
DEBTOR'S PROPERTY; (2) APPROVING BIDDING PROCEDURES IN
CONNECTION WITH AUCTION SALE; (3) APPROVING FORM AND MANNER OF
NOTICE OF SALE, (4) SCHEDULING A FINAL HEARING TO APPROVE SALE, AND
(5) APPROVING THE SALE OF THE TRUSTEE'S INTEREST IN DEBTOR'S REAL
PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES**

      THIS MATTER came before the Court on _____, 2010 upon the motion (the

"Motion")[1] of Kenneth A. Welt, as Chapter 11 Trustee (the "Trustee") for Lucky Chase II, LLC

(the "Debtor"), seeking an Order (1) authorizing the Trustee to schedule an auction sale of the

Debtor's property, (2) approving bidding procedures in connection with auction sale, (3)

approving form and manner of notice of sale, (4) scheduling a final hearing to approve sale, and

_____

[1] Capitalized terms used but not defined herein have the meanings given to such terms in the Motion and all Exhibits thereto.

(5) approving the sale of the Trustee's interest in the Debtor's real property, free and clear of liens, claims and encumbrances2 (the "Motion"). The Court, having determined at the hearing held on _____, 2010 (the "Hearing") that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and all other parties-in-interest;

And upon the record of the Hearing; and the Court having considered all of the evidence presented, testimony proffered, and arguments of counsel made at the Hearing; and after due deliberation thereon, and good cause appearing therefore, it is hereby

FOUND AND DETERMINED THAT:[3]

A.      This Court has jurisdiction over this matter and over the property of the Debtor pursuant to 28 U.S.C. §§ 157(a) and 1334, and venue is proper in this district pursuant to 28 U.S.C. § 1408;

B.      This is a core proceeding pursuant to 28 U.S.C. § 157(b);

C.      Good and sufficient notice of the relief sought in the Motion has been given in accordance with Bankruptcy Rule 2002, and no other or further notice is or shall be required. A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all parties-in-interest;

D.      The Bidding Procedures and proposed Sale Notice, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice thereof;

E.      The Bidding Procedures set forth herein are fair, reasonable, and appropriate and are designed to maximize the recovery on the Debtors' assets;

---

2 As set forth herein, if the FDIC is the Successful Bidder, the sale will be subject to the lien of the Miami-Dade County Tax Collector.
[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, as applicable, in accordance with Bankruptcy Rule 7052.

J.      The Trustee's proposed marketing efforts and bidding process as described in the Motion and at the Hearing is fair and reasonable, and designed to fully expose the Debtor's assets to the market.  The expedited timeline for the auction and sale process set forth in the Bidding Procedures appears to be reasonable and justified by the circumstances of this chapter 11 case.

K.      The entry of this Order is in the best interests of the Debtor, its respective estate, creditors, and all other parties-in-interest.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

### General Provisions

1.      The findings and conclusions set forth above constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

2.      The relief requested in the Motion is granted as modified herein.

### Bidding Procedures

3.      The "Bidding Procedures" as such term is used in this Order are as follows:

(a) Participation Requirements:   Unless otherwise ordered by the Court, in order to participate in the bidding process, an interested bidder must (i) wire into the trust account of Genovese Joblove & Battista, P.A., an escrow deposit of $500,000 no later than 5:00 p.m. on _____, 2010, which is two (1) business days prior to the scheduled auction (the "Bid Deadline") and (ii) submit to Genovese Joblove & Battista, P.A. a fully executed asset purchase agreement substantially in the form attached to the Motion as **Exhibit "B"** (the "Purchase Agreement"), which shall include  a purchase price of no less than $9,000,000, on or before the Bid Deadline (the effectiveness of such Purchase Agreement being contingent only upon the Qualified Bidder becoming the Successful Bidder pursuant to these procedures, subject only to Bankruptcy Court Approval, with no due diligence or financing contingencies).   A person who timely complies with these requirements shall be a "Qualified Bidder".

The FDIC shall be deemed a Qualified Bidder by virtue of the FDIC Bid.

(b) Marketing Plan: The Trustee, by separate application filed contemporaneously with the Motion, is seeking to retain the services of Fisher Auction Co., Inc. (the "Auctioneer") to

implement an extensive Accelerated Marketing Plan to advertise the bulk sale of the Property and to conduct the auction sale thereof (the "Marketing Plan"). A copy of the Marketing Plan, which outlines the Auctioneer's proposed marketing activities, is attached to the Motion as **Exhibit "A".**

(c) <u>Participation in Auction</u>: Provided that a Qualified Bid is submitted on a timely basis, the Trustee, by and through the Auctioneer, will conduct an auction (the "Auction"). The Auction shall take place in the clubhouse at the Property, which is located at 13841 S.W. 90th Avenue, Miami, Florida, 33176-6903, on _____, 2010, which is the date that is one business day prior to the requested hearing date on the proposed sale, beginning at 10:00 a.m. or such other time or place as the Trustee shall notify all Qualified Bidders.

(d) <u>Auction Procedures</u>: At the Auction, the opening bid will be the FDIC Bid. All Qualified Bidders shall be entitled to make any subsequent bids, provided however, that the initial overbid shall be at least $9,000,000.00 and all subsequent bids shall be in increments of $100,000. Bidding at the Auction shall continue until such time as the highest and best offer is determined, which shall be determined by the Trustee in the exercise of his business judgment. The Trustee reserves the right to modify the bidding increments or announce at the Auction additional procedural rules for conducting the Auction in the exercise of his business judgment.

(e) <u>Successful Bid</u>: After the conclusion of the Auction, the Trustee shall submit the highest or best bid (the "Successful Bid") for approval by the Bankruptcy Court on _____, 2010, at 51 S.W. 1st Ave., Room 1406, Miami, FL 33130 (the "Sale Hearing"). The Qualified Bidder who has the Successful Bid presented for approval to the Court shall be referred to herein as the "Successful Bidder." Closing shall take place within twenty (20) days of entry of the Sale Order or 6 days after the Sale Order becomes final and non-appealable, whichever is later. The Successful Bidder, if not the FDIC, must be prepared and must in fact consummate the purchase of the Property in accordance with the Purchase Agreement. Upon the failure of the Successful Bidder to consummate the closing of the purchase of the Property because of a breach or failure on the part of the Successful Bidder, then the Trustee may elect in his business judgment the next highest or otherwise best Qualified Bidder to be the Successful Bidder (the "Back Up Bidder"). At the Sale Hearing, the Trustee intends to seek approval from the Court for the next highest or best bid (the "Back Up Bid"), which approval shall authorize the Trustee to consummate the Back Up Bid immediately after a default under the Successful Bid without further order of the Court. Promptly following the conclusion of the Sale Hearing, the Trustee shall return the deposits to each unsuccessful Qualified Bidder (except the Back Up Bidder whose deposit shall either be returned upon the closing of the sale to the Successful Bidder or applied to the purchase price in a closing with such Back Up Bidder). The ultimate purchaser, upon closing, whether the Successful Bidder or the Back Up Bidder, shall be referred to herein as the "Purchaser".

(f) <u>As Is Where Is</u>: The Property will be sold in its "As Is", "Where Is" condition and with all faults, with no guarantees or warranties express or implied.

(g) <u>Executory Contracts and Unexpired Leases</u>: No later than one (1) business day prior to the Auction Sale, the Purchaser shall designate for the Trustee those executory contracts and unexpired leases which are to be assumed by the Trustee and assigned to the Successful Bidder (each a "Designated Contract"). Subsequent to the Sale Hearing, the Trustee may file a separate motion seeking the Court's approval of the assumption and assignment of the Designated Contracts to the Successful Bidder.

(h) <u>Real Estate Commissions</u>: The Auctioneer shall be entitled to a commission as outlined in the FDIC Bid. The Trustee shall not be responsible for any other real estate commissions. The Purchaser shall indemnify and hold the estate harmless for any other claimed real estate commissions.

(i) <u>Objections</u>: Objections, if any, to the Sale, must (a) be in writing; (b) set forth the nature of the objector's claims against or interest in the Debtor's estate, and the basis for the objection and the specific grounds therefore; (c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of Florida and all Orders of this Court; (d) be filed with the Court and served upon counsel to the Trustee, the United States Trustee for the Southern District of Florida and counsel to the FDIC, so as to be RECEIVED no later than 5:00 pm (Eastern) two (2) businesses days prior to the Sale Hearing (the "Objection Deadline"). Only timely filed and served responses, objections, or other pleadings will be considered by this Court at the Sale Hearing. The failure of any person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Sale or the consummation and performance of the Agreement.

4.    The Bidding Procedures are hereby approved. The Trustee is authorized to act in accordance with the Bidding Procedures, which shall be binding upon all parties-in-interest in these cases.

5.    The Auction shall be held on _____, 2010, commencing at 10:00 a.m. Eastern Time in the clubhouse at the Property, which is located at 13841 SW 90th Avenue, Miami, Florida, 33176-6903.

<u>**Sale Hearing**</u>

6.    The Sale Hearing shall be held before this Court on _____, 2010 at ____ _.m. (Eastern Time), United States Bankruptcy Court, 51 S.W. 1st Ave., Room 1406, Miami, FL 33130. The Sale Hearing may be adjourned or rescheduled without notice other than by an

announcement of such adjournment at the Sale Hearing. The Sale Hearing shall be an evidentiary hearing on all matters relating to the proposed sale.

### Objections

7.      Objections, if any, to the Sale, must (a) be in writing; (b) set forth the nature of the objector's claims against or interest in the Debtor's estates, and the basis for the objection and the specific grounds therefore; (c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of Florida and all Orders of this Court; (d) be filed with the Court and served upon the Trustee, the Successful Bidder, the United States Trustee for the Southern District of Florida and counsel to the Debtor, so as to be RECEIVED no later than 5:00 pm (Eastern) two (2) business days prior to the Sale Hearing (the "Objection Deadline"). Only timely filed and served responses, objections, or other pleadings will be considered by this Court at the Sale Hearing. The failure of any person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Sale or the consummation and performance of the Agreement.

### Notice

8.      The Sale Notice is hereby approved in all respects.

9.      Notice of the Bidding Procedures, the Auction, the Sale Hearing and the remainder of the relief requested in the Motion, as described in the Motion, shall be good and sufficient notice thereof, and any requirements for other or further notice shall be waived and dispensed with pursuant to Bankruptcy Rules 2002, 6004, 6006 and 9007 and pursuant to this Court's powers under section 105 of the Bankruptcy Code.

### Approval of Stalking Horse Bid

10.      The terms of the "FDIC Bid" are approved in all respects as follows:

(a)   the FDIC shall be the stalking horse bidder with an irrevocable credit bid, pursuant to Section 363(k) of the Bankruptcy Code, in the amount of $8,762,867.23;

(b)   if the FDIC is the Successful Bidder, the Auctioneer will receive a fee of 4% of the ultimate sale price, to be paid by the FDIC within 4 business days following the Sale Hearing, with 1% of the ultimate sale price to be allocated by the Auctioneer for the benefit of the Debtor's general unsecured creditors;

(c)   if a bidder other than the FDIC is the Successful Bidder, the Auctioneer will receive a fee of 5% of the ultimate sale price, to be paid out of the sales proceeds, with 1% of the ultimate sale price to be allocated by the Auctioneer for the benefit of the Debtor's general unsecured creditors;

(d)   if the FDIC is the Successful Bidder, the sale shall be free and clear of all liens except for the lien of the Miami-Dade Tax Collector;

(e)   if a bidder other than the FDIC is the Successful Bidder, the sale shall be free and clear of all liens, with all liens including those of the Miami-Dade Tax Collector to be satisfied from the sale proceeds in the order of priority of such liens;

(f)   the FDIC shall advance up to $68,000 in marketing and advertising costs (the "Marketing Advance") to the Trustee's Auctioneer, with all such advances being added to the FDIC's allowed secured claim.  In the event that a bidder other than the FDIC is the Successful Bidder, the Marketing Advance shall be repaid from the sale proceeds;

(g)   the initial overbid shall be at least $9,000,000 and all subsequent bids shall be in increments of $100,000;

(h)   within two (2) business days of the final hearing to approve the sale of the Property to the highest and best bidder, the FDIC shall notify the Trustee of any executory contracts

and/or unexpired leases it wishes to have assumed and assigned, and will file a notice of filing of same. If it is the Successful Bidder, the FDIC shall be responsible for curing any defaults or providing adequate assurance of prompt cure of any defaults under such assumed contracts; and

(i)       pursuant to the FDIC Stipulation, all allowed fees, costs and statutory commissions of the Trustee and his professionals, including any contingency fee awarded to Mitchell Feldman and FBS Property Tax Abatement Group (the "Professional Fees") shall be paid as follows:  (i) if the FDIC is not the Successful Bidder, then the Professional Fees shall be paid from the sale proceeds, and (ii) if the FDIC is the Successful Bidder, then the FDIC will pay such Professional Fees by way of surcharge or otherwise within the later of 10 business days of closing or an Order allowing such Professional Fees.

## Miscellaneous

11.       The Trustee is hereby authorized and empowered to take such steps, expend such sums of money and do such other things as may be necessary to implement and effect the terms and requirements established by this Bidding Procedures Order.

12.       This Bidding Procedures Order shall be binding upon, and inure to the benefit of the Debtor, the Trustee and the estate, including their respective successors and assigns, including any chapter 7 trustee or other fiduciary appointed for any of the Debtors' estates whether in the above-captioned cases, subsequent bankruptcy cases or upon dismissal of any of the Debtor's bankruptcy cases.

13.       Notwithstanding Bankruptcy Rules 6004 and 6006, this Bidding Procedures Order shall be effective and enforceable immediately upon its entry.

14.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

15.     To the extent this Order is inconsistent with the Motion, or with any prior order or pleading with respect to the Motion in these cases, the terms of this Order shall govern.

16.     This Court shall retain jurisdiction over any matters relating to or arising from the implementation of this Bidding Procedures Order, including, but not limited to the right to amend this Bidding Procedures Order.

###

Submitted by:

Michael L. Schuster, Esq.
Genovese Joblove & Battista, P.A.
Counsel to Chapter 11 Trustee
100 Southeast Second Street, Suite 4400
Miami, FL 33131
Telephone:   (305) 349-2300
Facsimile:    (305) 349-2310
mschuster@gjb-law.com

Copy to: Michael L. Schuster, Esq.
(Attorney Schuster is directed to serve a conformed copy of this Order on all parties in interest)